**Jetty Lee HARVEY, Appellant (Defendant),**

v.

**The STATE of Wyoming, Appellee (Plaintiff).**

**No. 90–113.**

Supreme Court of Wyoming.

June 11, 1992.

Rehearing Denied July 8, 1992.

Stuart S. Healy (argued), of Healy & Kinnaird, Sheridan, for appellant.

Joseph B. Meyer, Atty. Gen., Sylvia Hackl, Deputy Atty. Gen., Karen A. Byrne, Sr. Asst. Atty. Gen., and Hugh Kenny (argued), Sr. Asst. Atty. Gen., for appellee.

Before URBIGKIT, C.J., and THOMAS, CARDINE, MACY and GOLDEN, JJ.

CARDINE, Justice.

Jetty Lee Harvey challenges his conviction for conspiracy to commit kidnapping.

His prior convictions for kidnapping, which was the objective of the conspiracy, and sexual assault were reversed due to a speedy trial violation. *Harvey v. State*, 774 P.2d 87 (Wyo.1989) (*Harvey I*). The issues Harvey presents in this appeal concern double jeopardy, speedy trial, and pretrial publicity questions, plus an issue concerning the use of Harvey's allocution statement at the sentencing after his first trial.

We affirm.

Harvey presents the following issues:

1. —Does the double jeopardy clause of the Fifth Amendment to the United States Constitution prohibit the State from prosecuting Appellant for conspiracy to commit kidnapping by relying upon evidence of his conduct which constitutes the substantive offense and served as the basis for the prior conviction of Appellant for kidnapping?

2. —Has the Appellant's right to a speedy trial been denied by reason of his second prosecution?

3. —Has the Appellant been deprived of his rights to a public trial by an impartial jury as guaranteed by the Sixth Amendment to the United States Constitution by having to defend himself against conspiracy charges to a jury of persons who were all aware of his prior conviction on the underlying substantive offenses from inflammatory pretrial publicity?

4. —Did the trial court commit reversible error by allowing statements made by the Appellant at the allocution portion of his sentencing hearing following his initial conviction to be used against him in the second prosecution in violation of Appellant's constitutional rights to silence and due process?

### FACTUAL BACKGROUND

During the evening of January 5, 1986, Harvey was the passenger in the front seat of an extended-cab pickup truck driven by Everett Phillips in Rock Springs. *See Phillips v. State*, 835 P.2d 1062 (Wyo.1992) (*Phillips II*). David Swazo sat in the back seat of the truck. The truck passed a woman walking along Elk Street. Phillips said he wanted to grab the woman. Harvey considered this a dare. Phillips turned the truck around, and Harvey asked the woman if she wanted a ride. The woman attempted to ignore him but, after the truck stopped, Harvey exited the truck and stood in front of her. Harvey told her she was going to have a ride and grabbed her as she tried to run past him. Harvey picked her up, and she felt herself being pulled into the truck. Inside the truck she was pulled into the back seat. The truck left the scene of the abduction.

Swazo, with the help of Harvey and Phillips, removed her clothes. Swazo kissed her and licked her breasts and vagina. Swazo put his fingers into her vagina and attempted to penetrate her vagina with his penis. Harvey and Phillips laughed, jeered and made lewd comments as Swazo assaulted her. The truck stopped, Phillips turned around in his seat, and he began to remove his pants. At that time, Harvey said "Oh shit. It's the cops."

The police were alerted to the abduction and assault by a pizza delivery man, Ron Lacey, who was sitting in his car counting tip money when he saw the abduction. Lacey followed the truck as it left the scene of the abduction, drove onto Interstate 80, exited the interstate and entered a trailer court. From there, Lacey went to a telephone and alerted law enforcement authorities using 911.

On January 9, 1986, Harvey was charged with kidnapping and sexual assault in the first degree or aiding and abetting those crimes. *Harvey I*, 774 P.2d at 90. A trial on those charges began on July 21, 1987, and Harvey was found guilty on those charges following a three-day trial. We reversed the conviction because of a speedy trial violation and directed the trial court to dismiss the indictment. 774 P.2d at 98. Our decision was issued on May 5, 1989. *Id.* at 87.

On July 7, 1989, a complaint charging Harvey with conspiracy to commit kidnapping and conspiracy to commit sexual assault was filed. On July 25, 1989, Harvey filed a petition for a writ of prohibition

with this court. We denied the petition on September 18, 1989. *State ex rel. Harvey v. County Court of Sweetwater County*, 779 P.2d 291 (Wyo.1989). On September 27, 1989, the State dropped the conspiracy to commit kidnapping charge, apparently pursuant to plea bargain negotiations. The State refiled conspiracy to commit kidnapping charges again on November 7, 1989. An information charging Harvey with conspiracy to commit sexual assault was filed in district court on November 3, 1989. An information charging him with conspiracy to commit kidnapping was filed on November 21, 1989. On December 18, 1989, the district court issued an order certifying questions to the Wyoming Supreme Court. These questions centered on double jeopardy, speedy trial, and vindictive prosecution issues. We remanded the matter to district court with the questions unanswered on January 2, 1990.

Harvey moved for dismissal of the charges or a change of venue due to pretrial publicity on November 14, 1989. The court reserved the question until trial in an order filed November 29, 1989. On December 27, 1989, the court issued a pretrial order stating that it would attempt to seat a jury in Sweetwater County before considering moving the venue. Jury selection began on January 8, 1990, and concluded on January 11, 1990. Opening statements were given, and testimony began on January 12, 1990. On January 17, 1990 the jury found Harvey guilty on the conspiracy to commit kidnapping charge and not guilty on the conspiracy to commit sexual assault charge. On March 15, 1990, Harvey received a sentence of 12 to 15 years in the state penitentiary on the charge for which he was convicted.

### DISCUSSION

#### 1. Double Jeopardy

 Harvey's double jeopardy claim mirrors that of the appellant in the companion case of *Phillips II*. In that case, we noted that in *Grady v. Corbin*, 495 U.S. 508, 110 S.Ct. 2084, 109 L.Ed.2d 548 (1990), the United States Supreme Court held that:

[T]he Double Jeopardy Clause bars a subsequent prosecution if, to establish an essential element of an offense charged in that prosecution, the government will prove conduct that constitutes an offense for which the defendant has already been prosecuted.

110 S.Ct. at 2087. *Phillips II*, 835 P.2d at 1067. However, a difference exists between the conduct needed to prove an offense and the evidence introduced to prove the conduct. *Grady*, 110 S.Ct. at 2093; *Phillips II*, 835 P.2d at 1067. Thus, in the later case of *United States v. Felix*, —— U.S. ——, 112 S.Ct. 1377, 118 L.Ed.2d 25 (1992), which involved a second trial on conspiracy charges, the United States Supreme Court, referring to the above quotation from *Grady*, recognized and then resolved the uncertainty and confusion created by *Grady* when it stated:

Taken out of context, and read literally, this language supports the defense of double jeopardy. But we decline to read the language so expansively, because of the context in which *Grady* arose and because of difficulties which have already arisen in its interpretation.

*Felix*, 112 S.Ct. at 1383–84. Then, quoting with approval from *United States v. Bayer*, 331 U.S. 532, 67 S.Ct. 1394, 91 L.Ed. 1654 (1947), the Court stated:

In language applicable here, we pointedly stated that "the same overt acts charged in a conspiracy count may also be charged and proved as substantive offenses, for the agreement to do the act is distinct from the act itself." [331 U.S. at 542, 67 S.Ct. at 1399]; *see also Pinkerton v. United States*, 328 U.S. 640, 643, 66 S.Ct. 1180, 1182, 90 L.Ed. 1489 (1946) ("[T]he commission of the substantive offense and a conspiracy to commit it are separate and distinct offenses ... [a]nd the plea of double jeopardy is no defense to a conviction for both offenses").

*Felix*, 112 S.Ct. at 1384. Conspiracy and the completed substantive offense are separate offenses. *Iannelli v. United States*, 420 U.S. 770, 777, 95 S.Ct. 1284, 1289, 43 L.Ed.2d 616 (1975). The proof of different

conduct is necessary to convict a person of each offense.

A conspiracy is an agreement between two or more persons to do an unlawful act. The crime of conspiracy is complete when an agreement has been made and an overt act or acts are performed to further the unlawful design. The overt acts need not be criminal in themselves.

*Phillips II*, 835 P.2d at 1067 (citations omitted). *See also* W.S. 6–1–303.

The conduct constituting the substantive crimes of first degree sexual assault and kidnapping is defined as follows:

(a) Any actor who inflicts sexual intrusion on a victim commits a sexual assault in the first degree if:

(i) The actor causes submission of the victim through the actual application, reasonably calculated to cause submission of the victim, of physical force or forcible confinement.

W.S. 6–2–302; and

(a) A person is guilty of kidnapping if he unlawfully removes another from his place of residence or business or from the vicinity where he was at the time of the removal * * *.

W.S. 6–2–201.

As in *Phillips II*, the evidence from Harvey's kidnapping and sexual assault trial and his conspiracy trial overlapped. The overlapping evidence included testimony from the victim recounting the time she first encountered Harvey until her rescue. Notwithstanding evidence detailing the abduction and sexual assault, the evidence of the overt acts preceding this entails conduct that does not constitute the crimes of kidnapping or rape. Phillips telling Harvey to grab the woman and Harvey undertaking (agreeing) to do so, turning the truck around on the street, stopping the truck, telling the victim she was going to have a ride, approaching the woman, and stopping her are not acts that constitute elements of the crimes of first degree sexual assault or kidnapping. However, they are conduct that satisfies the elements of an agreement beforehand and an overt act necessary to prove a conspiracy. Prosecuting Harvey on conspiracy charges after his conviction

for the substantive crimes does not violate his right to be protected against double jeopardy. *Phillips II*, 835 P.2d at 1068; *see also United States v. Felix, supra*, 112 S.Ct. 1377 (holding that "long antedating any of these cases [*Grady v. Corbin*, 495 U.S. 508, 110 S.Ct. 2084, 109 L.Ed.2d 548 (1990); *Blockburger v. United States*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932); *Harris v. Oklahoma*, 433 U.S. 682, 97 S.Ct. 2912, 53 L.Ed.2d 1054 (1977)], and not questioned in any of them, is the rule that a substantive crime, and a conspiracy to commit that crime, are not the 'same offense' for double jeopardy purposes," and that "a mere overlap of proof between two prosecutions does not establish a double jeopardy violation").

### 2. Speedy Trial

■ Harvey bases his argument of a speedy trial violation on the span between the time of the incident and the time he was brought to trial. *Harvey I*, 774 P.2d 87, gave us the opportunity to delineate and discuss the right to a speedy trial as guaranteed by the Sixth Amendment of the United States Constitution and Art. 1, § 10 of the Wyoming Constitution. In *Harvey I*, we stated that "the speedy trial clock starts to run upon arrest or when the complaint is filed." 774 P.2d at 94. *See also United States v. Marion*, 404 U.S. 307, 314–15, 92 S.Ct. 455, 460, 30 L.Ed.2d 468 (1971); and *United States v. MacDonald*, 456 U.S. 1, 6–7, 102 S.Ct. 1497, 1501, 71 L.Ed.2d 696 (1982). Thus, we do not examine this issue by calculating the passage of time from January 5, 1986, the date of incident, to January 8, 1990, the date of the trial. Instead, we look at the period of time from the filing of the first complaint, July 7, 1989, until the date of the trial, January 8, 1990.

In *Phillips II*, we summarized our speedy trial analysis as follows:

Our speedy trial analysis requires we balance four factors. This test requires us to look at: (1) the length of the delay; (2) the reason for the delay; (3) the defendant's assertion of her speedy trial right; and (4) the prejudice to the defen-

dant. [*Phillips v. State*] *Phillips I*, 774 P.2d [118] at 121 [Wyo.1989], citing to *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182 [33 L.Ed.2d 101] (1972). However, when the length of the delay is neither "presumptively prejudicial" nor significantly long, no further analysis is warranted. *Osborne v. State*, 806 P.2d 272, 277 (Wyo.1991); *Phillips I*, 774 P.2d at 121.

*Phillips II*, 835 P.2d at 1068. As explained below, the time span in this case between the date of the filing of the complaint and the date of the start of the trial is neither "presumptively prejudicial" nor significantly long. Thus, after calculating the time span, we need not analyze the speedy trial issue further.

Between the time the complaint was first filed to the time of the trial spans 185 days. The information on the conspiracy to commit sexual assault charge was filed on November 3, 1989. The information on the conspiracy to commit kidnapping charge was filed on November 21, 1989. Both sides indicate in their briefs that the interval of time from September 27, 1989, when the conspiracy to commit kidnapping charge was dropped, to November 7, 1989, when charges were refiled, was occupied by plea bargain negotiations. Harvey does not argue that this time span caused him prejudice. The time from the filing of the first information for conspiracy to commit sexual assault to the time of trial spans 66 days.

■ Two delays attributable to Harvey are subtracted from this computation. District Court Rule 204(c) and (d); *Phillips II*, 835 P.2d at 1068. Harvey filed a petition for a writ of prohibition with this court on July 25, 1989, which we denied on September 18, 1989. *State ex rel. Harvey*, 779 P.2d 291. This is a span of 55 days. On December 18, 1989, an order certifying questions to this court on Harvey's motion was entered. We remanded the case to district court with the questions unanswered on January 2, 1990. This is a span of 15 days. The time from the filing of the complaint to the date of trial, with time deducted for delays attributable to Harvey,

is only 115 days. The time from filing of the first information to the date of trial with time deducted for delays attributable to the defendant is only 51 days. Thus, we conclude that Harvey's right to a speedy trial for the conspiracy charges was not violated.

*3. Pretrial Publicity and Change of Venue*

■ After Harvey moved to dismiss the charges or for change of venue due to pretrial publicity, the court reserved the question until trial in an order filed November 29, 1989. On December 27, 1989, the court issued a pretrial order stating:

The Court also indicated that if a jury could not be obtained in Sweetwater County during the week of January 8, [1990] the Court would be inclined to move the case to either Uinta or Lincoln counties for trial during the week of January 15, 1990.

Jury selection began on January 8, 1990, and concluded on January 11, 1990. Voir dire occupies over 900 pages of transcript in the record. Some 74 persons were examined for the jury in this case. Each juror was examined individually concerning his or her knowledge about the earlier trial and subsequent reversal. Of the 74 persons examined, only ten persons stated that they had no knowledge of the previous convictions. However, 43 persons stated they had formed no opinion as to Harvey's guilt or innocence. After seating a jury, Harvey renewed his motion. The court found that the jury as seated would be fair and impartial and denied the motion.

We have summarized our procedure for determining whether the trial court correctly ruled on a motion for change of venue due to pretrial publicity as follows:

It is the burden of the defendant to show prejudice so great that a fair trial cannot be obtained, *Collins v. State*, [589 P.2d 1283 (Wyo.1979)], and the defendant must show actual prejudice in the minds of jurors. *Wilcox v. State*, Wyo., 670 P.2d 1116, 1119 (1983). Because of this, the motion for a change of venue cannot be logically passed on until the

extent of prejudice, if any, is determined upon voir dire examination. *Moss v. State*, [492 P.2d 1329, 1331 (Wyo.1972) ]. " * * * The ultimate test of the propriety of a change of venue is what is revealed in voir dire of the jury panel. * * * " *Shaffer v. State*, Wyo., 640 P.2d 88, 103, 31 A.L.R.4th 166 (1982). The judge's ruling on venue is subject to review only for an abuse of discretion. *Murray v. State*, Wyo., 671 P.2d 320, 326 (1983); *Jackson v. State*, Wyo., 522 P.2d 1356, *cert. denied* 419 U.S. 1055, 95 S.Ct. 637, 42 L.Ed.2d 652 (1974); *Mares v. State*, Wyo., 500 P.2d 530, 535 (1972).

We have adopted a two-pronged test for determining whether a change of venue should be granted because of pretrial publicity. First, the nature and extent of the publicity must be considered; second, the difficulty or ease in selecting a jury must be considered along with the amount of prejudice which actually appears during voir dire examination. *Murray v. State, supra.* Each of these elements must be considered in order to determine whether the court abused its discretion in denying the change of venue.

*It is to be expected that most of the jury panel will have heard about a sensational case, but there is no requirement that a juror be ignorant of the facts and issues involved in a case. Wilcox v. State, supra.* The totality of the circumstances must indicate the presence of improper prejudice. *Weddle v. State*, Wyo., 621 P.2d 231 (1980). The question focuses on whether a fair jury was ultimately selected. *Shaffer v. State, supra.*

*Murry v. State*, 713 P.2d 202, 208 (Wyo. 1986) (emphasis added).

█ Our application of the first-prong of this test is somewhat handicapped in that evidence in the record of the pretrial publicity is limited mainly to questioning of potential jurors on voir dire about their knowledge of the case. Outside the record from the trial court, reprints of newspaper articles concerning the case were provided by Harvey in an appendix to his brief. Normally we do not consider matters outside the record on appeal. *Collins v. State*, 589 P.2d 1283, 1290 (Wyo.1979). However, we take judicial notice of these and the amount of publicity on the reversal of Harvey's earlier conviction and the filing of the conspiracy charges generated in order to ensure Harvey effective assistance of appellate counsel. *37 Gambling Devices v. State*, 694 P.2d 711, 716 (Wyo.1985); *Stice v. State*, 799 P.2d 1204, 1207 (Wyo. 1990).

This case, from announcement of the reversal of the earlier conviction to coverage culminating in the commencement of trial proceedings, received more publicity than most criminal cases receive. The newspaper accounts of the events were fair and balanced. Some letters to the editors and editorial columns indicate that these events sparked certain emotions in people. We do note the material submitted in the appendix to Harvey's brief is not one-sided. Some material considers the rights involved in our decision in *Harvey I* and makes for a lively and informed debate on these issues. The amount and nature of the publicity requires us to examine the effect it had on the jury.

It is apparent that Harvey received a fair and impartial jury through a long, involved and careful jury selection. Well over half of the persons called for jury duty stated during voir dire that they had formed no opinion as to Harvey's guilt or innocence despite whatever they knew about the case. *See Murry*, 713 P.2d 202. Out of this group, a jury was selected that exhibited no prejudice apparent in the record. The fact that this jury acquitted Harvey on one of the conspiracy counts is further indication that the members of the jury carefully considered the evidence without prejudice. We find no error in the court's denial of Harvey's motion for a change of venue or outright dismissal of the charges.

## 4. Use of Allocution Testimony

█ After conviction in the first trial, at Harvey's sentencing for the kidnapping and sexual assault, Harvey made an allocution statement to the court. At his subse-

quent trial on the conspiracy charges, the State read portions of his allocution statement into evidence as follows:

MR. FLYNN: Ready, your Honor?

"MR. KINNAIRD: At this time, your Honor, I would like for Mr. Harvey to make a statement that he would like to make [to the Court]."

DETECTIVE MAXWELL: "MR. HARVEY: I meant this woman no harm. In fact, I even stopped her from being harmed at the end. I tried resisting long before she was even abducted. Everett was just insistent from two blocks past her to two blocks to her, telling me to grab her. Grab her. And I was saying, 'No. I don't want this.' And even when I pulled up beside her and I rolled down my window, she walked by. I just asked her if she wanted a ride because it was cold. She never looked at me. She never answered. She just kept her head down, her hands in her coat pocket and she walked by. And I turned to Everett and I said, 'See, she doesn't even want a ride.' And he says, 'No. All you got to do is grab her.' He throws it into reverse and backs up past the woman, slapping me, 'Just grab her. Just grab her.'"

THE COURT: You read that incorrectly Officer.

THE WITNESS: I'm sorry. "'Just grab her. Grab her.' And that's when I finally broke down on it there. I got out and stepped out in front of her. She walked up to me, lifted her head, looked at me and I said, 'Hey, look. Just get in and we'll give you a ride home.' And she turned and walked around me. And that's when I heard Everett say, 'Grab her, chicken-shit.' And that was the final straw of the dare.

"I turned and grabbed her by the coat, the shoulder, pulled her off her feet toward the pickup. Picked her up and put her in the vehicle. She was laying between the seats with her hands up like this. She was saying, 'Don't hurt me.' I said, 'No one is going to hurt you.' She relaxed. * * * I grabbed her legs by the boots, and I said, 'Don't worry. No one is going to hurt you.'

"And then Everett Phillips—I don't know where we were going. He pulls into this trailer park and starts hollering, 'I want some. I want some.' I says, 'No, Everett. Let's take the woman home.' And he goes, 'Well, the bitch can suck it.' And I grabbed his arm then and I said, 'No, Everett. We're taking her home. Let's go.' And that is when I saw a cop car go by through the window. And I said, 'Now there is a cop. Let's just take her home.'

"And when we stopped, the cops, I didn't even know it was cops. I could see lights in the mirror. Everett got out and went back to them. He was gone for, anyway, two minutes and there was no struggle in the back. There was no one hollering, screaming. I just looked in the mirror. And then as I'm looking in the mirror back a couple minutes or so, this woman [the victim], she got between the seats and started headed for the driver's door. And I just stepped out of the truck. And the police officer told me to stop and put my hands on the camper. That's just what I done until after the fight with David Swazo. They cuffed us and took us to jail. But, at the time of all of this, there was a real—there was a big factor, too of very drunk."

MR. FLYNN: Thank you, Officer, that finishes the reading.

Harvey claims that the use of his allocution statements violated his right not to incriminate himself under the Fifth Amendment of the United States Constitution and Art. 1, § 11 of the Wyoming Constitution.

The origin of a defendant's right to allocution—to address the court before having sentence pronounced—lies in English common law. Under early English criminal practice, an accused was not allowed counsel nor was he a competent witness for himself. Allocution provided a convicted defendant the only opportunity to speak for himself, and its omission would generally have required reversal. Annotation, *Necessity and Sufficiency of Question to Defendant as to Whether He Has Anything to Say Why Sentence Should Not Be Pro-*

*nounced Against Him,* 96 A.L.R.2d 1292, 1295 (1964). In the early days of Wyoming jurisprudence, this court did not consider it reversible error if the trial court failed to properly allow the defendant to allocute. *Kinsler v. Territory of Wyoming,* 1 Wyo. 112 (1873) (Convicted murderer resentenced using procedures in accordance with statutory sentencing provisions). The omission of the court to address the defendant did not require a new trial, but it did require setting aside the judgment in order to allow compliance with the requirement. *Keffer v. State,* 12 Wyo. 49, 73 P. 556, 560 (1903).

Under current practice of criminal procedure, a defendant's right to address the court at his sentencing is embodied in W.R.Cr.P. 33, which states in part:

> (a) *Sentence.*
>
> (1) Imposition of Sentence.—Sentence shall be imposed without unreasonable delay. Pending sentence the court may commit defendant, continue or alter the bail. Before imposing sentence the court shall afford counsel an opportunity to speak and shall address the defendant personally and ask him if he wishes to make a statement in his own behalf and to present any information in mitigation of the punishment.

W.R.Cr.P. 33(a)(1). We have recognized the right to allocution as "constitutionally protected." *Christy v. State,* 731 P.2d 1204, 1207 (Wyo.1987).

Harvey argues that use at a subsequent trial of his allocution statement impermissibly compromises his right of allocution, his right against self-incrimination, and right to due process. He relies upon *Simmons v. United States,* 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968), to advance this contention. In *Simmons,* one of the petitioners sought to have evidence suppressed due to an illegal search and seizure in violation of the Fourth Amendment of the United States Constitution. In order to have standing to contest the admission of the evidence, the petitioner had to claim ownership of the evidence. 390 U.S. at 389, 88 S.Ct. at 974. The statements of ownership were subsequently used to in-

criminate him at trial. Thus, the Court noted that allowing use in trial of the petitioner's claim of ownership at a suppression hearing would require the petitioner to choose between the exercise of two constitutional rights. The Court reversed the petitioner's conviction because it found "intolerable that one constitutional right should have to be surrendered in order to assert another." 390 U.S. at 394, 88 S.Ct. at 976. However, exercising a right to allocution does not require surrendering one right to preserve another. The convicted party only needs to decide whether the right to remain silent will be asserted or waived.

■ The right of allocution is similar to the right to testify in one's own behalf. The United States Supreme Court recognizes the right to testify in one's own behalf as a constitutional right embodied in the Sixth Amendment of the United States Constitution right to call witnesses in one's own behalf and the Fourteenth Amendment Right of due process. *Rock v. Arkansas,* 483 U.S. 44, 51–52, 107 S.Ct. 2704, 2708–09, 97 L.Ed.2d 37 (1987). These rights apply as well to actions in state courts. 483 U.S. at 52, 107 S.Ct. at 2708. We recognize this right in our own constitution, Art. 1, § 10, Wyo. Const., and we recognize that an accused can waive the right, take the stand, and testify as a witness in his own behalf. Only incriminating statements obtained by a "genuine compulsion of testimony" spark concerns about violation of the privilege against self-incrimination. *United States v. Washington,* 431 U.S. 181, 186–87, 97 S.Ct. 1814, 1818, 52 L.Ed.2d 238 (1977); *Powers v. United States,* 223 U.S. 303, 315, 32 S.Ct. 281, 284, 56 L.Ed. 448 (1912). Testimony given voluntarily may be used against a defendant without violating his rights. 431 U.S. at 186–87, 97 S.Ct. at 1818.

■ A defendant's choice to exercise his right to allocution is entirely voluntary; he can speak to the court, but he is not required to do so. We do not prescribe limits on what the defendant can or cannot say during allocution. A defendant's statements may be admissible against him in

further proceedings, provided they are voluntary. However, if the trial court were to require a defendant to confess to criminal activities in his allocution in return for a more lenient sentence, those statements would amount to "genuine compulsion of testimony" in violation of the right against self-incrimination. *Washington*, 431 U.S. at 187, 97 S.Ct. at 1818; *United States v. Rodriguez*, 498 F.2d 302, 312 (5th Cir.1974).

We examine the transcript at Harvey's sentencing to determine if his statement was the result of compulsion. Before Harvey spoke to the court, the following took place:

COURT: Court is in session; you may be seated. These are proceedings in Criminal Docket No. 86–11, the State of Wyoming versus Jetty Lee Harvey. Will Mr. Harvey and his counsel please stand at the lectern. Let the record show the presence of Mr. Harvey with his attorney Mr. Virgil Kinnaird.

Mr. Harvey, earlier you were arraigned and tried and convicted of the crime of Kidnapping and First Degree Sexual Assault. And you've requested a pre-sentence investigation, which has been and I've read it.

Are you under the influence of alcohol or drugs or have any mental defect which could affect your ability to understand these proceedings?

MR. HARVEY: No, sir.

COURT: Do you or your attorney have anything to say in your behalf or wish to present information in mitigation of punishment or know of any reason why I shouldn't sentence you now?

MR. KINNAIRD: Yes, Your Honor. We'd like to present some evidence on his behalf. We do not have any reason why sentence should not be imposed at this time.

COURT: All right. Who do you want to have speak?

MR. KINNAIRD: Well, Mr. Harvey himself would like to make a statement to the Court and then after Mr. Harvey has completed his statement, I have a young lady by the name of Miss Cory Wagonsen (Phonetic spelling) from Sheridan, Wyoming, actually from Big Horn, Wyoming, Sheridan County, who would like to make a statement to the Court. And I have a letter from an individual familiar with Mr. Harvey, and I brought the letter down pursuant to your earlier indications that you would accept a letter on his behalf that I would read into the record, sir.

COURT: All right. Will the young lady stand.

MR. KINNAIRD: This is Cory Wagonsen, Your Honor.

COURT: All right. Raise your right hand, both of you. Do you solemnly swear that the testimony you're about to give is the truth, the whole truth, and nothing but the truth, so help you God?

MS. WAGONSEN: I do.

MR. HARVEY: I do.

COURT: You may proceed, Mr. Kinnaird.

MR. KINNAIRD: At this time, Your Honor, I'd like for Mr. Harvey to make a statement that he would like to make to the Court.

Harvey then made his allocution statement. Following receipt of other evidence, the court addressed Harvey as follows:

COURT: I have considered the possibility of probation and I've listened to Mr. Kinnaird, but feel as in the case of Mr. Phillips that the prior record, the nature of the crime, and other factors compel me to believe that probation is not warranted and should be denied.

The court proceeded to pronounce sentence. There was nothing stated by the court that would even suggest that allocution was required, and there was no evidence nor inference that Harvey was forced to relate the details of the abduction and assault at his sentencing. Harvey made these statements voluntarily.

This issue comes to us as one of first impression. We have considered whether Harvey's statements might be analogous and subject to the fruit of the poisonous tree doctrine, *Wong Sun v. United States*, 371 U.S. 471, 484, 83 S.Ct. 407, 416, 9 L.Ed.2d 441 (1963), because they were obtained in a case later dismissed for a

speedy trial violation. 774 P.2d at 98. Had the trial court granted Harvey's motion to dismiss for lack of a speedy trial, no occasion would have existed for Harvey to allocute. But the same may be said for any defendant who waives his right to remain silent, testifies, and the case is later reversed on appeal. In *Harrison v. United States*, 392 U.S. 219, 222, 88 S.Ct. 2008, 2010, 20 L.Ed.2d 1047 (1968), defendant testified to refute a statement previously made. The conviction was reversed on appeal. The defendant's testimony was received in a subsequent trial which resulted in conviction. On appeal, the Court held the testimony inadmissible because it was necessary to refute a prior statement and, therefore, fruit of the poisonous tree. Harvey's allocution in this case was not prompted by a desire to refute a prior statement, suppress illegally obtained evidence, or anything of a similar nature. *Harrison* is of no help. Simply stated, he waived his right to remain silent and made a voluntary statement which is admissible, the same as if he had testified at trial for the sole purpose of giving testimony favorable to himself.

Affirmed.

URBIGKIT, C.J., filed a dissenting opinion.

GOLDEN, J., filed a dissenting opinion in which URBIGKIT, C.J., joined.

URBIGKIT, Chief Justice, dissenting.

I join in the dissent with Justice Golden on the preclusive mistake in introduction of allocution evidence, and further dissent from the conviction in this case and the singular denial of constitutional rights and procedural justice for this appellant in the face of the high emotion exhibited in the community and the distasteful criminal offenses charged.[1]

This total abject failure in the justice delivery system precludes any reasoned constitutional justification: double jeopardy disavowal, twice-violated speedy trial, and the denied right to a fair and impartial jury within the atmosphere of extreme community reaction. Last, but certainly not least, was prosecutorial allocution misuse of defendant's prior statement which, although a fundamental principal of Wyoming criminal law, was relegated to be a trap for the defendant when exercised. Any right to appeal as a Wyoming statutory—and in my opinion, constitutional—right is mortgaged by a procedural booby

1. The principal participant in these events, David Swazo, entered a guilty plea after fourteen months of incarceration, at which time he denied the events of the occurrence charged in the crimes of kidnapping and first-degree sexual assault. He received a sentence of fifteen to twenty-five years incarceration. His petition for post-conviction relief to vacate the judgment and sentence and grant a new trial based on the trial court's failure to comply with W.R.Cr.P. 15 (now W.R.Cr.P. 11) when the charges were orally denied at the plea change hearing and based on ineffectiveness of counsel was denied by the trial court. Any hearing by this court on his petition for post-conviction relief was also denied on a three-to-two vote. *Swazo v. State*, 800 P.2d 1152 (Wyo.1990), Urbigkit, C.J., dissenting.

Everett W. Phillips, after the first guilty verdict of kidnapping and first-degree sexual assault with a discrepancy involved of whether he was convicted as an accessory or as a principal, was acquitted as a matter of law on the speedy trial constitutional violation by decision in *Phillips v. State*, 774 P.2d 118 (Wyo.1989) (*Phillips I*). He was re-charged on July 8, 1989 with conspiracy to commit kidnapping and conspiracy to commit first-degree rape. A change of venue was granted from Sweetwater County, Wyoming to Uinta County, Wyoming (Evanston, Wyoming) after which he was convicted of the two conspiracy offenses. He was given a sentence of twenty to thirty years with credit for time served on the original charges before the speedy trial reversal of conviction.

Jetty Lee Harvey, this appellant, was similarly found guilty of alternately either aiding and abetting or as the rape and kidnapping principal in first trial with the acquittal to follow by this court's reversal for the constitutional speedy trial violation. *Harvey v. State*, 774 P.2d 87 (Wyo.1989) (*Harvey I*). In the present proceeding, following the 1989 re-charge on conspiracy to kidnap and conspiracy to commit first-degree sexual assault, he was acquitted on the sexual assault conspiracy charge and convicted on conspiracy to commit the crime of kidnapping arising from the late night pick up of the victim from a Rock Springs, Wyoming street. He was sentenced to a term of twelve to fifteen years with credit for the time served on the first convictions before appellate court reversal. Consequently, he is acquitted of accessory, conspiracy or acting as a principal in any sexual assault charge and stands convicted of the inchoate conspiracy to kidnap.

trap. Consequently, the judicial system's responsibility for constitutional protection is either ignored or denied.

I will address the four principal issues in reverse order:

1. Unconstitutional reuse of any statements provided in allocution following reversed adverse jury verdict in the first trial as evidence of guilt in the second trial.

2. Non-production of a fair and impartial jury.

3. Denied speedy trial.

4. Prosecution in contravention of the constitutional prohibition against double jeopardy.

## I. ALLOCUTION—AN INTRODUCTION

As a rule, any classification for the sake of characterization without factual or logical definition adds little to the understanding of basic constitutional principles. I have always considered allocution to be constitutional within ingrained due process concepts under Wyoming law when following pervasive authority generally available in comment in *Christy v. State,* 731 P.2d 1204 (Wyo.1987) and find now no reason to change from that view. However, it hardly matters at all whether the characterization is constitutional or "just" a statutorily created foundational principle of Wyoming law, since allocution was instilled by statute in this state's judicial practice thirty years before statehood, 1869 Wyo. Terr.Gen.Laws ch. 74 §§ 158–60, and has continued for 123 years in essentially the same form, although transformed by action of this court from the superseded statute to a contemporary rule of criminal procedure.

In 1869, our early Wyoming territorial ancestors provided as a criminal process requirement:

Sec. 158. Before the sentence is pronounced, on the conviction of felony, the defendant shall be informed by the court of the verdict of the jury, and asked whether he has anything to say why judgment should not be pronounced against him.

Sec. 159. If the defendant has nothing to say, or after he shall have made a statement, the court shall proceed to pronounce judgment as is provided by law.

Sec. 160. Whenever any person shall be convicted, by confession or otherwise, of any offense punishable either in whole or in part by fine, such person may move the court to hear testimony in mitigation of the sentence; and it shall be the duty of the court to hear such testimony at such time as may be suitable and proper, at the term of court at which the motion is made, or said court may continue the case to a future term, on the same terms as the case might have been continued before verdict or confession; and it shall be the duty of the prosecuting attorney to attend to such proceedings on the behalf of the territory, and to offer any testimony necessary to give the court a true understanding of the case.

*Id.*

In March 1992, the Wyoming Supreme Court re-authenticated the right to allocution by continued inclusion in the Wyoming Rules of Criminal Procedure:

(c) Sentence.—

(1) Imposition of Sentence.—* * * Before imposing sentence, the court shall also:

\* \* \* \* \* \*

(B) Afford counsel for the defendant an opportunity to speak on behalf of the defendant; and

(C) Address the defendant personally and determine if the defendant wishes to make a statement and to present any information in mitigation of the sentence.

The attorney for the state shall have an equivalent opportunity to speak to the court. Upon a motion that is jointly filed by the defendant and by the attorney for the state, the court may hear *in camera* such a statement by the defendant, counsel for the defendant, or the attorney for the state.

W.R.Cr.P. 32(c).

Allocution is fundamental, ingrained, defined, and, in my perception of the Wyoming Constitution, required for due process

within our Bill of Rights. Wyo. Const. art. 1, §§ 6, 10 and 11. Cynicism aside, among those who deprecate allocution as a pointless ceremonial institution, *see* Paul W. Barrett, *Allocution*, IX Mo.L.Rev. 115 (1944), the compelling validity of the right of a convicted person subject to discretional sentencing to manifest acceptance of responsibility or factual disagreement directly relates to both the constitutional right of the defendant to defend [2] and the rehabilitative responsibilities of the Wyoming penal system.[3] *Cf.* Note, *Procedural Due Process at Judicial Sentencing for Felony*, 81 Harv.L.Rev. 821, 833 (1968).

Commentators have discussed the historical roots of the allocution tenet:

> Allocution, sometimes called "the allocutus" is of such ancientness that it is difficult, if not impossible, to discover its historical origin. In philology, as in law, allocution is an address, especially a formal, hortatory, authoritative address. "In Roman antiquity" it was "a formal address by a general-in-chief or imperator to his soldiers," and, "In the Roman Catholic Church" it is "a public address by the pope to his clergy or to the church generally."

Paul W. Barrett, *supra*, IX Mo.L.Rev. at 115 (footnotes omitted).

> Tied to the defendant's right to be present at sentencing is the ancient right of allocution. Everyone agrees that allocution is the formal address of the trial judge to the defendant as he stands at the bar for sentencing. In its earliest form, the allocution was an effort to elicit any information that would bar the imposition of sentence. Thus it performed the mission of the more modern motion in arrest of judgment or motion for a new trial. Chitty, however, noted that if the defendant has nothing to urge

in bar, "he frequently addresses the court in mitigation of his conduct, and desires their intercession with the King or casts himself on their mercy."

Although it is perfectly clear that allocution originated as a device to raise legal issues that might present the rendition of judgment, its modern use, undoubtedly influenced by the writings of Chitty, has come to include an opportunity to speak in mitigation of sentence. In *Green v. United States*, [365 U.S. 301, 81 S.Ct. 653, 5 L.Ed.2d 670 (1961)] the Court traced Federal Rule 32(a), as it then read, to the common-law right of allocution. The Court noted that as early as 1689 it was recognized in England that the court's failure to ask the defendant if he had anything to say before sentence was imposed required reversal. The important point is that in *Green* the Court recognized the significant changes that have occurred since 1689—the right to counsel in felony cases, the great decrease in capital offenses, the defendant's right to testify—but held that none of these changes lessened the need for the defendant to present his plea in mitigation.

One interesting insight to be gained from these two principles—the right to be present and the right to make a statement in mitigation of sentence—is the early and continued recognition of an active role for the criminal defendant, not only at the trial on the merits but after the determination of guilt. Indeed, as the outlines of English criminal trial procedure gradually took shape, we detect a steady enlargement of the role of the accused in the proceedings. If today a plea for mercy sounds quaint, and if legal cause is amply protected by post-conviction motions, appeal, and collateral attack, it does not necessarily follow, as

---

**2.** Wyo. Const. art. 1, § 10 states in pertinent part:

> In all criminal prosecutions the accused shall have the right to defend in person and by counsel, to demand the nature and cause of the accusation, to have a copy thereof, to be confronted with the witnesses against him, to have compulsory process served for obtaining witnesses, and to a speedy trial by an

impartial jury of the county or district in which the offense is alleged to have been committed.

**3.** Wyo. Const. art. 1, § 15 states:

> Penal code to be humane.
> The penal code shall be framed on the humane principles of reformation and prevention.

some have suggested, that there is nothing worthy of preservation and development within the concept of allocution.

Indeed, one of the primary strategies to achieve rational sentencing is to maximize the participation of the defendant and his counsel in the process. This requires acceptance of the view that the person convicted of a crime is not merely an object to be acted upon, but is a complex individual whose special needs and, quite possibly, whose special threat to the well-being of others, is not summed up by the word "guilty." The concept of allocution contains within it the seeds necessary to achieve this objective and this view of the convicted.

Fred Cohen, *Sentencing, Probation, and the Rehabilitative Ideal: The View From Mempa v. Rhay*, 47 Tex.L.Rev. 1, 9–11 (1968) (footnotes omitted).

The constitutional component of the right of allocution is discernible from the significant number of decisions which directly address this issue. The United States Supreme Court, through a whole series of cases,[4] has never specifically accepted nor explicitly rejected any conclusion that a constitutional right component is contained within the unquestioned obligation of the trial court to provide opportunity to exercise allocution for the convicted and soon-to-be sentenced individual.[5]

Since Wyoming has provided a continuous 123–year statutory and procedural rule recognition of the right to allocution, any trial time denial later considered on appellate review does provide and does not answer the definable question of process insignificance whether the trial court mistake would be only a violation of its statutory responsibility or for an actual denial of a constitutional protection. In either case, the trial court would be wrong.

The materiality of the distinction for this appeal, if it is to be found, arises not from denial, but when any defendant might utilize the right to then inject a prepackaged hinderance and encumbrance on later rights for appeal with loss of a right against self-incrimination if retrial occurs. That is what happened here. Appended in analysis and theory is the explicit function found in modern sentencing which expects judicial consideration of the defendant's acceptance of responsibility. This is true with both sentencing guidelines or where, as here, the normal discretion regarding indeterminate sentencing exists. In either regard, the individual's fundamental right to seek benefit in sentencing via utilization of allocution at the time of the first conviction becomes, under the perspective of this majority, a waiver of constitutional rights if a retrial should be obtained.

This case, third time on appeal and as it involves the procedural and substantive rights of an accused charged with a very serious criminal offense, is indeed a case of first impression broadly more efficacious and pervasive than just this appellant's future confinement as a monument to—if not actual prostitution of—a failed justice delivery system. To apprehend the majority decision, realistically unsupported by persuasive case law and in contravention to the responsive and thoughtful dissent of Justice Golden, it becomes necessary to further define the status and explication of allocution in the Wyoming system of justice for any logical analysis about exercise being authored into a waiver of the totally separate and different constitutional rights in subsequent proceedings.

## A. ALLOCUTION—WHAT IS IT?

The most comprehensive case on allocution defining its character and function in

---

**4.** *McGautha v. California*, 402 U.S. 183, 217, 91 S.Ct. 1454, 1472, 28 L.Ed.2d 711 (1971); *United States v. Behrens*, 375 U.S. 162, 84 S.Ct. 295, 11 L.Ed.2d 224 (1963); *Hill v. United States*, 368 U.S. 424, 82 S.Ct. 468, 7 L.Ed.2d 417 (1962); *Green v. United States*, 365 U.S. 301, 304, 81 S.Ct. 653, 655, 5 L.Ed.2d 670 (1961); *Ball v. United States*, 140 U.S. 118, 11 S.Ct. 761, 35 L.Ed. 377 (1891). *Cf. Mempa v. Rhay*, 389 U.S. 128, 88 S.Ct. 254, 19 L.Ed.2d 336 (1967) (consid-

ering the requirement for a lawyer to be present at the time of sentencing); and *Specht v. Patterson*, 386 U.S. 605, 87 S.Ct. 1209, 18 L.Ed.2d 326 (1967) (requiring the presence of counsel at a commitment proceeding).

**5.** *See, e.g., McGautha*, 402 U.S. 183, 91 S.Ct. 1454.

current review is *Boardman v. Estelle,* 957 F.2d 1523 (9th Cir.1992). Following a child sexual abuse guilty plea in the California state court system, the defendant in *Boardman* requested his right to address the court in allocution to answer in part third-party victim communications made directly to the court. All right of the accused to address the court before sentencing was denied, while victim impact communications were accepted. The California intermediate appellate court rejected appellant's argument in an unpublished decision and the California Supreme Court affirmed without written opinion in apparent acceptance that a due process violation had not occurred as a result of the denial of allocution under California sentencing law.

Following rejection of habeas corpus in the United States District Court, the Court of Appeals found constitutional error and reversed and remanded to the United States District Court to determine if the denial was not harmless and, if not, then to have the defendant returned to the state court for re-sentencing. It is noteworthy that California had no allocution statute or rule. This is significantly different from the Wyoming legal history of statute and rule, now W.R.Cr.P. 32(c).

The federal tribunal, in perceiving a federal constitutional interest involved in the state court denial of allocution, related in introduction:

> "The most persuasive counsel may not be able to speak for a defendant as the defendant might, with halting eloquence, speak for himself."

> *Green v. United States,* 365 U.S. 301, 304, 81 S.Ct. 653, 655, 5 L.Ed.2d 670 (1961) (Frankfurter, J., writing for the plurality).

Gary Boardman asserts he was denied due process of law because the state trial court refused to allow him to speak at his sentencing hearing after he affirmatively requested to do so. We agree that due process requires criminal defendants be permitted to allocute before sentencing if they so request, and we remand for consideration of whether the error in this case was harmless.

*Boardman,* 957 F.2d at 1524.

On the subject of waiver of the right by retention of counsel, the *Boardman* court further recognized:

> California first argues that a defendant who elects to be represented by counsel has no right to speak in his own behalf. The California courts have adopted this view, finding no right of allocution for a represented defendant. "The [defendant] was represented by counsel and it was the function of that counsel, rather than of the defendant himself, to address the court on the defendant's behalf." *People v. Cross,* 213 Cal.App.2d 678, 682, 28 Cal.Rptr. 918 (1963).

> We reject this argument. A defendant who chooses to be represented by counsel does not waive his right to allocution. "That a defendant is entitled to representation of counsel at all stages of the proceedings, including sentencing, does not necessarily mean he cannot speak 'in his own behalf' ... in mitigation of punishment." *Taylor v. United States,* 285 F.2d 703, 705 (9th Cir.1960) (permitting counsel to speak does not satisfy Rule 32(a)'s requirement that the defendant *personally* be offered the opportunity to speak). A defendant's choice to be represented by counsel is not a complete surrender of his right to direct his defense, and does not permit a court forcibly to interpose that counsel between the defendant and the exercise of his personal rights.

> "When the administration of the criminal law ... is hedged about as it is by the Constitutional safeguards for the protection of an accused, to deny him in the exercise of his free choice the right to dispense with some of these safeguards ... is to imprison a man in his privileges and call it the Constitution."

*Adams v. United States ex rel. McCann,* 317 U.S. 269, 279–80, 63 S.Ct. 236, 241–42, 87 L.Ed. 268 (1942), *quoted in Faretta v. California,* 422 U.S. 806, 815, 95

S.Ct. 2525, 2531, 45 L.Ed.2d 562 (1975). The Sixth Amendment "does not provide merely that a defense shall be made for the accused; it grants to the accused *personally* the right to make his defense." *Faretta*, 422 U.S. at 819, 95 S.Ct. at 2533 (emphasis added) (holding that a defendant has a right of self-representation guaranteed by the Sixth Amendment). *Because we find the right to allocute at sentencing to have the same personal quality as the right to make a defense, we reject California's argument that Boardman abandoned his right of allocution when he retained counsel.*

*Boardman*, 957 F.2d at 1527–28 (emphasis added and footnotes omitted).[6]

Equally persuasive is the Rhode Island Supreme Court's application of its own state constitution in recognition of the defendant's constitutional interest in *State v. Brown*, 528 A.2d 1098 (R.I.1987). In citing the Rhode Island constitutional provision on right to trial, that court said:

The right of allocution in this state is a right of constitutional dimension. *See* R.I. Const. art. I, § 10. A defendant in a criminal prosecution has the constitutional right to address the court before the trial justice pronounces sentence. *State v. Nicoletti*, 471 A.2d 613, 618 (R.I.1984); *Leonardo v. State*, 444 A.2d 876, 878 (R.I.1982). Brown, in this case, was not afforded the opportunity to speak before the pronouncement of sentence. The violation of that right requires this court to remand the case for resentencing.

For the above-stated reasons the defendant's conviction is affirmed but the sentence imposed is vacated, and the case is remanded to the Superior Court for resentencing with direction to permit the defendant his constitutional right of allocution.

*Brown*, 528 A.2d at 1105 (footnote omitted). The Rhode Island constitutional provision, R.I. Const. art. I, § 10, stated:

"In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury; to be informed of the nature and cause of the accusation, to be confronted with the witnesses against him, to have compulsory process for obtaining them in his favor, to have the assistance of counsel in his defense, and shall be at liberty to speak for himself; nor shall he be deprived of life, liberty, or property, unless by the judgment of his peers, or the law of the land."

*Brown*, 528 A.2d at 1105 n. 2.

Comparably, the Wyoming Constitution uses the more common language of "right to defend in person and by counsel" in stating:

In all criminal prosecutions the accused shall have the right to defend in person and by counsel, to demand the nature and cause of the accusation, to have a copy thereof, to be confronted with the witnesses against him, to have compulsory process served for obtaining witnesses, and to a speedy trial by an impartial jury of the county or district in which the offense is alleged to have been committed.

Wyo. Const. art. 1, § 10. I see no practical difference between Rhode Island's "to speak for himself" provision and Wyoming's "right to defend in person" language.

I also conclude that since allocution had statutorily existed in specific detail for more than twenty years before the adoption of the Wyoming Constitution, it is really rationally undeniable that allocution was constitutionally embedded in design in the text provided by the Wyoming Constitution's "in person" right to defend provision.

As was perceived in *Boardman*, we are informed by a look at the direct and indirect determinations of the United States Supreme Court that the necessity of furnishing the right to allocution is to be uniformly recognized, although its constituen-

---

**6.** Whether allocution is also required at re-sentencing following revocation of probation, instead of only being the better practice, is unresolved within continued conflict in the federal circuit courts. *Cf. United States v. Coffey*, 871 F.2d 39 (6th Cir.1989) and *United States v. Turner*, 741 F.2d 696 (5th Cir.1984). *See also United States v. Core*, 532 F.2d 40 (7th Cir.1976).

cy as constitutional or not has not as yet been specifically determined. The necessity of allocution was first recognized by the United States Supreme Court in *Green v. United States*, 365 U.S. 301, 304, 81 S.Ct. 653, 655, 5 L.Ed.2d 670 (1961).[7] Surely no one would doubt that "[s]entencing is a critical stage of the criminal process." *Mempa v. Rhay*, 389 U.S. 128, 133–34, 88 S.Ct. 254, 256–57, 19 L.Ed.2d 336 (1967). *See also Boardman*, 957 F.2d at 1525 and *United States v. Lundien*, 769 F.2d 981 (4th Cir.1985), *cert. denied* 474 U.S. 1064, 106 S.Ct. 815, 88 L.Ed.2d 789 (1986). In addressing F.R.Cr.P. 32(a), Justice Frankfurter stated in *Green*, 365 U.S. at 304, 81 S.Ct. at 655:

> The design of Rule 32(a) did not begin with its promulgation; its legal provenance was the common-law right of allocution. As early as 1689, it was recognized that the court's failure to ask the defendant if he had anything to say before sentence was imposed required reversal. See Anonymous, 3 Mod. 265, 266, 87 Eng.Rep. 175 (K.B.). Taken in the context of its history, there can be little doubt that the drafters of Rule 32(a) intended that the defendant be personally afforded the opportunity to speak before imposition of sentence. We are not unmindful of the relevant major changes that have evolved in criminal procedure since the seventeenth century—the sharp decrease in the number of crimes which were punishable by death, the right of the defendant to testify on his own behalf, and the right to counsel. But we see no reason why a procedural rule should be limited to the circumstances under which it arose if reasons for the right it protects remain. None of these modern innovations lessens the need for the defendant, personally, to have the opportunity to present to the court his plea in mitigation. The most persuasive counsel may not be able to speak for a defendant as the defendant might, with halting eloquence, speak for himself. We are buttressed in this conclusion by the fact that the Rule explicitly affords the defendant two rights: "to make a statement in his own behalf," and "to present any information in mitigation of punishment." We therefore reject the Government's contention that merely affording defendant's counsel the opportunity to speak fulfills the dual role of Rule 32(a).

*Green* was followed by *Hill v. United States*, 368 U.S. 424, 82 S.Ct. 468, 7 L.Ed.2d 417 (1962), which is inconsistently but erroneously cited by the majority in this case to establish a non-constitutional confirmation for allocution. In *Hill*, this examination was not involved since the case centered on the appellate concept that the accused had not asked to speak. Left open was the constitutional issue in the case of a denied affirmative request *under federal law concepts:*

> It is to be noted that we are not dealing here with a case where the defendant was affirmatively denied an opportunity to speak during the hearing at which his sentence was imposed. Nor is it suggested that in imposing the sentence the District Judge was either misinformed or uninformed as to any relevant circumstances. Indeed, there is no claim that the defendant would have had anything at all to say if he had been formally invited to speak. Whether § 2255 relief would be available if a violation of Rule 32(a) occurred in the context of other aggravating circumstances is a question we therefore do not consider.

*Id.* at 429, 82 S.Ct. at 472.

The United States Supreme Court noted in footnote: "See *Van Hook v. United*

---

**7.** The Federal Rules of Criminal Procedure were amended in 1966 to explicitly incorporate the allocution requirement:

> The amendment writes into the rule the holding of the Supreme Court that the court before imposing sentence must afford an opportunity to the defendant personally to speak in his own behalf. *See Green v. United States*, 365 U.S. 301, 81 S.Ct. 653, 5 L.Ed.2d 670 (1961); *Hill v. United States*, 368 U.S. 424, 82 S.Ct. 468, 7 L.Ed.2d 417 (1962). The amendment also provides an opportunity for counsel to speak on behalf of the defendant.

F.R.Cr.P. 32, at 108–09 (1991 rev. ed.). Thus, the 1966 federal rule amendment accomplished decisively what the Wyoming legislature had enacted about 100 years earlier in 1869.

*States,* 365 U.S. 609 [81 S.Ct. 823, 5 L.Ed.2d 821 (1961) ], for the relief afforded on direct appeal in a case where the sentencing judge disregarded the mandate of Rule 32(a)." *Hill,* 368 U.S. at 429 n. 6, 82 S.Ct. at 472 n. 6. *Van Hook v. United States,* 365 U.S. 609, 609, 81 S.Ct. 823, 823, 5 L.Ed.2d 821 (1961) stated in part:

> The petition for writ of certiorari is granted. The judgment is reversed and the case remanded for resentencing in compliance with Rule 32 of the Federal Rules of Criminal Procedure. *Green v. United States,* 365 U.S. 301 [81 S.Ct. 653].

The obvious modus vividendi for decision in *Hill* was its litigative pathway by a habeas corpus collateral conviction challenge. The *Hill* court then said: "We decide only that such collateral relief is not available when all that is shown is a failure to comply with the formal requirements of the Rule." *Hill,* 368 U.S. at 429, 82 S.Ct. at 472.

*Hill* was followed by *United States v. Behrens,* 375 U.S. 162, 84 S.Ct. 295, 11 L.Ed.2d 224 (1963), where the court again affirmed the importance of the right of a defendant in a federal court criminal proceeding to speak in allocution before sentencing. That court held that the trial court had committed reversible error in modifying the defendant's sentence in his absence. "This right, ancient in the law, is recognized by Rule 32(a) of the Federal Criminal Rules, which requires the court to 'afford the defendant an opportunity to make a statement in his own behalf and to present any information in mitigation of punishment.'" *Id.* at 165, 84 S.Ct. at 297. Justice Harlan, concurring in the result, recognized "the possible constitutional issues" involved in personal presence and opportunity for allocution. *Id.* at 168 n. 2, 84 S.Ct. at 298 n. 2.

In explicit terms, the court in *McGautha v. California,* 402 U.S. 183, 91 S.Ct. 1454, 28 L.Ed.2d 711 (1971) again recognized that allocution was a right of immemorial origin. I would agree with the author in *Boardman* that *McGautha* realistically stated a view of the justices in decision that there was a long-standing basis for the right of allocution separate and independent of the entitlement created by F.R.Cr.P. 32(a):

> Most recently, the Court explicitly recognized in *McGautha* that it had not yet confirmed the Constitutional basis for the right of allocution: "This Court has not directly determined whether or to what extent the concept of due process of law requires that a criminal defendant wishing to present evidence or argument presumably relevant to the issues involved in sentencing should be permitted to do so." *Id.* [402 U.S.] at 218 n. 22, 91 S.Ct. at 1473 n. 22 (rejecting defendant's claim that he was denied the right of allocution because guilt and penalty were determined in one proceeding, and his statements in asking for leniency in sentencing could be considered in determining guilt). The Court assumed without deciding that the Constitution does require that the trial court permit a defendant to speak at sentencing if he so requests. *Id.* at 218–19, 91 S.Ct. at 1472–73. It is precisely this lingering question that we must decide today.

*Boardman,* 957 F.2d at 1527.

Courts of the federal circuits have similarly and rather explicitly found the constitutional interest in allocution even before *Boardman* was written. In *United States v. Moree,* 928 F.2d 654, 656 (5th Cir.1991) (footnotes omitted), the appellate court recognized: "[W]e have consistently held that a defendant's rights to be present and to allocute at sentencing, which are of constitutional dimension, extend to resentencing proceedings." *United States v. Jackson,* 923 F.2d 1494, 1496 (11th Cir.1991) stated: "A defendant is entitled to be present when his sentence is imposed, Fed.R.Crim.P. 43(a); and this right to be present and speak is constitutionally based, *United States v. Huff,* 512 F.2d 66 (5th Cir.1975)." *See also Ashe v. State of North Carolina,* 586 F.2d 334 (4th Cir.1978), *cert. denied* 441 U.S. 966, 99 S.Ct. 2416, 60 L.Ed.2d 1072 (1979). Converse consideration has been given in other federal court decisions to be defined only within rule application and enforcement. *United States v. Domin-*

guez–Hernandez, 934 F.2d 598 (5th Cir. 1991); United States v. Miller, 849 F.2d 896 (4th Cir.1988); United States v. Leavitt, 478 F.2d 1101 (1st Cir.1973).

Contrary to the designed negativism portrayed in the staid journal review, Paul W. Barrett, supra, IX Mo.L.Rev. 115, state courts have also had an extended course of requiring a right of access by the convicted individual to allocution before sentencing. The right is derived from constitution,[8] enacted rule or statute,[9] or applied common law.[10] The changing scope of case law provides an increasing recognition which is currently found in the updated text provided in Arthur W. Campbell, Law of Sentencing, § 9:5, at 246 (2d ed. 1991) (footnotes omitted), which addressed allocution and stated:

> Jurisdictions split variously concerning the status of allocution. A few tribunals have elevated it to the level of a constitutional right, although others have declined this invitation. A number of states regard it as part of their common law. Many provide for it by statute; others, including the federal system, afford it by court rule.[11]

### B. STATUS OF ALLOCUTION IN WYOMING CASE LAW

Unnecessary confusion seems to have been created by this majority opinion as to early Wyoming Supreme Court evaluation of the efficacy or constitutionality of its even then long-standing allocution requirement. Despite a differing text and opinion comment, no relevant authority is provided in the two cases cited denying to this right some constitutional perspective. First, in Kinsler v. Territory, 1 Wyo. 112 (1873), appellant raised the absence of any record on appeal issue to establish either grant or denial of allocution as his issue in a death penalty conviction. Clearly, even for that time, the opinion writing was a model of brevity, if not clarity. The opinion introduction, discussion and decision are found in one sentence stating: "Judgment of the district court affirmed, and the prisoner resentenced by the supreme court, in accordance with the provisions of the statutes of the territory of Wyoming." Id. at 114.

It is somewhat difficult to determine which statutes are referenced, but apparently the decisional statute is one for a capital case that provides that the appellate court "shall order a suspension of the execution until such writ of error or other process provided by law, shall be heard and determined; upon hearing such writ of error, they shall order the prisoner to be discharged, a new trial to be had, or appoint a certain day for the execution of the sentence as the nature of the case may require." 1869 Wyo.Terr.Gen.Laws ch. 74, § 189.

The second case thirty years later, Keffer v. State, 12 Wyo. 49, 73 P. 556 (1903), is similarly unpretentious and equally non-precedential on this issue. Among many other issues, contention was made about denied allocution in the death penalty conviction. Having first omitted allocution and then noting the omission, the trial court had required the defendant to be recalled and then informed the defendant of the verdict, afforded a right to allocution, and then proceeded with resentencing. This court noted the remedy for omission

---

**8.** Brown v. State, 235 Ga. 644, 220 S.E.2d 922 (1975); Brown, 528 A.2d 1098.

**9.** People v. Vecchio, 819 P.2d 533 (Colo.App. 1991); People v. Emig, 177 Colo. 174, 493 P.2d 368 (1972); Miler v. United States, 255 A.2d 497 (D.C.App.1969); Kent v. State, 287 Md. 389, 412 A.2d 1236 (1980); Com. v. Knighton, 490 Pa. 16, 415 A.2d 9 (1980). Cf. State v. Saari, 152 Vt. 510, 568 A.2d 344 (1989) which held that the right is statutory and not constitutional.

**10.** State v. Lyles, 308 Md. 129, 517 A.2d 761 (1986); Harris v. State, 306 Md. 344, 509 A.2d 120 (1986).

**11.** To provide a comprehensive analysis, it is also apparent that some cases find a constitutional difference in denied request compared to the lack of the court's invitation to speak when related to the constitutional status and accessibility to collateral attack of allocution. Ashe, 586 F.2d 334. See McGautha, 402 U.S. 183, 91 S.Ct. 1454 and Hill, 368 U.S. 424, 82 S.Ct. 468, compared to Green, 365 U.S. 301, 81 S.Ct. 653. See also Boardman, 957 F.2d 1523.

was recall for allocution followed by resentencing. That 1903 remedy predated what is today the general law on the remedy for denied allocution. *See* Arthur W. Campbell, *supra,* § 9:5 at 250, which states:

> The judicial remedy for serious allocution defects provides one point of nationwide uniformity. Where there is a substantial violation of the allocution right, appellate tribunals remand for resentencing under proper procedures. Where remand is not ordered, it is usually because the error is regarded as insubstantial or non-prejudicial.

Consequently, there was no appellate issue because the trial court had already provided the appropriate remedy. *See also United States v. Siciliano,* 953 F.2d 939, 953 (5th Cir.1992); *Miler v. United States,* 255 A.2d 497, 498 (D.C.App.1969); *Wright v. State,* 24 Md.App. 309, 330 A.2d 482, 486 (1975); and *Brown v. State,* 11 Md.App. 27, 272 A.2d 659, 662 (1971).

Whether allocution is constitutional as I believe or otherwise, the basic foundational nature of allocution in Wyoming sentencing under both state and federal constitutional concepts can hardly be in present doubt. The pervasive question then to decide is whether its exercise pollutes subsequent proceedings to authenticate denial of other constitutional rights by applying concepts of waiver and forfeiture. *Engberg v. Meyer,* 820 P.2d 70, 96 (Wyo.1991), Urbigkit, C.J., dissenting in part and concurring in part; *Campbell v. State,* 772 P.2d 543, 544 (Wyo.1989), Urbigkit, J., specially concurring and dissenting; *Cutbirth v. State,* 751 P.2d 1257, 1267 (Wyo.1988), Urbigkit, J., dissenting.

This case ranges far beyond the modern appellate statements personified by some criminal decisions of the United States Supreme Court[12] and a course of recent Wyoming Supreme Court decisions with which I completely disagree and to which I have angrily dissented.[13] Here we have an exercise of a constitutional right to then be claimed to constitute a waiver and forfeiture rather than a neglect or failure of counsel to act as the generally established hitching post which controls case decisions in the usual waiver/forfeiture of constitutional right concepts now in current vogue. *Ylst v. Nunnemaker,* — U.S. —, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991).

## II. WAIVER OF EFFECTIVE RIGHT TO APPEAL AND VIOLATION OF PRIVILEGE AGAINST SELF-INCRIMINATION BY EXERCISED ALLOCUTION

At least as far as comprehensive research has presently revealed, this court is presented a case of total first impression regarding prosecutorial reuse of allocution statements for principal evidence of guilt upon retrial following reversal of an initial conviction. The anomalous nature of the case is highlighted by its status of first, reversal for denied speedy trial and second, being charged with the inchoate associative offense belatedly pulled out of the file cabinet and subsequent conviction by using exactly the same facts except the additive allocution information. With this evidentiary use of allocution statements for subsequent prosecution and conviction, the invidious and insidious caustic of constitutional rights waiver and forfeiture is introduced into Wyoming law to achieve a popular local result, although avoiding consecration to the basics of the Wyoming and federal constitutions.

Factually, what does this appeal present? First, speedy trial was denied to two defendants for approximately eighteen months

---

12. *Coleman v. Thompson,* — U.S. —, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991); *McCleskey v. Zant,* — U.S. —, 111 S.Ct. 1454, 113 L.Ed.2d 517 (1991); *Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977).

13. *Engberg,* 820 P.2d at 96, Urbigkit, C.J., dissenting in part and concurring in part; *Kallas v. State,* 776 P.2d 198, 200 (Wyo.1989), Urbigkit, J., specially concurring in the result and dissenting

in the opinion; *Amin v. State,* 774 P.2d 597, 599 (Wyo.1989), Urbigkit, J., dissenting; *Cutbirth,* 751 P.2d at 1267, Urbigkit, J. dissenting. To be added is *Swazo,* 800 P.2d 1152, Urbigkit, C.J., dissenting. These present appeals of Harvey and Phillips cannot be properly understood unless the connexity of these appeals to the incarceration and guilty plea status of *Swazo* is also reviewed.

in order to apply prosecutorial persuasion on the third alleged participant (Swazo) who could not make bond until he finally pled out on an agreement to testify for the state. Considering that constitutional speedy trial means something within the jurist's oath of office to support, obey and defend the constitutions, this court reversed Harvey's original conviction. However, because Harvey, having been convicted by jury trial, had exercised his right to allocution as a foundational right of rule/statute/constitution prior to sentencing in *Harvey I*, we are now faced with deciding the propriety of prosecutorial reuse of the allocution statement upon retrial for conspiracy.

The first offense having been reversed on appeal, the majesty of the state is employed to change the name of the offense from kidnapping, rape or aiding and abetting rape to pursue re-prosecution on the identical facts under the terminology of conspiracy. However, there is this one significant change. The statements made in first occasion for allocution by the defendant prior to the reversal of this conviction are now read into the jury proceeding as inculpation testimony to constitute principal evidence of conspiratorial guilt. The majority makes an absurd and sophomoric argument in absolution of this abusive invasion of the constitutional right of allocution based on the waiver justification that allocution is voluntary. Of course, all allocution is and has been voluntary for the last 500 years, but a case of reuse in the fashion now presented in this case has apparently never reached appeal in that same period of time.

Another equally absurd but logically consistent approach to accommodate the majority decision would be by case law or rule change to require the trial court to give a *Miranda*-type warning in conjunction with the rule required advice, W.R.Cr.P. 32(c)(1)(C), of the right of allocution. The defendant would then need to be advised that if he elects to say something, it might be used against him during appeal or might become inculpatory evidence (properly defined by the trial court) on retrial or if the individual should be charged sequentially with another offense arising out of the same events, like conspiracy. *Miranda v. State of Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).[14] *See United States v. Edwards*, 669 F.Supp. 168 (S.D.Ohio 1987) regarding the absence of a *Miranda* warning in consideration that there was a violation of the privilege against both self-incrimination and the *Johnson* waiver by waiver of constitutional rights by plea. *Johnson v. Zerbst*, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938). *See, however, United States v. Gotti*, 641 F.Supp. 283 (E.D.N.Y.1986) where, in prosecution of the Gambino Family, warnings of a waiver by plea were not considered. Out of all of this, it should also be recognized that this case involves the utilization of the allocution of the defendant himself and not judicial proceeding statements of others which then become evidence of some character regarding associative offenses with the defendant. *See United States v. Winley*, 638 F.2d 560 (2d Cir.1981), *cert. denied* 455 U.S. 959, 102 S.Ct. 1472, 71 L.Ed.2d 678 (1982) which was cited in *Gotti*.

The inadmissibility of a prior guilty plea that has been legally withdrawn or judicially invalidated should provide a principle that applies here. *See Standen v. State*, 101 Nev. 725, 710 P.2d 718 (1985). Since the conviction which created the forum for the allocution of this appellant was reversed, unanimous and unassailable principles of law relating to the inadmissibility of the "admission" should dictate the inadmissibility of this evidence. In *Standen*, the guilty plea to a charge of murder was reversed. Subsequent use in evidence of

---

14. The court might well also tell the accused that—unless he waives those constitutional rights—his failure to speak in behalf of himself could be weighed in the determination of severity of punishment in the initial sentencing decision. Similarly, he might as well also be advised about the non-resolvable constitutional dilemma with which he is faced, heavier sentence for lacking mia culpa attitude at sentencing (acceptance of responsibility criteria) or jeopardized retrial if a reversal occurs.

the prior guilty plea was determined by the Nevada Supreme Court to be erroneous:

> The judge advised the jury that they should base their decision on all the evidence in the case and that the guilty plea was a part of that evidence. This was error. A prior guilty plea that has been legally withdrawn or judicially invalidated is deemed never to have existed and should not be used as evidence. *See Kercheval v. United States,* 274 U.S. 220, 224, 47 S.Ct. 582, 583, 71 L.Ed. 1009 (1927).

*Standen,* 710 P.2d at 720. *See also People v. Belleci,* 24 Cal.3d 879, 157 Cal.Rptr. 503, 598 P.2d 473 (1979) (where suppressed evidence was subsequently used for sentencing enhancement on a guilty plea for another offense; reversal and remand of the sentence was consequently required). A withdrawn notice of alibi used to impeach the defendant likewise required reversal of the conviction on the basis of error in admission of the evidence in *Jackson v. State,* 808 P.2d 700 (Okl.Cr.1991). *See also Sterling v. State,* 514 P.2d 401 (Okl.Cr.1973). The rule regarding reversed convictions, withdrawn pleas, and discontinued alibi defenses is identical to the statements made in conjunction with plea negotiations which fail. *State v. Trujillo,* 93 N.M. 724, 605 P.2d 232 (1980). *See also People v. Rosenthal,* 617 P.2d 551 (Colo.1980) (psychiatric examination communications in state courts).

Authorities cited by the State in appellate briefing lack logical relevance for propriety to reuse allocution testimony. The State's cited cases included first trial testimony when the defendant elects not to testify at a second trial, *Edmonds v. United States,* 273 F.2d 108 (D.C.Cir.1959), *cert. denied* 362 U.S. 977, 80 S.Ct. 1062, 4 L.Ed.2d 1012 (1960); *Ayres v. United States,* 193 F.2d 739 (5th Cir.1952); *People v. Carlson,* 677 P.2d 390 (Colo.App.1983), *aff'd* 712 P.2d 1018 (Colo.1986); use of voluntary grand jury testimony at trial, *United States v. Licavoli,* 604 F.2d 613 (9th Cir.1979), *cert. denied* 446 U.S. 935, 100 S.Ct. 2151, 64 L.Ed.2d 787 (1980); John F. Gillespie, Annotation, *What Is "Other Proceeding" Under Rule 801(d)(1)(A) of Federal Rules of Evidence, Excepting From Hearsay Rule Prior Inconsistent Statement Given "At a Trial, Hearing, or Other Proceeding",* 37 A.L.R.Fed. 855 (1978); and the right of cross-examination if the accused voluntarily testifies. *United States v. Johnson,* 488 F.2d 1206 (1st Cir. 1973).

The State's citation of a case involving exercise of the privilege against self-incrimination in a second proceeding having not been waived by prior testimony in a different case is similarly unpersuasive and non-definitive here. *United States v. Fortin,* 685 F.2d 1297 (11th Cir.1982). Similarly, cases where an unrepresented plea is not later admissible at trial provide no support for this court's decision. *Arsenault v. Com. of Mass.,* 393 U.S. 5, 89 S.Ct. 35, 21 L.Ed.2d 5 (1968); *White v. State of Maryland,* 373 U.S. 59, 83 S.Ct. 1050, 10 L.Ed.2d 193 (1963); *State v. Snell,* 177 Neb. 396, 128 N.W.2d 823 (1964). Wyoming has applied the same reasoning and result to testimony at a coroner's inquest where proper warning was not given to the witness. *Maki v. State,* 18 Wyo. 481, 112 P. 334 (1911).

The same result appertains if a defendant is unrepresented and unwarned when submitting to a pretrial psychological examination. *Estelle v. Smith,* 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981). The true and certain principle that an unrepresented plea is *not admissible* during a subsequent trial hardly proves that the exercise of the foundational principle of allocution renders its substance later *admissible* at a re-trial following reversal and remand. Likewise, the fact that a defendant's properly represented and advised testimony at a preliminary hearing is later usable at the trial itself is not particularly newsworthy nor does it have anything to do with the issues in this appeal. *State v. Williams,* 115 N.H. 437, 343 A.2d 29 (1975). *Accord People v. Downer,* 192 Colo. 264, 557 P.2d 835 (1976), in regard to testimony before a grand jury. Also, no persuasive authority is provided in a case when a conviction is reversed after the defendant was erroneously forced to testify because of the im-

proper introduction of his confession. *See Harrison v. United States,* 392 U.S. 219, 88 S.Ct. 2008, 20 L.Ed.2d 1047 (1968), where re-introduction of the testimony in first trial was not constitutionally permitted in the retrial.

Having considered the cases cited in the State's brief, I will then consider the case recitation by this court's opinion. Actually, neither the State in its brief nor now the majority in decision cite one single case assessing waiver of rights against self-incrimination by exercised right of allocution—not one single case!

This case has precisely nothing to do with fruits of the poisonous tree as a justification for the majority decision. *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). Nor does it have anything to do with testimony in a first trial and right to remain silent upon second trial, *Harrison,* 392 U.S. 219, 88 S.Ct. 2008, which clearly rejects the present majority decision and, instead, is consistent with the constitutional principle which realistically should be applied to reverse the reuse thesis presented in majority opinion. Applying the majority's rationale, it is feasible to say in a generic way that when the accused elects to defend, the court could as easily say that he waives later rights to have guilt determined at trial. Waiver this broadly portrayed would only mean that the exercise of one fundamental right sequentially requires that all other equally fundamental rights are thereafter lost and forfeited. Fortunately, even in 1992 in the constitutional environment now presented, no case to support this broad-reaching attack on basic constitutional concepts is provided by the State or the majority opinion.

The status of allocution in the fabric of Wyoming law has already been adequately discussed in this dissent to validate required and unquestionable recognition that the right is fundamental in our system and has continued in that fashion for 123 years. We need to look at each case cited in the majority opinion to assess what structure of constitutional law the writer of that opinion seeks to create. Actually directed to the subject by majority opinion are only

two cases, *Wong Sun,* 371 U.S. 471, 83 S.Ct. 407 and *Harrison,* 392 U.S. 219, 88 S.Ct. 2008, although a third case which provides countervailing authority is distinguished. *Simmons v. United States,* 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968).

*Wong Sun,* under the authorship of Justice Brennan, developed the fruits of the poisonous tree exclusion as an application started with the invalidity of original evidentiary acquisition which then is extended to evidence consequently acquired or created. It is theoretically illogical to define this understanding about what is illegal polluting its product to then conclude that what is justly provided as a protection (exercising the right to make an allocution statement) denies any succeeding constitutional rights. Obviously, *Wong Sun* has absolutely nothing to do with waiver or forfeiture of the right against self-incrimination derived from the exercise of allocution.

*Harrison* falls no closer to a base line of claimed precedential relevance. In that case, which followed *Wong Sun,* fruits of the poisonous tree, it was determined that when coerced confessions were admitted into evidence causing the accused to then waive rights against self-incrimination by testifying in repetition, such coerced testimony given at the first trial was then inadmissible in a second trial. If *Harrison* means anything, although not cited in appellate briefing, it is that, like the repressed first trial testimony, an illegal conviction cannot produce admissible evidence upon retrial which, in actuality, is the present status provided in this appeal. *Harrison* is indeed a strange precedent to authenticate this decision. The principal elements in its decision should constitutionally require reversal in this appeal.

Since this is the substantive case law cited in the majority opinion, we look further to find something that even by analogy could possibly justify affirming allocution admissibility status upon reversal and retrial. A most unusual statement is contained in the majority opinion including a citation to *United States v. Washington,*

431 U.S. 181, 97 S.Ct. 1814, 52 L.Ed.2d 238 (1977) which bears examination. It is said:

A defendant's statements may be admissible against him in further proceedings, provided they are voluntary. However, if the trial court were to require a defendant to confess to criminal activities in his allocution in return for a more lenient sentence, those statements would amount to "genuine compulsion of testimony" in violation of the right against self-incrimination. *Washington*, 431 U.S. at 187, 97 S.Ct. at 1818; *United States v. Rodriguez*, 498 F.2d 302, 312 (5th Cir.1974).

Maj. op. at 1083.

Overtly, the only possible purposes for allocution are either to deny guilt (which will seldom serve to diminish the severity of the sentence) or to seek leniency (normally by assessed responsibility in seeking moderation in retributional assessment). Reuse of allocution at a later trial would only be pursued by the prosecution if some inculpatory content can be extrapolated to serve re-prosecutorial purposes.

Another two sentences in the majority opinion deserve similar content questions about logic. "However, exercising a right to allocution does not require surrendering one right to preserve another. The convicted party only needs to decide whether the right to remain silent will be asserted or waived." Maj. op. at 1082. What the court says simply does not make practical sense. How these two sentences can be asserted to approve applied waiver of right against self-incrimination for retrial, including pollution of an appeal opportunity by evidentiary commitment when exercising allocution, defies any rational understanding. As earlier stated, we understand this court's thesis to establish that if the accused elects to exercise allocution as a fundamental right, he will surrender a right against future self-incrimination which is, in actuality, the uninformed and essentially involuntary advance abandonment of his future right to defend.[15]

What this court now tells defense counsel in general and defendants in particular within the Wyoming state courts is that: In exercising this fundamental right, please recognize the diminution of your right to appeal and that you will probably be foreclosed a fair trial and an opportunity to defend if a reversal should actually be achieved; consequently, the only way to protect your right to defend on retrial would be to surrender the right to allocution in the first proceeding. In practical effect, this court tells any convicted individual that he should not exercise the fundamental right of allocution if the actual validity of original conviction is questionable. Legal malpractice and ineffectiveness of counsel considerations are appropriately magnified and multiplied.

Here, within this six-year course of litigation, this result means that Harvey accidentally and without any opportunity to anticipate the result which followed, surrendered his actual right to protest denial of a speedy trial and, by failure of trial counsel to anticipate what this court has now done in result, accepted the consequence of his first conviction as the price for exercising his constitutionally concerned and statutorily provided right to allocution. Today, in Wyoming, allocution is a trap for the uninformed attorney and the unwise accused. Minimal if not nonexistent benefit remains because the gamble in irritating the judge by contending innocence or the commitment in explaining regret is a much heavier price than any potential benefit to be achieved.

To justify this status in case law, the majority opinion added to the fruits of the

---

**15.** The most pernicious mutation of a similar ideology is found in federal sentencing guideline sentence enhancement if the accused pleads innocent and then elects to testify. If the sentence is enhanced for obstruction of justice, "the jury did not believe you" becomes added years in sentence. This "do not rock the boat with defending" mentality has achieved significant authority in the federal courts with mesmeriza- tion of the sentencing guidelines. *See United States v. Acosta–Cazares*, 878 F.2d 945 (6th Cir.), *cert. denied* 493 U.S. 899, 110 S.Ct. 255, 107 L.Ed.2d 204 (1989) compared with the more current case of *United States v. Dunnigan*, 944 F.2d 178 (4th Cir.1991), *cert. granted* — U.S. ——, 112 S.Ct. 2272, 119 L.Ed.2d 199 (1992). *See also United States v. Rodriguez*, 959 F.2d 193 (11th Cir.1992).

poisonous tree cases of *Wong Sun* and *Harrison*, a disregard of *Simmons*, 390 U.S. 377, 88 S.Ct. 967, which will be discussed in detail hereafter, and then only four other cases for further application: *Rock v. Arkansas*, 483 U.S. 44, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987); *Washington*, 431 U.S. 181, 97 S.Ct. 1814; *Powers v. United States*, 223 U.S. 303, 32 S.Ct. 281, 56 L.Ed. 448 (1912); and *United States v. Rodriguez*, 498 F.2d 302 (5th Cir.1974). The latter case is the most implausible considering the existence of contemporary sentencing guidelines in the federal system. *Cf.* Marcia G. Shein & Jana L. Jopson, *Sentencing Defense Manual*, App. 2A, Pt. E, at 227 (1991). In *Rodriguez*, abusive conduct by the trial judge to force admission of guilt as a function of sentencing was sufficiently criticized in appellate decision to require resentencing. The case did not involve a question of reuse of allocution; rather, it was an abusive violation of initial Fifth Amendment rights as a sentencing price for bargained justice.

*Powers*, 223 U.S. 303, 32 S.Ct. 281 established the well-accepted fact that the accused who elects to testify at trial subjects himself to cross-examination at that trial. *Rock*, 483 U.S. 44, 107 S.Ct. 2704, as is well known, addresses the right of the defendant to testify whether or not subjected to hypnotic rehearsal as a condition of Fourteenth Amendment effectuation of due process. The closest case to have something even marginally relevant to allocution reuse upon retrial is *Washington*, 431 U.S. 181, 97 S.Ct. 1814. *Washington* determined that a "target" witness in a grand jury session who voluntarily testified in waiver of his Fifth Amendment privilege against self-incrimination did not warrant quashing a subsequent indictment. The accused had been warned in the session that anything he said might be used against him. In *Washington*, the court held that the Fifth Amendment applied to grand jury sessions, but that it did not preclude voluntary self-incrimination *when properly warned.* "[T]arget witness status neither enlarges nor diminishes the constitutional protection against compelled self-incrimination." *Id.* at 189, 97 S.Ct. at 1820. The

court further added, on an issue not presented in the appeal, that with the complete warning against self-incrimination, the subsequent voluntary testimony could be available to use against the defendant at the actual trial.

This unpersuasive array of authority does not justify waiver from exercise of the fundamental right of allocution honored by legislation, constitutional convention, and acceptance by this court in rule adoption that the privilege against self-incrimination is lost upon retrial after first conviction reversal for fundamental mistakes in the prosecution. Although this colloquy has apparently never happened before in a sufficient way to create an issue for appellate review, there is still something beyond reasoned logic to be found in controlling principles of constitutional law. Although I agree with the analysis of Justice Golden, I venture further because of the significance of the issue and the comparably involved realistic validity of the Wyoming Rules of Criminal Procedure only recently adopted in providing rights and requirements for the delivery of justice.

The significant case which was unpersuasively distinguished in the majority opinion is *Simmons*, 390 U.S. 377, 88 S.Ct. 967. The *Simmons* issue was whether testimony of the accused in a pretrial suppression motion hearing would become admissible at trial. The United States Supreme Court held that the testimony of the accused "is to be regarded as an integral part of his Fourth Amendment exclusion claim." *Id.* at 391, 88 S.Ct. at 975. The United States Supreme Court then recognized:

> Under the rule laid down by the courts below, he could give that testimony only by assuming the risk that the testimony would later be admitted against him at trial. Testimony of this kind, which links a defendant to evidence which the Government considers important enough to seize and to seek to have admitted at trial, must often be highly prejudicial to a defendant.

*Id.*

The United States Supreme Court then established by extended analysis and in a

fashion that fits identically with exercise of allocution to forego rights if a successive retrial occurs:

> The rule adopted by the courts below does not merely impose upon a defendant a condition which may deter him from asserting a Fourth Amendment objection—it imposes a condition of a kind to which this Court has always been peculiarly sensitive. For a defendant who wishes to establish standing must do so at the risk that the words which he utters may later be used to incriminate him. Those courts which have allowed the admission of testimony given to establish standing have reasoned that there is no violation of the Fifth Amendment's Self–Incrimination Clause because the testimony was voluntary. As an abstract matter, this may well be true. A defendant is "compelled" to testify in support of a motion to suppress only in the sense that if he refrains from testifying he will have to forgo a benefit, and testimony is not always involuntary as a matter of law simply because it is given to obtain a benefit. However, the assumption which underlies this reasoning is that the defendant has a choice: he may refuse to testify and give up the benefit. When this assumption is applied to a situation in which the "benefit" to be gained is that afforded by another provision of the Bill of Rights, an undeniable tension is created. Thus, in this case Garrett was obliged either to give up what he believed, with advice of counsel, to be a valid Fourth Amendment claim or, in legal effect, to waive his Fifth Amendment privilege against self-incrimination. *In these circumstances, we find it intolerable that one constitutional right should have to be surrendered in order to assert another.* We therefore hold that when a defendant testifies in support of a motion to suppress evidence on Fourth Amendment grounds, his testimony may not thereafter be admitted against him at trial on the issue of guilt unless he makes no objection.

*Id.* at 393–94, 88 S.Ct. at 976 (emphasis added and footnotes omitted). What this court now accepts in this decision are the same ideas advanced in dissent by Justice Black within that 1968 *Simmons* opinion. Only one other justice joined in Black's dissent and I have not found a single case which has since been reported that adopted that doctrinal position.

In addition to the suppression hearing preclusion now firmly fixed by *Simmons* as an unqualified principle in American law, there are a number of other comparable concepts, none of which are addressed in majority decision, which support denial of admissibility of the allocution statements following reversal and a follow-on proceeding (whether a retrial in the normal case, or, here, where conspiracy is interjected to avoid double jeopardy).

*Smith,* 451 U.S. 454, 101 S.Ct. 1866 authors the well-defined rule that no evidentiary waiver results from what is said by the defendant during a competency examination. *See also Fortin,* 685 F.2d 1297 and *Edmonds,* 273 F.2d 108, which determined that in a commitment examination, the doctor could not subsequently testify to statements made to him by the accused. *Cf. Powell v. Texas,* 492 U.S. 680, 109 S.Ct. 3146, 106 L.Ed.2d 551 (1989) (which comparably involve Sixth Amendment non-notice to counsel defects in the commitment process) and *Satterwhite v. Texas,* 486 U.S. 249, 108 S.Ct. 1792, 100 L.Ed.2d 284 (1988).

There is additional case law providing a preclusion to reuse of testimony at a later stage when the initial statement is made by the defendant to resolve double jeopardy issues, *United States v. Bounos,* 693 F.2d 38 (7th Cir.1982), and statements made by a defendant at a bail hearing. *Williams,* 343 A.2d 29. *See also* Note, *Administration of Pretrial Release and Detention: A Proposal for Unification,* 83 Yale L.J. 153, 153–55 (1973). Clearly also, statements and communications made in connection with plea bargaining are not thereafter admissible as evidence against interests for prosecution. Ferdinand S. Tinio, Annotation, *Admissibility of Defense Communications Made in Connection with Plea Bargaining,* 59 A.L.R.3d 441 (1974); W.R.Cr.P. 15(e)(6) (now W.R.Cr.P. 11(e)(6)).

Wyoming established this rule more than sixty years ago in *State v. Mau,* 41 Wyo. 365, 285 P. 992 (1930). In civil context, see also *Mentock v. Mentock,* 638 P.2d 156 (Wyo.1981); *Coulter, Inc. v. Allen,* 624 P.2d 1199 (Wyo.1981); *United States v. DiLoreto,* 888 F.2d 996 (3rd Cir.1989); and *State v. Fox,* 70 Haw. 46, 760 P.2d 670 (1988).

*Harrison,* 392 U.S. 219, 88 S.Ct. 2008, which precluded reuse of the testimony in second trial and resulted from an improperly admitted confession during the first trial, is consistent in defining the present structure of American law. Despite the on-going diminution of constitutional rights by the current United States Supreme Court, a continued course of precedent justifies the conclusion that neither this nation nor this state exists by a constitution where reliance on one guarantee necessarily results in relinquishment of all other basic constitutional protections.[16]

Philosophically, this court (prior to the present majority opinion) and courts generally have been reluctant to infer a waiver of a constitutional privilege. Michael A. DiSabatino, Annotation, *Right of Witness in Federal Court to Claim Privilege Against Self–Incrimination After Giving Sworn Evidence on Same Matter or in Other Proceedings,* 42 A.L.R.Fed. 793, 795 (1979), citing as an example *United States v. Steffen,* 103 F.Supp. 415 (N.D.Cal.1951). For illustration of this basic principle of constitutional law, see *Smith v. United States,* 337 U.S. 137, 69 S.Ct. 1000, 93 L.Ed. 1264 (1949), where a grant of immunity was considered. The concept was identically recognized in non-waiver of a right to a jury trial in *Johnson,* 304 U.S. at 464, 58 S.Ct. at 1023; *Aetna Ins. Co. v. Kennedy, to Use of Bogash,* 301 U.S. 389, 393, 57 S.Ct. 809, 811, 81 L.Ed. 1177 (1937); and *Hodges v. Easton,* 16 Otto 408, 106 U.S. 408, 1 S.Ct. 307, 27 L.Ed. 169 (1882) as a right to counsel. In *Johnson,* 304 U.S. at 464, 58 S.Ct. at 1023 (footnotes omitted), Justice Black stated:

There is insistence here that petitioner waived this constitutional right. The District Court did not so find. It has been pointed out that "courts indulge every reasonable presumption against waiver" of fundamental constitutional rights and that we "do not presume acquiescence in the loss of fundamental rights." A waiver is ordinarily an intentional relinquishment or abandonment of a known right or privilege. The determination of whether there has been an intelligent waiver of the right to counsel must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused. With regard to self-incrimination, see also *Rogers v. United States,* 340 U.S. 367, 377, 71 S.Ct. 438, 444, 95 L.Ed. 344 (1951), Black, J., dissenting. A case involving waiver by plea at arraignment in the absence of counsel provided a similar judicial rejection of waiver of the constitutional right, *Wood v. United States,* 128 F.2d 265 (D.C.Cir.1942), where it was also recognized that the defendant was entitled to have counsel at the proceedings. A comment of the court was particularly noteworthy regarding "impairment of the court's integrity. Admitting the plea would array [the trial court] on the prosecution's side as an agency for procuring as well as for admitting evidence." *Id.* at 274.

Within the peculiar status of this case where the fiction of a different offense is created to avoid the preclusion of double jeopardy, there is yet another objection to allocution statement reuse in a subsequent trial. This is derived from the direction of the majority that *this is a different case* on trial. Consequently, any reuse concept derived from the same proceeding, e.g., grand jury, preliminary hearing, or retrial with reversal, has no technical application to this case where now conceptualized to consist of a statement made at sentencing in one offense to consequently become admissible evidence for trial of another offense. *See, e.g., State v. Holm,* 67 Wyo. 360, 224 P.2d

---

**16.** The possible exception is the waiver by guilty plea which both the majority of this court and this writer in dissent addressed in detail in *Davila v. State,* 831 P.2d 204 (Wyo.1992) and *Robinson v. State,* 831 P.2d 231 (Wyo.1992).

500 (1950). This was not impeachment. *Compare Mintle v. Mintle,* 764 P.2d 255 (Wyo.1988) with *State v. McComb,* 33 Wyo. 346, 239 P. 526 (1925) and *Crago v. State,* 28 Wyo. 215, 202 P. 1099 (1922).

As a result of a series of proceedings involving judicial misconduct, the Vermont Supreme Court in *In re Hill,* 149 Vt. 431, 545 A.2d 1019 (1988) was faced with a comparable decision. In that case, the court was required to determine whether a judge could be required to testify at a disciplinary proceeding if the testimony might create unfavorable criminal prosecution evidence. The court found that the judge's prior testimony in a still-pending criminal proceeding did not create a waiver of her right against self-incrimination in another forum.

We agree with respondent that her privilege with respect to her false swearing case remains alive. Despite the jury verdict against her, the Fifth Amendment privilege is available until the case is fully concluded, including any appeals. See *State v. Gretzler,* 126 Ariz. 60, 88, 612 P.2d 1023, 1051 (1980). Nor does the fact that she testified in her criminal trial constitute a waiver of her right to assert the privilege in another forum—here, the Judicial Conduct Board. See *United States v. Yurasovich,* 580 F.2d 1212, 1220 (3d Cir.1978). Further, we are not persuaded that the representations of her counsel to her willingness to testify, made in this Court, constitute a waiver. While we recognize that it may be possible to waive the privilege expressly, or impliedly, by agreement, the waiver of such an important constitutional right must be clear and intentional and cannot be lightly inferred. See *Smith v. United States,* 337 U.S. 137, 150, 69 S.Ct. 1000, 1007, 93 L.Ed. 1264 (1949); *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938). We have reviewed the record and do not believe that the statements of respondent's counsel meet this standard.

Respondent has demonstrated a risk of further prosecution under 13 V.S.A. § 3015, our obstruction of justice statute. That statute is taken almost verbatim from the federal obstruction of justice statute, 18 U.S.C. § 1503. The federal statute has been interpreted quite broadly. See, e.g., *United States v. Jeter,* 775 F.2d 670 (6th Cir.1985); *United States v. Vesich,* 724 F.2d 451 (5th Cir.1984). It is not incumbent on respondent to demonstrate that she will be prosecuted or that the answer to a question will result in her conviction. The United States Supreme Court has described the standard as follows:

"The privilege afforded not only extends to answers that would in themselves support a conviction under a ... criminal statute but likewise embraces those which would furnish a link in the chain of evidence needed to prosecute the claimant for a ... crime. But this protection must be confined to instances where the witness has reasonable cause to apprehend danger from a direct answer. The witness is not exonerated from answering merely because he declares that in so doing he would incriminate himself—his say-so does not of itself establish the hazard of incrimination. It is for the court to say whether his silence is justified and to require him to answer if 'it clearly appears to the court that he is mistaken.' However, if the witness, upon interposing his claim, were required to prove the hazard in the sense in which a claim is usually required to be established in court, he would be compelled to surrender the very protection which the privilege is designed to guarantee. To sustain the privilege, it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result. The trial judge in appraising the claim 'must be governed as much by his personal perception of the peculiarities of the case as by the facts actually in evidence.'"

*Hoffman v. United States,* 341 U.S. 479, 486–87, 71 S.Ct. 814, 818, 95 L.Ed. 1118

(1951) (citations omitted). As the Board correctly ruled in this case, at least some of the questions that special counsel intended to ask would offend the privilege under the *Hoffman* standard. But, we need not rule today precisely which questions and answers fall within the privilege because of the nature and scope of the remedy we are announcing.

*In re Hill,* 545 A.2d at 1022–23.

The court then justified enforced testimony at the discipline hearing by providing a "use and fruits immunity" for any future criminal proceeding. The court recognized that the judge could not be required to testify in disciplinary proceedings and risk self-incrimination for criminal prosecution. The underlying case, *State v. Begins,* 147 Vt. 295, 514 A.2d 719 (1986), involved both criminal prosecution and pending probation revocation for the same event. The issue developed as to the right of the defendant to testify in the probation revocation hearing without convicting himself by that testimony in a criminal case which might follow. The court elected to enforce constitutional options for the accused and provided an immunity from subsequent prosecution if required to exercise one constitutional right in a prior probation revocation. In systematology, those cases are most similar to the broader allocution question presented here. The same answer is obviously required for fair and reasoned constitutional right protection; allocution testimony cannot thereafter be introduced as evidence for criminal conviction in the identically postured associated offense of conspiracy.

This concept is particularly valid since allocution was acquired as the fruits of the first invalid conviction when speedy trial was denied, *Harrison,* 392 U.S. 219, 88 S.Ct. 2008, and any evidentiary reuse was directly contrary to· the preclusion there provided. We have "testimony" which is found to be a product of a very poisoned tree infected by the disease of denied speedy trial. If the speedy trial dismissal had occurred as constitutionally required by *Harrison,* no occasion for allocution would have been created in this case. The Vermont Supreme Court in *Hill,* in greater

wisdom and rational protection of its constitution, provided a well-supported standard of constitutional law. In general resolution of self-incrimination, see also *State v. Linscott,* 521 A.2d 701, 703 (Me.1987) (quoting *Licavoli,* 604 F.2d at 623): "'[A] waiver of the Fifth Amendment privilege is limited to the particular proceeding in which the waiver occurs.'" In *Licavoli,* the converse situation developed. The witness had testified favorably for the defendant in the grand jury proceeding and then elected "to take the Fifth" when subpoenaed by defendant to testify at trial. The court there recognized:

It is settled that a waiver of the Fifth Amendment privilege is limited to the particular proceeding in which the waiver occurs. * * * Consequently, voluntary testimony before a grand jury does not waive the privilege against self-incrimination at trial.

*Licavoli,* 604 F.2d at 623. The unavailable witness (non-party) opportunity under the hearsay exception then permitted the grand jury testimony to be read at trial. The case provides no basis for justification of allocution testimony admissibility.

The non-reuse principle after a double jeopardy challenge hearing recognized earlier with reference to *Bounos,* 693 F.2d 38 also provides comparable authority. The empirically stated principle applied in *Bounos* to double jeopardy and here to allocution is totally controlling in persuasive precedent and constitutional concept:

A criminal defendant may not be put to the choice between giving up his Fifth Amendment right not to incriminate himself and giving up some other constitutional right. *Simmons v. United States,* 390 U.S. 377, 394, 88 S.Ct. 967, 976, 19 L.Ed.2d 1247 (1968); *Wade v. Frazen,* 678 F.2d 56, 57 (7th Cir.1982). Hence if the defendants had testified to their conspiratorial activities between May 1979 and April 1980 in order to establish a claim under the double jeopardy clause of the Fifth Amendment, they would not thereby have surrendered their right (also under the Fifth Amendment) not to give testimony that could be used direct-

ly or indirectly to convict them of those unlawful activities. *United States v. Inmon*, 568 F.2d 326, 333 (3d Cir.1977); *United States v. Stricklin*, 591 F.2d 1112, 1118 (5th Cir.1979). The district court was therefore correct in offering to hold that the defendants would not be waiving their Fifth Amendment rights if they confessed guilt for the purpose of making out their double jeopardy claim.

*Bounos*, 693 F.2d at 39.

In denying a further right to judicial immunity, the court said:

> The Fifth Amendment of its own force, without the superaddition of a judicial immunity order, would have prevented the government from using the defendants' statements in a double jeopardy hearing, or leads developed from those statements, to mount a subsequent prosecution against them.

*Id.* at 40.[17]

The same principle applied in the ineffectiveness of counsel case of *Wade v. Franzen*, 678 F.2d 56 (7th Cir.1982). *Franzen* involved the voluntariness of confession where the totally unprepared defense counsel

> refused to comply with a local court rule, the validity of which is unchallenged, that the movant attest to the truth of the facts alleged in the motion. The lawyer was afraid that attestation would be treated as a waiver of Wade's right not to be forced to incriminate himself. It would not have been. See *Simmons v. United States*, 390 U.S. 377, 389–94, 88 S.Ct. 967, 973–76, 19 L.Ed.2d 1247 (1968). This was plain error on the lawyer's part; no conceivable tactical motive can be attributed to his action.

*Franzen*, 678 F.2d at 57.

In *United States v. Stricklin*, 591 F.2d 1112, 1118 (5th Cir.), *cert. denied* 444 U.S. 963, 100 S.Ct. 449, 62 L.Ed.2d 375 (1979), the court recognized in regard to a dismissal motion based on double jeopardy and

correlative burden for proof assessed against the government:

> The defendant might make the necessary prima facie nonfrivolous showing of double jeopardy by reference to the indictments, as supplemented by a bill of particulars if appropriate and ordered, and other record material, alone. He might find it necessary to offer his own testimony at the pretrial hearing. If the latter course is followed, the defendant will not thereby waive the privilege against self-incrimination and his testimony may not subsequently be used against him at the trial on the merits. In *Simmons v. United States*, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968), the Supreme Court held that a defendant may testify in a pretrial suppression hearing directed at vindication of Fourth Amendment rights without fear that his testimony will be used against him at the subsequent trial. The Supreme Court reasoned that any other rule would inhibit defendants from asserting Fourth Amendment claims and would require that one constitutional right be surrendered in order to assert another. 390 U.S. [377] at 392–94, 88 S.Ct. 967 [at 975–76]. We agree with the *Inmon* Court that the reasoning in *Simmons* is also controlling in a pretrial double jeopardy hearing.

*See also United States v. Ragins*, 840 F.2d 1184 (4th. Cir.1988) and *United States v. Inmon*, 568 F.2d 326 (3rd Cir.1977), *cert. denied* 444 U.S. 859, 100 S.Ct. 121, 62 L.Ed.2d 79 (1979).

In a similar context, the waiver of right against self-incrimination to be inferred from a guilty plea relates only for the purpose involved in the determination of the guilt or innocence of the crime admitted. It does not waive privilege against self-incrimination at other times for other crimes. *McCarthy v. United States*, 394 U.S. 459, 89 S.Ct. 1166, 22 L.Ed.2d 418 (1969); *Johnson*, 488 F.2d 1206. Furthermore, as the *Johnson* court said:

---

**17.** The court in *Bounos* recognized the considerable difference between unavailability of the testimony for future affirmative evidence of prosecution and the broad concepts of use and

transactional immunity. *See Kastigar v. United States*, 406 U.S. 441, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972) cited therein.

Constitutional privileges may not, in any event, be waived except as there is awareness of the consequences of the waiver. *See Brady v. United States,* 397 U.S. 742, 748, 90 S.Ct. 1463 [1468], 25 L.Ed.2d 747 (1970); *Smith v. United States,* 337 U.S. 137, 150, 69 S.Ct. 1000 [1007], 93 L.Ed. 1264 (1949).

*Johnson,* 488 F.2d at 1210.

*The test for admissibility of inculpatory statement evidence requires voluntariness and adjures coercion or compulsion for which this majority opinion just does not achieve a passing grade. Harrison,* 392 U.S. 219, 88 S.Ct. 2008; *Hoffman v. United States,* 341 U.S. 479, 71 S.Ct. 814, 95 L.Ed. 1118 (1951); *Horn v. State,* 12 Wyo. 80, 73 P. 705 (1903).

There is yet another major subject which is unaddressed by the majority in its predisposition to affirm conviction of Harvey for something. This is whether the very closely allayed presentence information furnished by the convicted individual to the probation officer for the presentence investigation report becomes an admission which creates admissible reuse evidence for a retrial or prosecution in another offense. *See Baumann v. United States,* 692 F.2d 565 (9th Cir.1982); *United States v. Jones,* 640 F.2d 284 (10th Cir.1981); *People v. Harrington,* 2 Cal.3d 991, 88 Cal.Rptr. 161, 471 P.2d 961 (1970), *cert. denied* 402 U.S. 923, 91 S.Ct. 1384, 28 L.Ed.2d 662 (1971); and *People v. Alesi,* 67 Cal.2d 856, 64 Cal. Rptr. 104, 434 P.2d 360 (1967). In *Jones,* the Tenth Circuit Court of Appeals reasoned that although the Fifth Amendment does offer protection in the sentencing process, the broad inquiry and information gathering defined in presentence investigation and reports is for sentencing and not to be used "substantively."

This present decision inflicts the greatest danger to the defendant in the presentence investigative and fact finding process of which allocution is but an included component. As a result of this decision, competent defense counsel are not only obligated in Wyoming to advise their clients not to exercise their rights of allocution if it might create evidence for a retrial or a

separate offense, but they should also decline to cooperate with the parole officer in the investigative report for sentencing to the extent of any adverse information since that agent has now been recreated by this court into a private investigator for the prosecutor in the acquisition of potential testimony for future criminal trials. By this thoughtless drive to affirm Harvey's conspiracy conviction, this court relegates the justified conduct of the convicted individual in responding during presentence investigation and allocution to something akin to the military direction to provide only name, rank, and serial number. We do this in contravention of the explicit direction provided by numerous decisions of the United States Supreme Court regarding the Constitution of the United States and in abject disregard of the due process and right to defend criteria of the Wyoming Constitution.

" 'Wisdom too often never comes, and so one ought not to reject it merely because it comes late.' Similarly, one should not reject a piecemeal wisdom, merely because it hobbles toward the truth with backward glances." *Wolf v. People of the State of Colorado,* 338 U.S. 25, 47, 69 S.Ct. 1359, 1368, 93 L.Ed. 1782 (1949), Rutledge, J., dissenting. *See also Watts v. State of Indiana,* 338 U.S. 49, 55, 69 S.Ct. 1347, 1350, 93 L.Ed. 1801 (1949): "Law triumphs when the natural impulses aroused by a shocking crime yield to the safeguards which our civilization has evolved for an administration of criminal justice at once rational and effective."

The decision of this court to countenance utilization of the allocution statements for second trial evidence is not only misguided in this case, but badly disruptive of the Wyoming constitutional and procedural law heritage. What we do is totally wrong.

### III. CHANGE OF VENUE

For purposes of introduction and by way of comparison, I begin this section by considering the impartial jury/change of venue element of another recent Wyoming case. Abdullah Kru Amin, when tried in Carbon County for holding hostage two

penitentiary employees, had absolutely no chance of realizing a fair and impartial jury for his life sentence criminal trial. *Amin v. State,* 811 P.2d 255, 262 (Wyo.1991), Urbigkit, C.J., dissenting. At the same time, Amin really had a minimal defense, since some hostage-taking was hardly in dispute on the record presented (although what did happen has since become subject to some question). So maybe, for this court in *Amin* to gloss over the constitutional direction of Wyo. Const. art. 1, § 10 of "an impartial jury" could be resolved in a "so what?" conceptualization of the constitutional right. However, there was not one-tenth of the angry, hostile, reactive publicity in Amin's case as was characterized by the "fire storm" which arose from this court's reversal of the original Harvey and Phillips convictions on the basis of the denied constitutional interest to receive a speedy trial.

Factually, our reversal of the forcible rape and kidnapping convictions and the stridency of the Wyoming Supreme Court's opinion dissents, repeated regularly and insistently in media and letter-writing, clearly guaranteed that a second trial for the two individuals in Sweetwater County could not be conducted with a jury that had not been subjected to the highest character of pre-conditioning. Where a campaign was urged in editorial and letter-writing to oppose retention of the Wyoming Supreme Court justices who had the temerity to enforce speedy trial constitutional interests in Sweetwater County, it could hardly be expected that the individuals scheduled for trial in the second prosecution, after exposure by scores of news stories and other organized letter-writing campaigns, could and would receive a fair and impartial jury in that jurisdiction. The issue is not the rights guaranteed by the First Amendment, which were properly exercised, but opportunity of amelioration by the judiciary to provide a Sixth Amendment impartial jury as the accommodation between diverging constitutional guarantees. *See also* Wyo. Const. art. 1, § 6, due process of law;

art. 1, § 10, right of accused to defend; and art. 1, § 20, freedom of the press.

Probably not even the *Hopkinson v. State,* 798 P.2d 1186 (Wyo.1990), *aff'd* 954 F.2d 609 (10th Cir.), *cert. denied* —— U.S. ——, 112 S.Ct. 959, 117 L.Ed.2d 125 (1992) case (and its progeny of subsequent litigation) nor any of the other criminal cases since the Tom Horn conviction, *Horn,* 73 P. 705, some 90 years ago, have created the totality of publicity found in Sweetwater County in 1989. This unrelenting publicity did not end with the denied rehearing by the Wyoming Supreme Court, but continued into re-arrest and then to trial date by the filing of a civil suit. No criticism of exercised First Amendment rights is necessary or appropriate, but the suggestion, or even worse, the judicial statement, that an impartial, disinterested jury was seated in Sweetwater County to retry Harvey in January 1990 is beyond factual validity of the wildest characterization. If a right to a change of venue to ensure trial by an impartial jury has even the slightest validity in Wyoming where a preconditioned jury will otherwise exist, this case will likely not be exceeded in this state's jurisprudence during the next century.[18] To say otherwise is to only use words to fill pages in an opinion. It would not be true.

In the case of *Armstrong v. State,* 826 P.2d 1106 (Wyo.1992), more recently tried in Sweetwater County, the scope and virulence of publicity provides no semblance of equivalency. That latter decision, authored by this writer, considered the seven newspaper articles in general tenure of coverage. By contrast, clipping files provided in this case substantiate a totally different continuum of outpouring publicity and community reaction. Even so far away as Cheyenne, Wyoming, the local newspapers carried an editorial attack on the individual members of the Wyoming Supreme Court in recommending an adverse retention vote at the next election for the jurists. Simplistically, the "sins" of the Wyoming Supreme Court in its temerity to reverse a Sweetwater County conviction on

---

18. The change of venue that was granted for the succeeding retrial of Phillips and the ease in that proceeding of selecting a reasonably impartial jury is certainly thoughtfully demonstrative.

the basis of a denied speedy trial was visited upon Harvey, the hapless defendant. The recognition that the problem of community arousal and preclusive decision existed is demonstrable not only in voir dire conducted in this case, but, by comparison, the change of venue thereafter granted to Phillips. This was not Simi Valley, California, where police officers had a jury overtly favorable to acquittal; this was Sweetwater County, a community angrily aroused that the constitutional right to a speedy trial should be dictatorially applied to the legal processes of the community. No one was excluded from the publicity contribution—prosecutor, judge, victim, and local legislators.[19]

My dissent in *Amin* was written with knowledge that this present case would follow. What was said there remains even more true:

> "The securing and preservation of an impartial jury goes to the very essence of a fair trial. See *Sheppard v. Maxwell*, 384 U.S. 333, 362–63, 86 S.Ct. 1507, 1522, 16 L.Ed.2d 600, 620 (1966); *Estes v. Texas*, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543, reh. den., 382 U.S. 875, 86 S.Ct. 18, 15 L.Ed.2d 118 (1965). It has long been recognized under the federal constitution that a defendant is entitled to a jury that is free of outside influences and will decide the case according to the evidence and arguments presented in court in the course of the criminal trial itself. *Patterson v. Colorado*, 205 U.S. 454, 462, 27 S.Ct. 556, 558, 51 L.Ed. 879, 881 (1907) (Holmes, J.)."
>
> *State v. Marshall*, 123 N.J. 1, 586 A.2d 85, 127 (1991) (quoting *State v. Williams*, 93 N.J. 39, 60–61, 459 A.2d 641 (1983)).

*Amin*, 811 P.2d at 272.

This case presents a saturation level of media exposure both overwhelming and inflammatory and equally directed to attack-

---

**19.** Sweetwater County is an insular community located about 200 miles from Salt Lake City and Ogden, Utah, and somewhat further from Cheyenne, the state capitol. Although the county totals 10,583 square miles and has a population of only 38,823, as of 1990, sixty-eight percent of the land is in federal ownership and eighty-one percent of the population live in the two adjacent cities fourteen miles apart—Rock Springs and Green River, Wyoming. Within the number of persons called for voir dire, only a few who resided in outlying areas as far away as sixty miles into the countryside and a small number in the town, generally recent arrivals, had not heard of the Wyoming Supreme Court's reversal of the Harvey and Phillips cases of prior rape and kidnapping convictions. Generally, those were the same persons who did not subscribe to a local county newspaper.

Between May 5, 1989, when the Wyoming Supreme Court reversed the Harvey and Phillips convictions for denied speedy trial, to January 1990, when the second trial for Harvey commenced, there were related stories carried in at least thirty-nine editions of the Rock Springs Rocket–Miner, the county's daily newspaper. Eight were letters to the editor, generally from members of the local sexual assault task force which attacked the Wyoming Supreme Court for conviction reversal and also named the defendants. At least twenty-five were front-page news stories which named the two defendants and normally referenced the prior conviction reversal in some way. Editorial attacks included publications in the local newspaper, the Cheyenne newspapers, and the Casper Star–Tribune. According to exhibits in this record or attached to the appellate briefs, this latter newspaper, the state's only general circulation newspaper, carried stories obviously more moderate in tone; however, as a source of general subscription in Sweetwater County, carried at least twenty-nine other accounts of the cases in various editorials, letters to the editor and news stories.

The publicity and angered attacks regarding first conviction reversal and the need for the application of justice against the defendants continued without interruption for the entire period of about eight months. The voir dire, with the general exception of a minority of persons who were generally either recent arrivals or persons living in outlying areas of the county and who did not subscribe to the local newspaper, demonstrated the saturation status of publication and community anger and hostility against both the defendants and the out-of-town appellate court that had reversed the local court's conviction. In equal measure, local ego and sincere concern about the rights of rape victims and punishment of the perpetrators were reflected in news stories, editorialized comments and letter writing.

Harvey and Phillips became extremely well-known names and fairly frequent objects of published photographs during the period from speedy trial/rape conviction reversal until recommencement of prosecution for conspiracy to commit the offenses for which the previous guilty verdicts had been rendered by the county jury about two years earlier.

ing the operation of the judicial system and the coincident societal "need" to punish these particular rape perpetrators. The "fluke" in reversal, based on denied speedy trial, especially inflamed the community. Published statements by the victim added fuel to the fire. No prior example of a denied change of venue in the face of the emotional level of community indoctrination has ever occurred in this state and the majority fails to cite any cases with the same character from any other jurisdiction.

The doctrinal concept of an impartial jury can be directly traced in its historical pathway for American law:

> Mr. Chief Justice Marshall, in *Burr's Trial* (1 Burr's Trial, 416), states the rule to be that "light impressions, which may fairly be presumed to yield to the testimony that may be offered, which may leave the mind open to a fair consideration of the testimony, constitute no sufficient objection to a juror; but that those strong and deep impressions which close the mind against the testimony that may be offered in opposition to them, which will combat that testimony and resist its force, do constitute a sufficient objection to him."

*Reynolds v. United States*, 8 Otto 145, 98 U.S. 145, 155, 25 L.Ed. 244 (1878).

Chief Justice Waite, following the quotation of Justice Marshall, then went on to relate:

It is clear, therefore, that upon the trial of the issue of fact raised by a challenge for such cause the court will practically be called upon to determine whether the nature and strength of the opinion formed are such as in law necessarily to raise the presumption of partiality. The question thus presented is one of mixed law and fact, and to be tried, as far as the facts are concerned, like any other issue of that character, upon the evidence.

*Id.* 98 U.S. at 156.

Eighty-three years later, the *Reynolds* perception of a proper jury as fair and impartial was considered by the United States Supreme Court in *Irvin v. Dowd*, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). The crescendo of "adverse publicity" reflected in analysis in that case was more than overmatched by what occurred in the geographically isolated, insular community of Sweetwater County in 1990, in reaction to the 1989 speedy trial reversal—particularly so since the third person involved (Swazo) had pled guilty, received a very extended sentence which was also well publicized and was serving time in the state penitentiary. The transcript of the second Harvey trial identifies the barrage of accusations against the first reversal within the 1,429 page trial transcript, with the voir dire encompassing nearly 1,016 pages or seventy-one percent of transcript.[20]

---

**20.** It is far from pleasant reading, but the very first juror called in opening voir dire provided a representative stage setting in recognition of attitude for what was to follow.

> THE COURT: * * * All right. Mr. [Prosecutor], you may talk to [the juror].
> [PROSECUTOR]: Thank you, your Honor. Mr. [Juror], have you heard anything about this case prior to coming here today?
> [JUROR]: Yeah. I read about it in the paper the other day. Talked to a few guys about it.
> [PROSECUTOR]: All right. Aside from that, do you have any other knowledge about the case?
> [JUROR]: No.
> [PROSECUTOR]: Okay. When you say that you read about it in the paper the other day, which paper was that?
> [JUROR]: It was in the Rocket, Sunday.
> [PROSECUTOR]: Okay. Would that have been last Friday's issue?

> [JUROR]: It's been the last couple of three days, whenever it was in there.
> [PROSECUTOR]: Okay. Did what you read in the paper recently cause you to decide any of the issues in the case?
> [JUROR]: As far as the case, itself, no. I guess, other than, you know, it's the second time around or whatever.
> [PROSECUTOR]: Okay. When you say second time around, what do you mean by that?
> [JUROR]: I'm pretty sure this is the one the Supreme Court sent back or whatever. The State or whatever it is.
> [PROSECUTOR]: Okay. With that knowledge, sir, do you have any opinions as to guilt or innocence of the Defendant?
> [JUROR]: Well, I don't know nothing about the case or nothing. Just that, you know, that it was guilty the first time and a law changed but not the act, so I don't know. I guess—So I guess I've got an open mind.

[PROSECUTOR]: Okay. Do you agree with the law, that a person is presumed innocent until proven guilty beyond a reasonable doubt?

[JUROR]: Yes.

[PROSECUTOR]: Do you think that's a fair way to administer justice in this country?

[JUROR]: Only way.

[PROSECUTOR]: Okay. And at the present time, are you willing to assume that the Defendant is innocent until you see whether the evidence in this trial proves him guilty?

[JUROR]: Yeah.

[PROSECUTOR]: Your Honor, I don't think I have anything further.

If I may, your Honor, it's my understanding that at this point, the Court wanted us to limit our questioning to those areas?

THE COURT: Yes.

[PROSECUTOR]: Thank you.

[DEFENSE COUNSEL]: Mr. [Juror], my name is * * *. * * *, actually, is what I'm called.

THE COURT: * * *, you have a quiet voice. Will you push the podium closer to the bench and to [the juror] and to me. I'm going to have trouble hearing you.

[JUROR]: I am, too.

THE COURT: Is it turned on? It is.

[DEFENSE COUNSEL]: It's the first time I've been accused of having a quiet voice.

THE COURT: It's a terrible thing to be a judge and have a hearing loss, Mr. [Juror].

[DEFENSE COUNSEL]: Is that going to affect your ability to sit in this case?

Mr. [Juror], can you hear me now?

[JUROR]: Yeah.

[DEFENSE COUNSEL]: Sir, I'm from Sheridan, Wyoming as the Judge pointed out so I probably don't know any of the jurors down here but I do know a little bit about human nature. And while you're sitting there telling me and the Court that you know things about this case, I take it you read something and that triggered a memory you had about something you have heard about or read last summer and you know quite a lot about this case then?

[JUROR]: Oh, I really—I really don't know anything about it.

[DEFENSE COUNSEL]: I think you mentioned something about the Supreme Court having reversed this case.

[JUROR]: Yeah.

[DEFENSE COUNSEL]: And turned back a guilty decision. And as you said that, sir, you hesitated quite a lot when [the prosecutor] asked you if you could be fair in this trial. Now, as Judge * * * pointed out, Mr. [Juror], I'm not trying to criticize your character or anything but it is sometimes hard to know something, to form some judgments about it, perhaps to get angry, if not at Mr. Harvey, over here, then at the Supreme Court and leave that out of the courtroom when you come in. Wouldn't you admit that?

[JUROR]: Yeah.

[DEFENSE COUNSEL]: Okay. And you probably did feel that way at one time, did you not?

[JUROR]: Ah, not really. You know, it's just the idea of—Oh, I hate to see it done twice. That's * * * kind of a waste.

[DEFENSE COUNSEL]: What done twice? The trial?

[JUROR]: The trial, right. It's the same one, isn't it?

[DEFENSE COUNSEL]: Okay.

[JUROR]: See, that's how little I know about the case. I read the paper one time. That's all I know about it.

[DEFENSE COUNSEL]: Do you feel what happened in the first trial was probably right?

[JUROR]: Well, I feel like they selected a jury and they went through it. Time was a problem.

[DEFENSE COUNSEL]: Um-hum.

[JUROR]: So unless they are bringing something different this time—I don't know, myself. I wasn't in the courtroom and I don't know what * * * would even be brought up about it.

[DEFENSE COUNSEL]: Do you recall having—outside of what you read, just this last week which apparently brought back some memories, did you read anything about it last summer—

[JUROR]: No.

[DEFENSE COUNSEL]: —when that Supreme Court decision came out about it?

[JUROR]: I don't recall anything about it.

[DEFENSE COUNSEL]: But you do have some understanding of what the case is about as you come into this Court?

[JUROR]: Yes.

[DEFENSE COUNSEL]: And you have an understanding about what happened to my client in the first trial as the result of what the jury did?

[JUROR]: Yes.

[DEFENSE COUNSEL]: Your Honor, based on your prior ruling, I'm going to ask that this juror be excused for bias.

THE COURT: Well, I can't excuse him on the basis of what you've established now, Mr. [Defense Counsel]. I've got some concerns, obviously, but I don't think that you have shown that [the juror] is unable to be fair and impartial at this stage. I still don't know what effect this publicity has on him. I don't know what his attitudes are about Mr. Harvey's guilt or innocence. I'm going to let you have a lot of latitude in inquiring in those areas, Mr. [Defense Counsel].

[DEFENSE COUNSEL]: All right.

THE COURT: If you want to ask him whether he thinks that Mr. Harvey is guilty as Mr. Harvey sits there, I'll permit you to do that.

[DEFENSE COUNSEL]: Okay.

THE COURT: Okay?

[DEFENSE COUNSEL]: All right, your Honor.

Mr. [Juror], do you recall what you saw in that article in the Rock Springs Miner last weekend or—

[JUROR]: Parts of it.

[DEFENSE COUNSEL]: Would you tell me, please, and the Court what you can recall?

[JUROR]: Well, I believe there was him and one other name, I thought, in the paper. And that it would have been tried and this—the State sent it back because it was—took too long for the trial and stuff.

[DEFENSE COUNSEL]: Okay. The first trial took too long before—

[JUROR]: Right, before it got started. Uh-huh.

[DEFENSE COUNSEL]: Okay. What were your thoughts as you read that article?

[JUROR]: Oh, my thoughts was the law, itself, you know, if—if it was innocent or guilty or whatever, it didn't change within eighteen months.

[DEFENSE COUNSEL]: Okay. So are you telling me that whatever the outcome of that first case was, eighteen months later it is not going to be any different?

[JUROR]: Right.

[DEFENSE COUNSEL]: And you know what the outcome of the case was, don't you?

[JUROR]: Well, according to the paper, it was guilty.

[DEFENSE COUNSEL]: Okay. So you're telling me and Judge * * * that it's probably still guilty eighteen months later?

[JUROR]: If it's being tried on the same thing. A jury just like the one you're going to pick has already give their honest opinion.

[DEFENSE COUNSEL]: And that's a little hard to put out of your mind, isn't it, Mr. [Juror]?

[JUROR]: Well, [y]eah. Yes and no. I mean, it's—it's doing it twice but maybe something has changed. I don't know.

[DEFENSE COUNSEL]: Um-hum.

[JUROR]: Because I've got nothing against him or I don't even know him or whatever.

[DEFENSE COUNSEL]: No, I understand that, sir, and I know that. I mean, I know you're not coming in here and saying "I don't like this man necessarily" but what you are coming in here with as I'm hearing you is the idea, "Well, I know that he's been convicted before because that was in the paper. And as the result of that, some of my own neighbors in the community have made that finding, based on the evidence that was presented then. And if that was the case back in July of 1987, it certainly should be the case now." Is that basically what you're saying?

[JUROR]: If it was proven that way, I guess.

[DEFENSE COUNSEL]: Okay. So then what you're telling me, you have that idea coming in here but now if we were to put on evidence and you heard different evidence this time even if it went to the same thing, you would keep your mind open sufficiently—

[JUROR]: Yes.

[DEFENSE COUNSEL]: —to where you would listen to my side of the story as well as [the prosecutor's]?

[JUROR]: Sure, I would.

[DEFENSE COUNSEL]: Okay. Sir, would you agree that perhaps two different jurors sitting on the same case in different locations at different times could, in fact, come up with different verdicts, based on the evidence, if they had the open mind we are talking about?

[JUROR]: I think probably, yes.

[DEFENSE COUNSEL]: Okay. And you're saying you're willing to do that?

[JUROR]: Yeah.

[DEFENSE COUNSEL]: And you'll give me the commitment that you'll keep your mind open and if you're not convinced beyond a reasonable doubt of Mr. Harvey's guilt in this case, you will acquit him and find him not guilty?

[JUROR]: Yes, if I'm not convinced by whatever comes out.

[DEFENSE COUNSEL]: Yes.

Well, your Honor, I would still—Let me just ask you a couple of other things.

Mr. [Juror], have you heard or read anything else about the case?

[JUROR]: Not to my knowledge. I don't read that much on this.

[DEFENSE COUNSEL]: When you read the paper and knew you were on this jury panel for this morning, did you talk to anyone about it?

[JUROR]: Oh, just the guys at work and stuff.

[DEFENSE COUNSEL]: And where do you work, sir? I can't recall.

[JUROR]: Out at Bridger Coal.

[DEFENSE COUNSEL]: And what were some of the things that were said in that—in those conversations?

[JUROR]: Basically, what there is here. I mean, it's probably swayed me in my opinion—or it hasn't swayed me. It has let me know what little bit I know about the case.

[DEFENSE COUNSEL]: Okay. It may have had some influence on you?

[JUROR]: Some. But my—you know, I still feel my biggest problem is some people in Cheyenne overturned what people here did. You know,—

[DEFENSE COUNSEL]: Okay.

[JUROR]: —to me, it just—

[DEFENSE COUNSEL]: That bothers you?

[JUROR]: Bad on the economy.

THE COURT: I think you probably have stronger feelings than that, don't you?

[JUROR]: Well, yeah, but—

THE COURT: You're trying to be tactful, aren't you, Mr. [Juror]?

[JUROR]: I guess I have to be halfway honest about it.

THE COURT: I want you to be totally honest.

[DEFENSE COUNSEL]: I want to be more that, than halfway honest, as the Judge said early on. I know the Judge is a stranger to

you and so am I and he has on his robe but this is the time you should express yourself to both of us.

[JUROR]: Well, that's my whole problem here. I don't really know what happens in the case. I just know what happened for me to get here.

[DEFENSE COUNSEL]: Okay.

[JUROR]: You know, through the—

THE COURT: Mr. [Defense Counsel], can I ask him a question?

[DEFENSE COUNSEL]: Yes, sir. I wish you would.

THE COURT: You told the Prosecutor you are willing to assume that Mr. Harvey is innocent because that's what he asked you. Are you able to assume that he's innocent? And I'm sure that you—you're willing to do that. But being willing and being able are two different things.

[JUROR]: I could be able if it's told to me so I could understand.

THE COURT: You believe deep down in your soul that you're able to look at Mr. Harvey and conclude that he's innocent as he sits there?

[JUROR]: Yeah. I—I don't know him, so I don't—really know the cases that went into it. My whole problem isn't him or the acts that got him there.

THE COURT: My concern, Mr. [Juror], is that you say that the law changed but the act hasn't.

[JUROR]: Right.

THE COURT: And then you say that if another's—if it's still the same old charge, then you don't think that the result will be any different. Now, when I put all of those things together, I begin to have doubts about whether or not you could turn Mr. Harvey loose if the evidence required that he be turned loose. In other words, can you afford him a reasonable doubt and can you say that he's innocent if he is, in fact, innocent? Do you understand what I'm trying to say to you?

[JUROR]: Yeah.

THE COURT: What's your response?

[JUROR]: I think they would have to prove to me that he is innocent.

THE COURT: Okay.

[JUROR]: I'm sorry.

[DEFENSE COUNSEL]: That he is innocent. They would have to prove to you that he's innocent.

[JUROR]: ([Juror] nodded.) That's—

[DEFENSE COUNSEL]: Your Honor, I would renew—

THE COURT: That's not the law.

[JUROR]: I know that isn't.

THE COURT: Okay. Mr. [Prosecutor], are there any questions you have for Mr. [Juror]?

[PROSECUTOR]: Just a couple, your Honor.

THE COURT: Okay. That's a good answer, Mr. [Juror], and I'm glad you said that to me. I'm not mad at you at all.

[JUROR]: Okay.

THE COURT: And I'm grateful to you, as is the Defendant and as is the State. Because we want it to be a fair trial. You know, if you were sitting over there, you would want Mr. Harvey to level with the judge and level with you.

[JUROR]: Right.

THE COURT: Okay.

[PROSECUTOR]: Thank you, your Honor. Mr. [Juror], one of the things that you mentioned a few minutes ago caught my interest and you were being asked about the outcome and you said that something to the effect that the outcome would be still guilty if they were being tried on the same thing.

[JUROR]: Um-hum.

[PROSECUTOR]: And that made me wonder was it clear to you based on what you heard here earlier this morning that Mr. Harvey is not here today to be tried on the same charge that * * * he was before?

[JUROR]: Well, I assumed something would change. I don't know.

[PROSECUTOR]: Okay. Let me tell you that the charge has changed. That the charge or charges that Mr. Harvey faces today are conspiracy charges and that he was not charged with conspiracy previously. And let me also tell you that conspiracy or a charge of conspiracy means that the State has to prove some things that are different from the original charges.

Now, knowing that, does it cause you to stop or reflect any or does any of that make a difference to you?

[JUROR]: Well, what exactly is—Well, it don't make no difference—if it's a whole different thing, conspire, as you say, I think—I would have to be open-minded about it. I—I would go by what I hear here.

THE COURT: What did you think the charges were the first time around against Mr. Harvey?

[JUROR]: Oh, I thought they were rape.

THE COURT: Anything else?

[JUROR]: Oh, not that I know of.

THE COURT: One of the charges now is conspiracy to rape.

([The juror] laughed.)

THE COURT: You laugh at that. Do you think that's a distinction without a difference, Mr. [Juror]?

[JUROR]: I don't know. (Pause) What—what would actually be conspiracy?

THE COURT: Pardon?

[JUROR]: What would actually be conspiracy? What is it? I don't know too much about this stuff. Sorry I'm taking all of your time.

THE COURT: Just one moment, Mr. [Juror].

Where's the statute book on this bench, Mr. Brown?

MR. BROWN: I beg you pardon?

THE COURT: It says crimes right here. That must be it.

[DEFENSE COUNSEL]: I have a copy of a proposed instruction. I've got an instruction

that I was going to propose. We haven't debated it. It's just a definition that's got a different background.

THE COURT: Here, I found it now. Section 6-1-303 of the Wyoming Statutes reads as follows, Mr. [Juror]: A person is guilty of conspiracy to commit a crime if he agrees with one or more persons and they or one or more of them—Let me begin again. A person is guilty of conspiracy to commit a crime if he agrees with one or more persons that they or one or more of them will commit a crime and one or more of them does an overt act to effect the object of the agreement. That's conspiracy. In short, the agreement to commit a crime. Agreeing to commit a crime is a crime. Fair enough, Mr. [Defense Counsel]?

[DEFENSE COUNSEL]: Yes, sir.

THE COURT: Mr. [Prosecutor]?

[PROSECUTOR]: Yes, sir.

THE COURT: That's what conspiracy is.

[JUROR]: Thank you.

THE COURT: Now, do you want to answer the question that was posed to you? Do you remember it?

[JUROR]: If it was conspiracy, you asked me?

[PROSECUTOR]: I think I had asked if that would make a difference?

[JUROR]: Well, it might, you know, or it would. I don't know if he agreed to it or not. He might have argued and just have been a part of it.

[PROSECUTOR]: Okay. Something that might be on people's minds and I'm—I don't know if you really said this or not but I'm just assuming a few things. Tell me if I'm right or wrong. But do you disagree with what the Supreme Court did?

[JUROR]: Yes.

[PROSECUTOR]: Okay. Would that disagreement with the Supreme Court be such that it would affect the way you listen to the evidence in [this] case?

[JUROR]: No.

[PROSECUTOR]: Would your disagreement with the Supreme Court cause you—would it affect your verdict?

[JUROR]: No. No.

[PROSECUTOR]: Okay. Understand that nobody is trying to tell you that you have to feel one way or the other, all right?

[JUROR]: Right.

[PROSECUTOR]: Your beliefs are your own and no one is trying to change them in any way. We're just trying to make sure those beliefs won't affect the way you reach and render your verdict in this case.

[JUROR]: All right.

[PROSECUTOR]: Okay. Now, in light of the questions that you've been hit with in the last few minutes here, is it still fair for us to assume that you are willing and able to set aside any concerns you might have and decide the case just on the basis of what you see and hear in evidence?

[JUROR]: Yes.

[PROSECUTOR]: Okay. Thank you. That's all.

THE COURT: Okay. Mr. [Juror], Mr. Harvey was previously charged with, tried and convicted of rape. The Supreme Court, as you know, reversed that conviction. He's now charged with conspiracy to commit rape. He's charged with having unlawfully agreed to commit rape with someone. I get the feeling that you really see that—the differences between agreeing to rape and raping as being the distinction without a difference. Am I wrong about your feelings, Mr. [Juror]?

[JUROR]: That's pretty close to right.

THE COURT: Pardon?

[JUROR]: I would say you're right.

THE COURT: Mr. [Juror], I'm going to excuse you because you're the first juror and I have some concerns but I want to talk to you because you're the first one up. I don't want you going back and talking to the other jurors about what went on in here or to anyone else until the trial is over. I'm very concerned that Mr. Harvey might not be able to get a fair trial in Sweetwater County. He doesn't have to be tried in Sweetwater County. He can be given a trial somewhere else and if he can't get a jury that can give him a clean slate going in, then we ought to take this case somewhere else. I want to talk with you just about how wide the publicity is in Sweetwater County. I'm trying to get a feel for it because I don't live here.

Mr. [Juror], where do you work by the way?

[JUROR]: I work for Bridger Coal. It's out here.

THE COURT: I know what Bridger Coal is. What is your position out there?

[JUROR]: I'm a stripping supervisor.

THE COURT: Pardon?

[JUROR]: Stripping supervisor.

THE COURT: So you're out in the mine?

[JUROR]: Yes.

THE COURT: You're on shift work?

[JUROR]: Yes.

THE COURT: Do you folks have a dog house or change room out there?

[JUROR]: Yes.

THE COURT: Are you part of the change room?

[JUROR]: Yes.

THE COURT: So you're in there when the hands come in and change and go out on shift and you're there when they come back off shift?

[JUROR]: Yes.

THE COURT: Was there quite a bit of discussion in the change room out there on the job or anywhere else on the job about this case, Mr. [Juror]?

[JUROR]: Right when it come out in the Rock Springs Rocket is the only time I heard it out there.

THE COURT: And how would you describe the general reaction of the people to this case that talked about it?

[JUROR]: Most of them—

THE COURT: Pissed off?

[JUROR]: Yeah. They were. They are pretty well concerned, anyway.

THE COURT: At whom?

[JUROR]: At the State for overturning it.

THE COURT: At the Supreme Court?

[JUROR]: Yes.

THE COURT: How about Mr. Harvey?

[JUROR]: Oh, it wasn't even brought up much. Like I say, I didn't even know what it was about until then and then since I read it in the paper, the rape and all that stuff, the assumed rape—

THE COURT: Do you recall when it was that it first came out?

[JUROR]: When the paper first come out?

THE COURT: Yeah, when it first came out that the Supreme Court had overturned it?

[JUROR]: No. I don't even remember when they did that.

THE COURT: Okay. It was about this time last year, maybe a little later, along about February, March. Does that refresh your recollection?

[JUROR]: No, I'm sorry. I don't recall.

THE COURT: Okay. Can you recall the—you heard about the case by reading about it in the newspaper just this last weekend?

[JUROR]: Yes.

THE COURT: Prior to that, when was the last time that you heard anything about the case?

[JUROR]: Oh, I probably heard something about it when it was going on but I—I don't follow it that much.

THE COURT: Did you hear talk out at the job this last week about this case?

[JUROR]: Yes.

THE COURT: Okay. What was the general nature of—what was the general consensus of opinion out there on the job about this case?

[JUROR]: Oh, there was no—everybody just figured it was right the first time.

THE COURT: Does everybody think that Mr. Harvey is guilty?

[JUROR]: We'd—anybody could have been. Whoever the name was. You know, they were just telling about the—I believe it was three people and one guy turned evidence on it or something.

THE COURT: But the general consensus is that the defendant, whatever his name is, is guilty?

[JUROR]: I would think so, yes.

THE COURT: Was it the general consensus that if he isn't guilty of rape, then he must be guilty of something else?

[JUROR]: No.

THE COURT: Was it the general consensus that because he was turned loose on the previous charges, if he was tried again, he ought to be convicted of something?

[JUROR]: No.

THE COURT: So, really, the talk, then, am I fair—Let me put it this way. Can I draw the conclusion, therefore, that the talk was really about the Supreme Court rather than Mr. Harvey or someone—or the Defendant?

[JUROR]: I would say, yes, the people I talked with.

THE COURT: So they were talking about those stupid judges, huh?

[JUROR]: Well, the Supreme Court Judges, yeah.

(Laughter)

THE COURT: Okay. You know, we're just human beings, too, you know.

[JUROR]: I know that.

THE COURT: Okay. Did you detect any anger in the community over what's happened?

[JUROR]: No.

THE COURT: Are they mad at anybody?

[JUROR]: No.

THE COURT: How about the Supreme Court? Are they mad at the Supreme Court?

[JUROR]: It won't do them no good. I don't believe so.

THE COURT: Are they mad at Mr. Harvey?

[JUROR]: As far as I know, they don't know him.

THE COURT: Okay. Well, you know, people can be mad at Manuel Noriega and we don't know him. I don't like the son of a gun. How about you?

[JUROR]: Yeah. True.

THE COURT: And it's in that same sense, Mr. [Juror].

[JUROR]: Right.

THE COURT: Did you detect anger in that same sense against Mr. Harvey?

[JUROR]: No.

THE COURT: Okay. So is it a fair summary that if it hadn't been for the newspaper arguments in the last couple of weeks, you wouldn't have thought anything more about the case, huh?

[JUROR]: My own personal thing, I wouldn't have known nothing about it.

THE COURT: Anything you want to say to me, Mr. [Juror]?

[JUROR]: No.

THE COURT: Okay. Is there anything that you want to ask in general, Mr. [Defense Counsel], Mr. [Prosecutor]?

[DEFENSE COUNSEL]: No.

THE COURT: I'm trying to get a feeling for what may be coming by talking to the first juror that I'm excusing, Mr. [Defense Counsel].

[DEFENSE COUNSEL]: No. I just hope you understand, Mr. [Juror], that I have nothing personal against you on any of these things.

[JUROR]: Okay.

[DEFENSE COUNSEL]: Thank you, sir.

THE COURT: I think the final proof of it is if you were sitting where Mr. Harvey sat,—

[JUROR]: I would be scared to death.

THE COURT: —you would be scared to death of a juror like you, wouldn't you?

[JUROR]: Probably, but I think I'm pretty honest. I think you would be lucky. (Laughter)

THE COURT: Okay.

Although the first juror, whose recitation is provided in the prior footnote, may have been the most outspoken, the recognition of community bias and predisposition in the questioning continued as demonstrated by the trial court's conciliatory attitude. The entire panel examined numbered seventy-five. Less than a dozen of that number *originally* were not aware of the prior conviction and Wyoming Supreme Court reversal. Approximately sixty-four were specifically aware of the case, of whom thirty were removed for obvious bias, basically because of the Wyoming Supreme Court reversal of the prior jury verdict.

The record in this case regarding newspaper coverage of the Harvey and Phillips rape and kidnapping cases is complex and incomplete. A trial court motion was filed in the Phillips retrial to dismiss on the basis of excess prejudicial pretrial publicity and for an alternative change of venue. The motion filed in behalf of Phillips, and a comparable motion filed in behalf of Harvey, were consolidated and then determined by an order of pretrial decision recognizing that each defendant had adopted and joined in the motion of the other.

Attached to the Phillips motion, which was not filed separately in the Harvey record, although consolidated for decision by the trial court, were extensive newspaper clippings detailing the course of publicity from Wyoming Supreme Court decision of reversal to mid-October 1989. Those enclosures are similar to but not identical with the appendix attached to the brief filed here by Harvey. Although originally denied at the same time Harvey's motion was denied, Phillips was subsequently given a change of venue for a sequentially later trial following the Harvey proceeding which was held in Green River from January 8 through 17, 1990.

In the thousand-page voir dire examination, specific reference was made by counsel and the trial court to the previously filed copies of newspaper stories. One of the major differences between the motion

attachments and the subsequent appendix to the brief were three new stories published at the time of the commencement of the Harvey trial in January 1990, some parts of which were seen and read by an indeterminate number of prospective jurors and some even apparently while the jurors were waiting to be examined for voir dire in the actual trial proceedings. These news stories are not found in the earlier filed documents in support of a change of venue motion, but were marked and are found as exhibits "A" and "B" in Volume VI of the transcript in the present record.

These three newspaper stories, published immediately before or during the Harvey trial, made clear that a conviction had earlier occurred and that the conviction had been reversed by action of the Wyoming Supreme Court. The first story was dated Saturday, January 6, regarding the convening of court for the trial the following Monday. The second, after the trial had commenced, discussed preliminary voir dire examination events, and the third related to a lawsuit that the victim had just filed in a civil proceeding claiming damages for assault, including $1 million punitive damages. See, for example, the voir dire discussion of the thirtieth juror about having read the Saturday newspaper story.

One the most interesting jurors who remained on the panel, but did not ultimately serve, was sequential juror number forty-four, who had done a paper for a college class regarding media coverage of the Harvey and Phillips cases. The class assignment was to analyze and compare coverage of the events following the Wyoming Supreme Court reversal between that provided by the local paper and the Casper Star–Tribune as a newspaper of statewide circulation. The jury panel member, as author in the class study, stated she found that the coverage was different in essentially finding a more biased approach in the local newspapers in comparison to the Casper Star–Tribune coverage, e.g., focused text which was antagonistic to the defendants.

[DEFENSE COUNSEL]: I think we would have been, too. You're one of the jurors that

I selected that I would have wanted to have, Mr. [Juror]. I think we are going to see a lot worse before the day is over.

Judicial review of a denied change of venue requires analysis of the entire circumstance. Consequently, examination of the more than 1,000 pages of voir dire transcript and its content is required. I start that review with the basic understanding that the Harvey and Phillips cases had caused monumental community reaction by simultaneously touching two very tender nerves in community perception and responsiveness. The first was a multiple-perpetrator sexual assault with, by "community standards," only one person (Swazo) properly punished, and the second, perhaps well-recognized to be even more predominate, was the reactivity to implied criticism about the adequacy of the function of the local judicial system "denied speedy trial." Ego and anger, unrequited by a very abusive Wyoming Supreme Court dissent written for media exposure, and defensiveness by the local prosecutor and the trial judge about the fact that it took eighteen months to try a relatively straight forward sexual assault charge, fueled the deep-seated reactivity. A scapegoat was required and was provided by assertion of the next trial judge and others in the community that the majority of the Wyoming Supreme Court had reversed the first conviction to punish the original trial judge for unasserted reasons. *See also* Christopher J. Walsh, Note, *CRIMINAL PROCE-DURE—The Right to a Speedy Trial—Has the Wyoming Supreme Court Correctly Applied the Balancing Test? Harvey v. State*, 774 P.2d 87 (Wyo.1989), XXV Land & Water L.Rev. 267, 279 (1990).

Within the jury panel, eighty-five percent of the members were aware of the prior conviction and its reversal. Nearly half of the venire people had a solidly founded conclusion of guilt and that a speedy trial was an unnecessary gimmick without legal justification.

It is clear beyond any question that the second trial judge, following his decision to deny a change of venue and then, when surprised in voir dire about the depth of community knowledge and reaction, exceeded almost superhuman judicial atten-tion and effort to provide the most fair jury that could be selected under the circumstances, both through leave to counsel to explore broadly in voir dire and a generally selective elimination. The effort conscientiously was addressed to minimize bias among prospective jurors and give Harvey some measure of receptivity by seating non-determinate members of the panel.

The trial court then made an interesting observation and presented Harvey with a most unusual dilemma. At mid-point in the initial voir dire examination, and then later after the first course of selection had been completed, the trial judge directed defense counsel to consider whether the few "uninformed" persons who might serve should be advised of what everybody else already knew in advance of the commencement of trial. It was not determined at this stage that the evidence of prior conviction would be admissible in trial. The trial judge's concern involved the likely shock to those who were not attuned to the facts when they found out from other jurors about the prior history of the case. As a result of "leveling the playing field," action was consequently taken in voir dire to advise the uninformed of the prior conviction and reversal to at least permit inquiry—nominal as it would then have been—whether that knowledge would affect their fairness and impartiality.

All of this might have achieved a faint prospect of fairness if a second and more specific decision had not then been made by the trial court, following empaneling of the jury, which was unintentionally or otherwise directed to ensure conviction. Added to predisposed status created by the jury's knowledge of prior conviction and reversal by the "non-substantial" concept of a denied speedy trial, the trial court surcharged the status by deciding that the State could insert into proof Harvey's allocution statements which he had made in first prosecution following his unconstitutional conviction. Thus, trial evidence was presented of his confession as a judicially embossed standard of guilt.[21]

---

**21.** It was surprising that it took a day and a quarter for the jury to reach a verdict after

From the standpoint of trial fairness, it is indisputable that the allocution statement authenticated by judicial embroidery under the circumstance when made, while permitting the voir dire information to the jury of the first guilty verdict on exactly the same evidence, predetermined a guilty verdict result beyond any measure of question. The logical progression under these circumstances was inescapable: first trial—guilt—allocution admission that the guilty verdict was correct—"unjustified" reversal by the Wyoming Supreme Court—retrial—introduction of admission of guilt via allocution "confession" in addition to acquaintanceship with guilt determination in the prior jury verdict—inevitable conviction. The result for the jury decision was realistically foreordained with these two factors in place. With essential fact finding eliminated, the jury became the instrumentality to ensure punishment for the confessed criminal and provided community absolution from the prior speedy trial "miscarriage of justice" reversal.

The question provided in context of a Wyo.Const. art. 1, § 10 impartial jury is, how do you find, in knowledge of prior determination of guilt plus confession after verdict to seek sentencing benefit, something that leaves an open issue for fair and impartial review in the present verdict? Can this process provide equal protection and due process in any context?

The basic United States constitutional stature for a fair and impartial jury as originally enunciated in *Reynolds*, 98 U.S. 145 was structured and defined for an excessive publicity circumstance in *Dowd*, 366 U.S. 717, 81 S.Ct. 1639. In *Dowd*, a murder conviction in an Indiana state court was reversed by the federal habeas corpus process. Justice Clark stated:

> England, from whom the Western World has largely taken its concepts of individual liberty and of the dignity and worth of every man, has bequeathed to us safeguards for their preservation, the most priceless of which is that of trial by jury. This right has become as much

American as it was once the most English. Although this Court has said that the Fourteenth Amendment does not demand the use of jury trials in a State's criminal procedure, *Fay v. New York*, 332 U.S. 261 [67 S.Ct. 1613, 91 L.Ed. 2043]; *Palko v. Connecticut*, 302 U.S. 319 [58 S.Ct. 149, 82 L.Ed. 288], every State has constitutionally provided trial by jury. See Columbia University Legislative Drafting Research Fund, Index Digest of State Constitutions, 578–579 (1959).

*Dowd*, 366 U.S. at 721–22, 81 S.Ct. at 1642. Justice Clark then went further:

> It is true that the presiding judge personally examined those members of the jury panel whom petitioner, having no more peremptory challenges, insisted should be excused for cause, and that each indicated that notwithstanding his opinion he could render an impartial verdict. But as Chief Justice Hughes observed in *United States v. Wood*, 299 U.S. 123, 145–146 [57 S.Ct. 177, 185, 81 L.Ed. 78 (1936)]: "Impartiality is not a technical conception. It is a state of mind. For the ascertainment of this mental attitude of appropriate indifference, the Constitution lays down no particular tests and procedure is not chained to any ancient and artificial formula."
>
> Here the build-up of prejudice is clear and convincing. An examination of the then current community pattern of thought as indicated by the popular news media is singularly revealing.

*Dowd*, 366 U.S. at 724–25, 81 S.Ct. at 1643–44.

The thoughtful and intense analysis resulting in reversal in *Dowd* has since been followed by five other comprehensively composed and carefully considered United States Supreme Court decisions. Not one of these cases would have countenanced venued trial in Sweetwater County under these circumstances. *Rideau v. Louisiana*, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963) required reversal based on the exposure of the jury to the specifics of the

---

submission. The compromise made was to provide only one finding of guilt for conspiracy to

commit kidnapping and a finding of not guilty for conspiracy to commit a sexual offense.

defendant's personal confession in detail to the crimes for which he was charged. In operational facts, in this present appeal with the admission of the allocution evidence and assurance that each juror knew of the prior conviction, this case identically achieves a *Rideau* status in guaranteed jury verdict of conviction within this present proceedings. The *Rideau* conviction was, of course, reversed, and F. Lee Bailey achieved the same reversal result of Sam Sheppard's conviction in *Sheppard v. Maxwell*, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966). Although the publicity achieved was certainly greater in that cause celebre during the extended *Sheppard* trial, parallel features exist which, in particular, result here from the prior reversal for denied speedy trial which authored the editorial and news barrages against the appellate court. The non-achievable expectancy there stated, and here repeated, of "I have confidence in the jury," seeks not only the implausible, but the impossible.

But the Court has also pointed out that "[l]egal trials are not like elections, to be won through the use of the meeting-hall, the radio, and the newspaper." *Bridges v. California*, [314 U.S. 252], at 271 [62 S.Ct. 190, 197, 86 L.Ed. 192 [(1941)]. And the Court has insisted that no one be punished for a crime without "a charge fairly made and fairly tried in a public tribunal free of prejudice, passion, excitement, and tyrannical power." *Chambers v. Florida*, 309 U.S. 227, 236–237 [60 S.Ct. 472, 477, 84 L.Ed. 716] (1940). "Freedom of discussion should be given the widest range compatible with the essential requirement of the fair and orderly administration of justice." *Pennekamp v. Florida*, 328 U.S. 331, 347 [66 S.Ct. 1029, 1037, 90 L.Ed. 1295] (1946). But it must not be allowed to divert the trial from the "very purpose of a court system ... to adjudicate controversies, both criminal and civil, in the calmness and solemnity of the courtroom according to legal procedures." *Cox v. Louisiana*, 379 U.S. 559, 583 [85 S.Ct. 466, 471, 13 L.Ed.2d 487] (1965) (Black, J., dissenting). Among these "legal procedures" is

the requirement that the jury's verdict be based on evidence received in open court, not from outside sources. Thus, in *Marshall v. United States*, 360 U.S. 310 [79 S.Ct. 1171, 3 L.Ed.2d 1250] (1959), we set aside a federal conviction where the jurors were exposed "through news accounts" to information that was not admitted at trial. We held that the prejudice from such material "may indeed be greater" than when it is part of the prosecution's evidence "for it is then not tempered by protective procedures." At 313 [79 S.Ct. at 1173]. * * *

* * * * * *

The undeviating rule of this Court was expressed by Mr. Justice Holmes over half a century ago in *Patterson v. Colorado*, 205 U.S. 454, 462 [27 S.Ct. 556, 558, 51 L.Ed. 879] (1907):

"The theory of our system is that the conclusions to be reached in a case will be induced only by evidence and argument in open court, and not by any outside influence, whether of private talk or public print."

*Sheppard*, 384 U.S. at 350–51, 86 S.Ct. at 1516.

In *Groppi v. Wisconsin*, 400 U.S. 505, 91 S.Ct. 490, 27 L.Ed.2d 571 (1971), the court involved itself with a change of venue statutory prohibition for Wisconsin misdemeanors and applied a similar constitutionally protective persuasion. The court discerned that the accused was entitled to a change of venue if required to provide a fair trial.

Here we are concerned with the methods available to assure an impartial jury in a situation where, because of prejudicial publicity or for some other reason, the community from which the jury is to be drawn may already be permeated with hostility toward the defendant. The problem is an ancient one. Mr. Justice Holmes stated no more than a commonplace when, two generations ago, he noted that "[a]ny judge who has sat with juries knows that in spite of forms they are extremely likely to be impregnated by the environing atmosphere." *Frank v. Mangum*, 237 U.S. 309, 349 [35 S.Ct.

582, 595, 59 L.Ed. 969 (1915)] (dissenting opinion).

*Groppi,* 400 U.S. at 509–10, 91 S.Ct. at 493.

In recognizing the congruity involved to the *Rideau* decision, the court said:

> *Rideau* was not decided until 1963, but its message echoes more than 200 years of human experience in the endless quest for the fair administration of criminal justice.[12]

[12] See *Rex v. Harris,* 3 Burr. 1330, 1333, 97 Eng.Rep. 858, 859 (K.B.1762): "Notwithstanding the locality of some sorts of actions, or of informations for misdemeanors, if the matter can not be tried at all, or can not be fairly and impartially tried in the proper county, it shall be tried in the next adjoining county." (Lord Mansfield.)

*Groppi,* 400 U.S. at 511, 91 S.Ct. at 493. In addition, Justice Stewart quoted *Crocker v. Justices of Superior Court,* 208 Mass. 162, 178–79, 94 N.E. 369, 376–77 (1911) in footnote:

> "... There can be no justice in a trial by jurors inflamed by passion, warped by prejudice, awed by violence, menaced by the virulence of public opinion or manifestly biased by any influences operating either openly or insidiously to such an extent as to poison the judgment and prevent the freedom of fair action. Justice cannot be assured in a trial where other considerations enter the minds of those who are to decide than the single desire to ascertain and declare the truth according to the law and the evidence. A court of general jurisdiction ought not to be left powerless under the law to do within reason all that the conditions of society and human nature permit to provide an unprejudiced panel for a jury trial."

*Groppi,* 400 U.S. at 511 n. 12, 91 S.Ct. at 493 n. 12.

Converse persuasion cannot be taken from *Murphy v. Florida,* 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975). In the present case, the Wyoming Supreme Court is called to exercise a supervisory responsibility for the state judicial system. A mistake is made when we ignore that responsibility as defined by similar circumstances in *Marshall v. United States,* 360 U.S. 310, 313, 79 S.Ct. 1171, 1173, 3 L.Ed.2d 1250 (1959).

Recognizing the consideration first given in *Marshall,* and then followed in *Murphy,* the historical relevance can surely not be ignored regarding the time sequencing of the publicity barrage. The *Murphy* seven-month hiatus between publication and trial is not found here; rather, we have, at best, a two-day lapse in news coverage before the jury began voir dire.

> The District Court found, however, that the news articles concerning petitioner had appeared almost entirely during the period between December 1967 and January 1969, the latter date being seven months before the jury in this case was selected. They were, moreover, largely factual in nature.

> The length to which the trial court must go in order to select jurors who appear to be impartial is another factor relevant in evaluating those jurors' assurances of impartiality. In a community where most veniremen will admit to a disqualifying prejudice, the reliability of the others' protestations may be drawn into question; for it is then more probable that they are part of a community deeply hostile to the accused, and more likely that they may unwittingly have been influenced by it.

*Murphy,* 421 U.S. at 802–03, 95 S.Ct. at 2037.

Furthermore, in recognition of the pervasive responsibility of the supervisory court, Chief Justice Burger, concurring in the judgment in *Murphy,* 421 U.S. at 803–04, 95 S.Ct. at 2038, stated:

> I agree with Mr. Justice BRENNAN that the trial judge was woefully remiss in failing to insulate prospective jurors from the bizarre media coverage of this case and in not taking steps to prevent pretrial discussion of the case among them. Although I would not hesitate to reverse petitioner's conviction in the exercise of our supervisory powers, were this a federal case, I agree with the Court that the circumstances of petitioner's trial did not rise to the level of a

violation of the Due Process Clause of the Fourteenth Amendment.

Justification for the State of Wyoming, and now this majority, to disregard the comprehensive course of developed United States Supreme Court decisions comes from misapplication of the principles elucidated in *Patton v. Yount*, 467 U.S. 1025, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984). The differences are twofold. First, in *Patton*, heightened publicity came *before the first trial* whereas here it developed because of a reversal of the first trial verdict and the subsequent community perceived and media-directed consensus that denied speedy trial was insufficient justification. The second and even greater difference was the conduct here where the trial court recognized the need to avoid keeping the secret from only some jurors and then applied the supra-imposition of the post-conviction judicial confession by introduction of Harvey's allocution statement into evidence. Thus, the panel members who were informed of the prior conviction were then directed in decision by the statements made in allocution by Harvey as a post-conviction first-trial "confession."

This was not a fair trial; it was a procedurally predetermined and irretrievably directed result. This was not a case of " 'little, if any, talk in public' between the trials." *Id.* at 1028, 104 S.Ct. at 2887. Likewise, this case did not involve a significant "lapse in time [which] had a profound effect on the community and, more importantly, on the jury, in softening or effacing opinion." *Id.* at 1033, 104 S.Ct. at 2889.

Just as Justice Stevens concluded in his dissent in *Yount* (quoting from Justice Frankfurter's concurrence in *Dowd*, 366 U.S. at 729, 81 S.Ct. at 1646), this majority decision to authenticate retrial in Sweetwater County under these circumstances is completely without legal or philosophic justification:

"More than one student of society has expressed the view that not the least significant test of the quality of a civilization is its treatment of those charged with crime, particularly with offenses which arouse the passions of a community. One of the rightful boasts of Western civilization is that the State has the burden of establishing guilt solely on the basis of evidence produced in court and under circumstances assuring an accused all the safeguards of a fair procedure. These rudimentary conditions for determining guilt are inevitably wanting if the jury which is to sit in judgment on a fellow human being comes to its task with its mind ineradicably poisoned against him." 366 U.S., at 729 [81 S.Ct. at 1646].

*Yount*, 467 U.S. at 1054, 104 S.Ct. at 2900.

Examples of recent state court litigation involving a requested change of venue to provide a fair trial is also informative. In *People v. Williams*, 48 Cal.3d 1112, 259 Cal.Rptr. 473, 480, 774 P.2d 146, 152–53 (1989), the sequential time of decision requires recognition:

Whether raised on petition for writ of mandate or on appeal from judgment of conviction, the reviewing court must independently examine the record and determine de novo whether a fair trial is or was obtainable. * * * The factors to be considered are the nature and gravity of the offense, the nature and extent of the news coverage, the size of the community, the status of the defendant in the community, and the popularity and prominence of the victim. * * *

Of course, the question presented on appeal from a judgment of conviction is necessarily different from that on a petition for writ of mandate. " 'A significant difference between pretrial and posttrial review is that after conviction in determining whether a defendant received a fair and impartial trial under the "reasonable likelihood" standard, the review is *retrospective....*.' In other words, voir dire may demonstrate that pretrial publicity had no prejudicial effect," or conversely may corroborate the allegations of potential prejudice. * * *

Put differently, because the prejudicial effect of publicity before jury selection is necessarily speculative, it is settled that "any doubt as to the necessity of removal ... should be resolved in favor of a

venue change." * * * After trial, any presumption in favor of a venue change is unnecessary, for the matter may then be analyzed in light of the voir dire of the actual, available jury pool and the actual jury panel selected. The question then is whether, in light of the failure to change venue, it is reasonably likely that the defendant in fact received a fair trial.

The court then analyzed the facts, whether raised on petition for writ of mandamus or on appeal from the judgment and conviction, and found the standard of review to be the same. "A showing of actual prejudice 'shall not be required.' * * *" *Id.* 259 Cal.Rptr. at 480, 774 P.2d at 153. The analytical factors "viewed not only in isolation but in relation to one another, compelled a change of venue in [*Williams*]." *Id.* Those included small population, 117,000; strong local press; widespread community awareness of the case; and extended and sometimes inflammatory publicity which continued to the date of decision. Each news story identified the defendant and was repeatedly found in front page and lead stories. The details were sensationally related. To extrapolate from that case, we would find here each of those factors also existed in Sweetwater County for the Harvey and Phillips—exacerbated by the media-sponsored attitude attacking the Wyoming Supreme Court reversal, and then capped at trial by the use of Harvey's allocution statement. The symbolism of the case was overtly "embedded in the public consciousness[.]" *Id.* 259 Cal.Rptr. at 483, 774 P.2d at 155–56. Unquestionably, these spectacular crimes after reversal "'aroused community attention'" and "'the possibility [or probability] of an unfair trial [did] originate in widespread publicity describing facts, statements and circumstances which tend to create a belief [of] guilt.'" *Id.* 259 Cal.Rptr. at 482, 774 P.2d at 155.

Particularly decisive here is the fact that the basis for Wyoming Supreme Court reversal—constitutionally denied speedy trial—emphasized the perceived validity of guilt within the community of jury panel participants. When the allocution evidence was added to the community perception of guilt, there was nothing left for the jury to consider regarding reasonable doubt. The jury is transposed into the handmaiden of the avenger with sword in hand. There is here far more than a reasonable likelihood—it nearly reaches a sociological certainty—that this defendant, when retried in Sweetwater County after the denied speedy trial reversal, could not and did not, receive either a fair trial or access to consideration by an impartial jury. A guilty verdict was a near certainty.

Similarly in *Hughes v. State*, 490 A.2d 1034 (Del.Super.1985), the fact that the jurors acquired knowledge of defendant's prior conviction in an earlier trial was sufficient to establish prejudice. The totality of the circumstances test applied in *Hughes* is equally persuasive in this case to require reversal as a matter of logic and law. Predominating considerations in the Delaware case were knowledge of the prior conviction and publicity regarding polygraph testing. Here, Harvey's allocution evidence was undeniably more decisive than just the generally questionable polygraph result in *Hughes*, even among scientifically unsophisticated jurors who may have been chosen to serve. In the factual context of *Hughes*, we have here a similarly unrebutted presumption that an impartial jury was never impaneled.

The totality of the circumstances understanding was likewise enforced in *People v. Boudin*, 97 A.D.2d 84, 469 N.Y.S.2d 89 (1983) because of preconceived opinion among the citizens arising from the "invidious" publicity tending to arouse ill will and vindictiveness. The prosecution's "assertion that 12 jurors [might] ultimately be found who [would] steadfastly maintain their impartiality is, under the circumstances of this case" intrinsically suspect. *Id.* at 91, 469 N.Y.S.2d 89. *See Amin*, 811 P.2d at 262, Urbigkit, C.J., dissenting. In terms of reason and logic to decisionally determine by simple statement that what is, in fact, is not, surely lacks adjudicatory merit or legal worth.

Although not reversing in the particular case, *Newcomb v. State*, 800 P.2d 935 (Alaska App.1990) examines and enumer-

ates factors which should, to a significant extent, inform our decision in this case. Each adverse factor described in *Newcomb* occurred here. Those include the nature of the publicity and whether it was inherently prejudicial. Additional factors present here but not found in *Newcomb* include editorials, a published letter by the victim, judicial comment, and news statements by the prosecution. Here, the confession comes in sideways by first conviction, constitutionally reversed, to be followed by the admission of the allocution in that proceeding as evidence of guilt at second trial. *Newcomb* also addresses the relevance of news reports of important details that the defendant will actively seek to dispute, emotionally charged editorials, and high interest continuing to trial in a community with a relatively small population base. Decisively, *Newcomb* differs from this case because it did not provide a nine-month hiatus before trial following periods of high publicity.

The trial of a second brother to follow a death penalty murder conviction of the first brother occasioned consideration of similar factors for change of venue in *Williams v. Superior Court of Placer County*, 34 Cal.3d 584, 194 Cal.Rptr. 492, 668 P.2d 799 (1983). That court examined five facts within which four were significant in mandating the change of trial location. These included:

(1) the nature and extent of the publicity, (2) the size of the population of Placer County, (3) the nature and gravity of the offense, (4) the status of the victim and of the accused, and (5) whether political overtones are present.

*Id.* 194 Cal.Rptr. at 494, 668 P.2d at 801. Added by footnote was consideration of the passage of a substantial time during which extensive publicity was absent.[22]

In *People v. Taylor*, 101 Ill.2d 377, 78 Ill.Dec. 359, 363–64, 462 N.E.2d 478, 482–83 (1984), there was a similar portrayal of "awareness" and the "saliency of the information." The court pointed out for evaluation of the case the ABA standard for criminal justice:

The ABA Standards for Criminal Justice deal more pointedly with the precise problems presented here: "A prospective juror who has been exposed to and remembers reports of highly significant information, such as the existence or contents of a confession, or other incriminating matters that may be inadmissible in evidence, or substantial amounts of inflammatory material, shall be subject to challenge for cause without regard to the prospective juror's testimony as to state of mind." (ABA Standards for Criminal Justice, ch. 8, sec. 3.5(b), at 8–43 (2d ed. 1980).) In this situation, disqualification is automatic. ABA Standards for Criminal Justice, Commentary, ch. 8, sec. 3–5(b), at 8–47 (2d ed. 1980).

*Taylor*, 78 Ill.Dec. at 369, 462 N.E.2d at 488.

The *Taylor* court enunciated the predominating concern of well-recognized multi-participant exposure interaction:

The problem here is a perplexing one which does not require appraisal of the sincerity of either the jurors or the trial judge. It is most probable that the jurors spoke sincerely when they testified that they had formed no opinions on the basis of the information that one defendant passed a lie detector test and was released, and the other was not released. The concern is that this information about polygraphs, by its nature, is unlike other factual details. This is not the type of information which the average juror can easily ignore. Its effect is subtle and unconscious, but at the same time potent. Whether or not the juror is aware of it or can express his feelings accurately, exposure to this type of highly inflammatory material is enough to raise the presumption of partiality. In order to protect the defendant's right to a fair and impartial jury, those jurors who had been tainted in this way should have been excused.

*Juries Gains in Popularity*, 68 A.B.A.J. 668 (1982) cited in *Williams*, 194 Cal.Rptr. at 500, 668 P.2d at 807.

---

**22.** The alternative suggested by Justice Mosk in special concurrence was to import the jury instead of moving the trial. *See Use of Imported*

The trial judge's dilemma is apparent. Once the judge is aware that there has been intensive publicity which included dissemination of inadmissible and highly prejudical information, the judge has no choice but to inquire as to the details which the potential juror remembers. As soon as the juror mentions these details, that juror is subject to a challenge for cause. Any further questions serve only to highlight the information and to increase the likelihood that any inferences, once drawn, will now be remembered, and any inferences not yet drawn, will not be drawn. There is no alternative but to excuse the potential juror.

*Id.* 78 Ill.Dec. at 366–67, 462 N.E.2d at 485–86.

The Illinois court resolved the issue simplistically: "[w]e conclude that the defendant did not [receive a fair trial]." *Id.* 78 Ill.Dec. at 368, 462 N.E.2d at 487. Actually, the court found error in both the denial of challenges for cause for five particularly well-informed jurors as well as the trial court's rejection of the change of venue request of which both defects are forcefully illustrated in this present case.

Utah recognized: "The constitutions of Utah and of the United States both guarantee a defendant the right of trial by an impartial jury." *State v. James*, 767 P.2d 549, 551 (Utah 1989). The Utah court followed the California cases of *Sheppard*, 384 U.S. 333, 86 S.Ct. 1507 and *Maine v. Superior Court of Mendocino County*, 68 Cal.2d 375, 66 Cal.Rptr. 724, 438 P.2d 372 (1968) in assessing "the burden on the defendant should be understood to be that he must raise a 'reasonable likelihood' that such a trial cannot be afforded him." *James*, 767 P.2d at 552. Factors enumerated in the California case law were considered and the venue change was mandated based on the size of the community and individual citizen emotional involvement resulting from widespread publicity. *See also State v. Jerrett*, 309 N.C. 239, 307 S.E.2d 339, 348 (1983) (quoting *Sheppard*, 384 U.S. at 352, 86 S.Ct. at 1516), which, in reversal of conviction, re-emphasized that " 'our system of law has always endeavored to prevent even the probability of unfairness.' " Similarly recognized was "[t]he probability of irreversible prejudice * * * illustrated by the actual jury *voir dire.*" *Id.* "The totality of the circumstances in the case before us clearly reveals that the population of Allegheny County was infected with prejudice against this defendant." *Id.* 307 S.E.2d at 349. Consequently, a totality of the circumstances review required a new trial at a different venue. *Cf. State v. Reeb*, 331 N.C. 159, 415 S.E.2d 362 (1992) where the preclusive factors were not similarly found.

This same systematology and province of constitutional law to provide a fair trial was thoughtfully stated in *Johnson v. State*, 476 So.2d 1195, 1209–10 (Miss.1985):

The right to a fair trial by an impartial jury is fundamental and essential to our form of government. It is a right guaranteed by both the federal and the state constitutions. *Adams v. State*, 220 Miss. 812, 72 So.2d 211 (1954). "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, ..." U.S. Constitution Amendment VI. "In all criminal prosecutions the accused shall have a right to ... a speedy and public trial by an impartial jury of the county where the offense was committed...." Miss. Const. Art. 3, § 26.

It is apparent that two potentially competing and conflicting rights are embodied in the provisions of both constitutions: the right to trial by an impartial jury and the right to trial in the locale where the offense was committed. It merits repetition that *both* of these rights are afforded the accused. Constitutional provision for trial in the vicinity of the crime is a safeguard against the unfairness and hardship involved when an accused is prosecuted in a remote place. *Platt v. Minnesota Mining & Mfg. Co.*, 376 U.S. 240, 84 S.Ct. 769, 11 L.Ed.2d 674 (1964). As this court said in *Eddins v. State*, 110 Miss. 780, 783, 70 So. 898, 899 (1916):

"The right to trial by an impartial jury is guaranteed by the organic law of the state, and when it is doubtful that such a jury can be obtained in the county of the venue of the homicide, *the person on trial for his life is but asking for his rights when he requests a change of venue*, there is no imaginable reason to refuse, except, possibly, a slight additional cost to the county. (emphasis added)."

The Mississippi court assumed its adjudicatory responsibility presented by constitutional law by developing a three-stage procedural analysis: (1) "The accused's right to a change of venue is clearly not self-executing; the defendant must file a [supported motion]." *Johnson*, 476 So.2d at 1210. (2) "[T]hen, the accused has a right to a change of venue when it is doubtful that an impartial jury can be obtained; such doubt is implicit when there is present strong public sentiment against the defendant; upon proper application, there arises a presumption that such sentiment exists; and, the state then bears the burden of rebutting that presumption." *Id.* at 1210–11. (3) Venue will be changed unless the presumption *is rebutted during voir dire.*

The factual record which demonstrates a failure of the state to rebut the presumption of strong public sentiment against the defendant in the 1985 Mississippi trial in *Johnson* is even more persuasively demonstrated in the 1990 trial of Harvey in Sweetwater County. For this second reason, constitutional concepts and well-defined procedural standards require reversal in order that a fair trial will be provided to Harvey after a change of venue is granted.

## IV. SPEEDY TRIAL

We start with the Wyoming Constitution written in September 1889 and promptly approved by a vote of the electorate of the state to provide:

In all criminal prosecutions the accused shall have the right to defend in person and by counsel, to demand the nature and cause of the accusation, to have a copy thereof, to be confronted with the witnesses against him, to have compulsory process served for obtaining witnesses, and *to a speedy trial by an impartial jury* of the county or district in which the offense is alleged to have been committed. When the location of the offense cannot be established with certainty, venue may be placed in the county or district where the corpus delecti [delicti] is found, or in any county or district in which the victim was transported.

Wyo.Const. art. 1, § 10 (emphasis added). We then consider the continued wisdom of the 1975 Judicial Conference which further directed, in part:

(a) It is the responsibility of court and counsel to insure to each person charged with crime a speedy trial.

(b) A criminal charge shall be brought to trial within 120 days following the filing of information or indictment.

(c) The following periods shall be excluded in computing the time for trial:

(1) All proceedings related to the mental illness or deficiency of the defendant.

(2) Proceedings on another charge.

(3) Delay granted by the court pursuant to subdivision (d).

(4) The time between the dismissal and the refiling of the same charge.

(5) Delay occasioned by defendant's change of counsel or application therefor.

(d) Continuances may be granted as follows:

(1) On motion of defendant supported by affidavit of defendant and defendant's counsel.

(2) On motion of the prosecuting attorney or the court if:

(i) The defendant expressly consents; or

(ii) The state's evidence is unavailable and the prosecution has exercised due diligence; or

(iii) Required in the due administration of justice and the defendant will not be substantially prejudiced.

Rule 204, Uniform Rules for the District Courts of the State of Wyoming (U.R.D.C.) (approved by the district judges of this

state as the Wyoming constitutional courts of general jurisdiction on September 20, 1984 and effective January 8, 1985).

Just about one year after approval of Rule 204, U.R.D.C., the incident occurred from which these events arose in Rock Springs. On January 9, 1986, a criminal complaint was filed and thereafter on July 21, 1987, more than eighteen and one-half months later, a trial was held. In between, a third alleged participant, Swazo, who had been held in jail without bond for about fourteen months, entered a plea and was sentenced so as to be available to testify against Harvey. Swazo stated that he pled out because of being told that after waiting fourteen months in jail, he would have to wait another six months before he could go to trial. *Swazo v. State*, 800 P.2d 1152 (Wyo.1990), Urbigkit, C.J., dissenting. The jointly conducted trials and subsequent convictions of Phillips and Harvey were reversed by opinion of this court in May 1989 on the constitutional basis of denial of an original speedy trial. Conspiracy charges were substituted for the precluded and reversed substantive events charges followed by separate retrials which then commenced almost exactly four years after the occurrence of events from which the charges were presented.

The daunting challenge in law and logic, not to exclude the prior decisions of this court in *Harvey v. State*, 774 P.2d 87 (Wyo. 1989) and *Phillips v. State*, 774 P.2d 118 (Wyo.1989), is presented for this present decision to explain how, with denied constitutional rights to a speedy trial in 1987, another prosecution and a further trial on exactly the same facts and with the same witnesses and evidence and only the name of the offense changed to escape double jeopardy, does this prosecution now demonstrate absolution from the constitutionally protected right to a speedy trial? This majority opinion from which I now dissent simply does not answer that challenge in either law or logic. The majority resolution cannot be found to meet that challenge in honest consecration with either Wyo. Const. art. 1, § 10 or to Rule 204, U.R.D.C. Instead of 120 days designed as a limitation in Rule 204, U.R.D.C. in joint action and adaptation, we had one and one-half years to the first trial and now a total of four years to the second trial. Even if we escarp the Wyoming Constitution and the courts' own rules into a balancing test of alleged evil versus admitted judicial default indoctrinated by *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), this decision still does not adequately balance unjustified delay against media pursued societal demands for desired retribution.[23]

---

**23.** In a concentrated and authoritative effort to bring some sense into the rights of Wyoming citizens to receive a speedy trial guarantee as a protection of their state constitution, the Wyoming Rules of Criminal Procedure have recently been changed to define a specific schedule. These rules, adopted by the Wyoming Supreme Court effective March 24, 1992, assess final responsibility for authorizing over-extended delays to the Wyoming Supreme Court itself. W.R.Cr.P. 48 states in part:

(b) Speedy trial.—

(1) It is the responsibility of the court, counsel and the defendant to insure that the defendant is timely tried.

(2) A criminal charge shall be brought to trial within 120 days following arraignment unless continued as provided in this rule.

(3) The following periods shall be excluded in computing the time for trial:

(A) All proceedings related to the mental illness or deficiency of the defendant;

(B) Proceedings on another charge;

(C) Delay granted by the court pursuant to Section (b)(4) or (5);

(D) The time between the dismissal and the refiling of the same charge; and

(E) Delay occasioned by defendant's change of counsel or application therefor.

(4) Continuances not to exceed six months from the date of arraignment may be granted by the trial court as follows:

(A) On motion of defendant supported by affidavit;

(B) On motion of the attorney for the state or the court if:

(i) The defendant expressly consents; or

(ii) The state's evidence is unavailable and the prosecution has exercised due diligence; or

(iii) Required in the due administration of justice and the defendant will not be substantially prejudiced.

(C) If a continuance is proposed by the state or the court, the defendant shall be notified. If the defendant objects, the defendant must show in writing how the delay may prejudice the defense.

(5) Any request to continue a trial to a date more than six months from the date of ar-

 raignment must be directed to the court to which appeals from the trial would be taken and may be granted by that court in accordance with Section (b)(4), above.

(6) Any criminal case not tried or continued as provided in this rule shall be dismissed 120 days after arraignment.

(7) If the defendant is unavailable for any proceeding at which the defendant's presence is required, the case may be continued for a reasonable time by the trial court but for no more than 120 days after the defendant is available or the case further continued as provided in this rule.

(8) A dismissal for lack of a speedy trial under this rule shall not bar the state from again prosecuting the defendant for the same offense unless the defendant made a written demand for a speedy trial or can demonstrate prejudice from the delay.

This change in the rules governing speedy trials can be compared with the statistics available to a committee which compiled a study of various state courts including the Sweetwater County district court during the period of prosecution of Harvey for his 1986 crime. In March 1990, the Rural Justice Center, under the authorship of Kathryn Fahnestock and Maurice D. Geiger and funded by a grant from the State Justice Institute, published a study entitled *Time to Justice: Caseflow in Rural Jurisdiction Courts.* Included in the on-site study were nineteen courts in four states. Statistics were unpleasantly revealing regarding Sweetwater County, with the introduction statement and the statistics that followed:

Many rural courts do not dispose of cases in a timely fashion, especially criminal matters.

Fieldwork in 19 counties, disposition times from 12 self-reporting counties, and the examination of statistics that preceded site selection show that a significant degree of delay exists in the majority of rural jurisdictions. Among the fieldwork sites, only Sheridan County, Wyoming, and Iowa County, Wisconsin, dispose of 90% of the criminal cases in six months or less. In eight of those counties, the median criminal disposition is over 180 days.

\* \* \* \* \* \*

### CRIMINAL AND CIVIL CASES
*Days to Disposition*

| | CRIMINAL CASES | | CIVIL CASES | |
|---|---|---|---|---|
| | 50% | 90% | 50% | 90% |
| \* \* \* | | | | |
| **WYOMING** | | | | |
| Sheridan | 72 | 178 | 74 | 329 |
| Johnson | 89 | 381 | 89 | 461 |
| **SWEETWATER** | **266** | **745** | **140** | **607** |
| Lincoln | 110 | 311 | 100 | 466 |
| Uinta | 109 | 555 | 139 | 645 |

Fahnestock & Geiger, *Time to Justice: Caseflow in Rural General Jurisdiction Courts* 29 (March 1990) (emphasis added, in part).

The statistics for pretrial detention of felony defendants for the three courts in the Third Judicial District are similarly informative:

### PRETRIAL DETENTION

| JURISDICTION | FELONY DEFENDANTS LODGED | PERIOD (MONTHS) | PRETRIAL DETENTION range of days | PRETRIAL DETENTION median days |
|---|---|---|---|---|
| \* \* \* | | | | |
| **WYOMING** | | | | |
| \* \* \* | | | | |
| **SWEETWATER** | **199** | **12** | **0–450** | **19** |
| Lincoln | 70 | 6 | 0–90 | 11 |
| Uinta | 187 | 6 | 0–90 | 12 |

Fahnestock & Geiger, *supra*, at 43 (emphasis added).

Seven hundred forty-five days—about two years—for ninety percent disposition of criminal cases does not show compliance with the constitutional guarantee of speedy trial. Fortunately with a change in judge and redirection of court operations, equivalent statistics would not be found in 1992. Furthermore, the present criminal rule, W.R.Cr.P. 48, will not permit this uncontrolled delay. In all but the most exceptional circumstances, disposition within six months of arraignment will be required. This is the Wyoming judiciary's effort to return to the citizens of the state of Wyoming the pledge now nearly 800 years old originated in the Magna Charta. *See Harvey,* 774 P.2d at 98, Urbigkit, J., specially concurring. Congress reached the same end by statutorily reversing *Barker,* 407 U.S. 514, 92 S.Ct. 2182 in enactment of the

I am no more convinced today that the Magna Charta of England, the Constitution of this nation, and the Constitution of the state of Wyoming have lost validity to provide a speedy trial than I was when I wrote the special concurrence for the first prosecution in May 1989. *Harvey*, 774 P.2d at 98, Urbigkit, J., specially concurring. I am also not persuaded that this court's double jeopardy by-pass is morally and logically justified in reversing its well-considered disposition in those cases which were directed to enforce speedy trial rights and provide speedy trial privileges within each Wyoming court. If justification by subjective non-enforcement is to be provided for failure and default in judicial conduct, little valid expectancy is retained that society in general will regularly and enthusiastically accept and apply rules of mutual responsibility.

Essentially I am totally unconvinced that—after two and one-half years of failure to properly prosecute in one effort—the State can now start over with a new clock to try and extrapolate another offense from the events to secure a second period to accommodate the constitutional interest of speedy trial. Harvey, as we stated in *Harvey*, 774 P.2d 87, was arrested January 9, 1986 and subsequently convicted for one of the charged events (conspiracy to commit kidnapping) in this second effort of prosecution four years later commencing January 8, 1990. He was not under arrest for only the brief period between issuance of the reversal mandate in the first prosecution in June of 1989 until rearrested on or about July 8, 1989 on an affidavit of probable cause which was *identical* to the initial affidavit which had produced his first arrest in early January 1986.

The only difference I can find is the "fire storm" of attacks, anger and published reaction to the first reversal because of this court's judicial willingness to enforce the Constitution of the state of Wyoming. I

reject yielding to that character of constitutional right adjudication by newspaper and community criticism, and I also reject bailing these issues into a neat delineation of time packaged into the majority decision identifying the period between July 8, 1989 and the trial date of January 8, 1990:

> [T]he time span in this case between the date of the filing of the complaint and the date of the start of the trial is neither "presumptively prejudicial" nor significantly long. Thus, after calculating the time span we need not analyze the speedy trial issue further.

Maj. op. at 1079. I find it to be nonsensical to play a counting game with the time between mid-1989 and the actual second trial date and, consequently, ignore the previous two and one-half years encompassed within the prosecutorial efforts involving Harvey. In that regard, I also reject an analysis to find that compliance with the intendment of Rule 204, U.R.D.C. was achieved, which apparently this court traditionally had agreed to ignore anyway.[24]

Harvey, in first recognition of a speedy trial violation, was forced into a delay of 562 days in *Harvey I* and can now wonder about the present speedy trial violation of 1,460 days since original arrest. He cogently and persuasively argued in appellate brief:

> The State defended [the speedy trial] issue * * * by arguing that the facts of this case presented a question of "pre-indictment delays" because of the successive prosecutions of Defendant. They argued that the clock did not begin to run on the speedy trial issue until no later than Mr. Harvey's arrest on the new charges on or about July 8, 1989. * * *
>
> In this regard, we again urge the Court to consider that the difference between the first and second prosecution of the Defendant is a "difference without distinction" * * * and that the "actual

---

Speedy Trial Act of 1974. 18 U.S.C.A. § 3161–3174.

**24.** *See Despain v. State*, 774 P.2d 77, 86 (Wyo. 1989), three judge majority in special concur-

rence; *Cook v. State*, 631 P.2d 5 (Wyo.1981); *Robinson v. State*, 627 P.2d 168 (Wyo.1981); *Cherniwchan v. State*, 594 P.2d 464 (Wyo.1979). *Cf. Harvey*, 774 P.2d at 104, Urbigkit, J., specially concurring.

restraints" upon Appellant's freedom and liberties, measured by his incarceration, the conditions of his bail, and the constant public accusation under which he has been living, have been continuous throughout these four years under every poignant United States Supreme Court decision which can be mustered by either side of this argument. *United States v. Loud Hawk*, 474 U.S. 302, 106 S.Ct. 648, 88 L.Ed.2d 640 (1986); *United States v. MacDonald*, 456 U.S. 1, 102 S.Ct. 1497, 71 L.Ed.2d 696 (1982); *United States v. Lovasco*, 431 U.S. 783, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977); *Dillingham v. United States*, 423 U.S. 64, 96 S.Ct. 303, 46 L.Ed.2d 205 (1975); *Moore v. Arizona*, 414 U.S. 25, 94 S.Ct. 188, 38 L.Ed.2d 183 (1973); *United States v. Marion*, 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971); *Barker v. Wingo, supra; Dickey v. Florida, supra;* [398 U.S. 30, 90 S.Ct. 1564, 26 L.Ed.2d 26] and *Klopfer v. North Carolina*, 386 U.S. 213, 87 S.Ct. 988, 18 L.Ed.2d 1 (1967).

The Sixth Amendment to the United States Constitution provides:

> "In all criminal prosecutions, the *accused* shall enjoy the right to a speedy and public trial, by an impartial jury of the state and district wherein the crime shall have been committed ..."

The leading case of *United States v. Marion, supra,* 404 U.S. [at] 313, 92 S.Ct. [at] 474, 30 L.Ed.2d [at] 474 interprets, the Speedy Trial Clause to have application when "the putative defendant in some way becomes an 'accused'." Citing what currently appears as Standard 12–2.2(a) of the *American Bar Association Standards of Criminal Justice*, the Supreme Court held that the constitutional protection begins no later than the date on which the accused is initially arrested or "held to answer." *Marion, supra,* 404 U.S. [at] 320–321 [92 S.Ct. at 463], 30 L.Ed.2d [at] 479 (Note 12). This standard was expressly adopted by this Court with specific reference to the *Marion* decision in *Harvey v. State, supra,* at 474 [774] P.2d [at] 93 (Note 7), and *Phillips v. State*, 474 [774] P.2d 118, 122 ([Wyo.] 1989).

Appellant has been "accused" of conspiracy to kidnap and conspiracy to commit sexual assault "in some way" since his initial arrest on January 5, 1986, upon charges of kidnapping and sexual assault and aiding and abetting in these offenses. That is clear from the fact that the Criminal Complaint and supporting Affidavit of Probable Cause generating the second arrest of Appellant is essentially identical to the first criminal complaint and supporting affidavit. * * *

This is not a case wherein the Appellant is complaining of pre-indictment delays caused by the Government's failure to investigate the circumstances of the case with reasonable diligence, as in *Marion* or *Story v. State*, 721 P.2d 1020 (Wyo.1986). Nor is it a case where the initial charges have been dismissed voluntarily by the State or by court order, without prejudice to refile, as in *United States v. MacDonald, supra.* Nor is this a case where conspiracy charges were joined in the same indictment or information allowing the government to proceed simultaneously on both charges, such as in *Ball v. United States*, 470 U.S. 856, 105 S.Ct. 1668, 84 L.Ed.2d 770 [740] (1985); *Iannelli v. United States*, 420 U.S. 770, 95 S.Ct. 1284, 43 L.Ed.2d 616 (1975); and *Schultz v. State*, 751 P.2d 367 (Wyo.1988). Rather, this is a case where the Defendant was arrested, accused and tried as a principal and accessory on the substantive offenses, convicted as a principal, and then rearrested, accused, tried and convicted on conspiracy charges after having his first conviction reversed by this Court. That reversal clearly bars the State from bringing the same charges (*Harvey v. State, supra,* at 474 [774] P.2d [at] 98, *Marion, supra,* 404 U.S. at 312 [92 S.Ct. at 459], *Strunk v. United States*, 412 U.S. at 434 [at 439], 93 S.Ct. 2260 [at 2263], 37 L.Ed.2d 56, at 61 [1973]). There is no precedent in the opinions of the United States Supreme Court or the common law of Wyoming for a second prosecution on conspiracy charges under these circumstances, probably because such a

transparent and unconscionable effort to circumvent the Speedy Trial Clause was previously unthinkable and precluded by double jeopardy and due process considerations.

In my opinion, proper justification for second prosecution of Harvey by this escape from speedy trial criteria does not find precedent in *Barker*, 407 U.S. 514, 92 S.Ct. 2182, *Harvey*, 774 P.2d 87 or *Phillips*, 774 P.2d 118. This court just utilizes sequential prosecution to follow failed prosecution to now attempt to properly convict on the principal charge with identical case facts and events redefined from those originally stated to the differentiated inchoate offense of conspiracy. Thus, this court finds a way by disingenuous redefinition to amend and remove speedy trial—as well as double jeopardy—out of the protections intentionally written into the Wyoming Constitution more than 100 years ago.

This case presents an ideal opportunity to apply plain meaning, *Allied–Signal, Inc. v. Wyoming State Bd. of Equalization*, 813 P.2d 214 (Wyo.1991), and clear purpose, *Zancanelli v. Central Coal & Coke Co.*, 25 Wyo. 511, 173 P. 981 (1918), and require what the constitution provides—a speedy trial. Just like constitutional amendment cannot occur by legislative inattention, *Rocky Mountain Oil and Gas Ass'n v. State Bd. of Equalization*, 749 P.2d 221 (Wyo.1987), it should not occur either by judicially politicized fear or subjective disdain. Our thoughtful efforts in *Harvey I* and *Phillips I* should surely demand this much. Authoritarian and totalitarian governments provide far more efficient systems to obtain societal retribution against an individual. Democratic socie-

ties, on the other hand, are based upon equal protection, due process and standards involved within established order for our society provided in the state and federal constitutions.

## V. DOUBLE JEOPARDY

I will address this subject in greater detail in a subsequently published dissent for *Phillips v. State*, 835 P.2d 1062 (Wyo. 1992), but within the seemingly unlimited precedent[25] provided by double jeopardy concepts confined to sequential prosecutions, I would find this court now takes both an inadvisable and undesirable pathway.

Wyoming now not only follows the politicized restructuring of the United States Supreme Court, but also re-conceptualizes the Wyoming constitutional provision providing a double jeopardy preclusion, Wyo. Const. art. 1, § 11, to authenticate a second prosecution after absolved criminal responsibility for commission of a principal offense using exactly the same evidence and involving exactly the same course of conduct. We commensurately reduce the protective scope of the Wyoming Constitution in double jeopardy protection—such protection once proudly included in our heritage in the law for many centuries more than this nation has existed and perhaps twenty times the lifespan of Wyoming's statehood. Consequently, I dissent on this issue also.

In order to authenticate this duplicative prosecution of Harvey for his involvement in alleged attempted kidnapping and rape with two other persons, the majority squeezes out and denies double jeopardy protection under both the United States Constitution and that of our sovereign

---

**25.** The authority for current United States constitutional examination of double jeopardy with sequential prosecution is centered around *Grady v. Corbin*, 495 U.S. 508, 110 S.Ct. 2084, 109 L.Ed.2d 548 (1990) which, incidentally, was about the last opinion authored by Justice William Brennan, Jr. for the United States Supreme Court. Its five-to-four status and the subsequent change in membership on the United States Supreme Court lucidly portrayed the expansiveness of involvement since occurring. Recognized to some extent in five subsequent opinions of the United States Supreme Court is application of the *Corbin* thesis of sequential prosecu-

tion to conspiracy prosecutions overlaying each other or separated from the first prosecution of the principal offense involved in the contended conspiracy. *Corbin* has since been cited in many other federal court cases, several of which have been reversed and remanded, when involving conspiracy or continuing criminal enterprise-type charges. Furthermore, since 1990, *Corbin* has been considered or applied in some fashion in all but about fourteen of the state court systems. A Westlaw search reveals 164 federal cases and 282 state cases in which the *Corbin* case is cited.

state. After a thoughtful analysis of historical double jeopardy, properly addressed to sequential prosecution, it is my persuasion that the majority fails in both efforts, but certainly regarding the Wyoming Constitution. Justice Fred Blume must be turning over in his grave from this cavalier reduction of right from the Wyoming Constitution which, as a philosophy, meant so much to him and his sense of development and protection of an identified Wyoming jurisprudence.

First, in *Blockburger* terms as a fiction to justify multiple prosecutions, I will accept that conspiracy or CCE—continuing criminal enterprise—in federal forums constitute a different offense from the categorical offenses, (in this case, first degree rape and kidnapping, or the ancillary and equally punishable satellites of aiding and abetting, accessory before the fact, and accessory after the fact). *Blockburger v. United States*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932). Clearly, the circumstance that a different crime is sequentially charged cannot in itself be considered to be determinative. In every case with denied guilt or in presumed insufficient punishment within a first foray, the second and subsequent attacks by the state will always be another criminal charge that can be adduced from the same transactional situation. This is the nexus of one continued transaction. *Cf. People v. Johnson*, 5 Cal. App. 4th 552, 7 Cal.Rptr.2d 23 (1992), where double jeopardy is not implicated, but, instead, considered felony murder connexity.[26]

In this case, the initial affidavit used in the second prosecution was *identical* with the sworn statements of the investigating officer used to commence prosecution number one, *Harvey I*. The evidence presented at the *Harvey II* trial was essentially identical except for the singular inclusion the second time around of the allocution evidence from *Harvey I*. Identical conduct of the participants was addressed by the same witnesses. This was conduct that constitutes an offense for which the defendant had been prosecuted. *Grady v. Corbin*, 495 U.S. 508, 110 S.Ct. 2084, 109 L.Ed.2d 548 (1990).

What does this double jeopardy preclusion really mean as a constitutional protection derived from a millennium old circumstance of our legal heritage?[27] I continue

26. If the connection is sufficient to transactionalize a felony into a connection with homicide to create felony murder, it is likewise an appropriate conceptual analysis to recognize that double jeopardy environs should be produced.

27. A succinct, yet complete, analysis of the ancient origin of double jeopardy is provided in George C. Thomas, III, *The Prohibition of Successive Prosecutions for the Same Offense: In Search of a Definition*, 71 Iowa L.Rev. 323, 325 nn. 8 and 9 (1986):

[8] "Historians have traced the origins of our constitutional guarantee against double jeopardy back to the days of Demosthenes, who stated that 'the laws forbid the same man to be tried twice on the same issue....'" *Whalen v. United States*, 455 [445] U.S. 684, 699 [100 S.Ct. 1432, 1441, 63 L.Ed.2d 715] (1980) (Rehnquist, J., dissenting) (quoting 1 Demosthenes 589 (J. Vance trans. 4th ed. 1970)). The date of the Demosthenes quotation was 355 B.C., M. Friedland, Double Jeopardy 16 n. 7 (1969), and the principle underlying the double jeopardy clause is, therefore, at least 2340 years old. *See also Benton v. Maryland*, 395 U.S. 784, 795 [89 S.Ct. 2056, 2062, 23 L.Ed.2d 707] (1969); J. Sigler, Double Jeopardy, The Development of a Legal and Social Policy 2 (1969) (tracing the roots of the prohibition to Greek and Roman law and stating that it "found final expression in the Digest of Justinian"); Gilday & Gillen, *Jeopardy—Meandering Through Mandates and Maneuvers*, 6 N.Ky.L.Rev. 245, 245 (1979) ("Its evolution can be traced back literally through the ages—from the Constitutional Convention, to the common law of England, through the Dark Ages, and deep into Greek and Roman times."); McKay, *Double Jeopardy: Are the Pieces the Puzzle?*, 23 Washburn L.J. 1, 9 (1983) (quoting 1 Demosthenes 589 (J. Vance trans. 4th. ed. 1970)); Comment, 5 N.Y.L.F. 393, 393 ("The idea that one trial and one punishment was sufficient survived through the Dark Ages ..."; Comment, *Twice In Jeopardy*, 75 Yale L.J. 262, 262 n. 1 (1965) (reaching same conclusion.)

[9] Not only does the principle find expression in Greek and Roman law, *see supra* note 8, but it also finds expression in early canon and Hebrew law. *Bartkus v. Illinois*, 359 U.S. 121, 152 [79 S.Ct. 676, 696, 3 L.Ed.2d 684] (1959) (Black, J., dissenting); J. Sigler, *supra* note 8, at 3 & n. 6. In modern times, the prohibition of double jeopardy is recognized, in some form, in nations as diverse as Japan, the Netherlands, Poland, Hungary, Norway, and the Soviet Union. *Id.* at 141–49 [79 S.Ct. at 687–94].

in identical persuasion as stated in the duplicative prosecution cases of, *Duffy v. State*, 789 P.2d 821 (Wyo.1990) and *Duffy v. State*, 730 P.2d 754 (Wyo.1986), as well as the sequential prosecution case of *Eatherton v. State*, 761 P.2d 91 (Wyo.1988), *remand* 810 P.2d 93 (Wyo.1991). The resilience of reason and justification in historical constitutional law satisfies me that we should adopt and apply II ABA Standards for Criminal Justice 13–2.3 (1980):

Standard 13–2.3. Failure to join certain offenses

(a) When a defendant has been charged with two or more related offenses which are within the jurisdiction of the same court, a timely defense motion to join the offenses for trial should be granted unless the court determines that, because the prosecuting attorney does not have sufficient evidence to warrant trying some of the offenses at that time, or for some other reason, the ends of justice would be defeated if the motion were granted in whole or in part.

(b) A defendant's failure to move for joinder constitutes a waiver of any right of joinder as to "same conduct" or "single criminal episode" offenses which the defendant knew had been charged.

(c) A defendant who has been tried for one offense may thereafter move to dismiss any additional offense based upon the same conduct or the same criminal episode, unless a motion for joinder of these offenses were previously denied, unless the right of joinder was waived pursuant to paragraph (b), or unless the two offenses are not within the jurisdiction of the same court. The motion to dismiss must be made prior to the same court. The motion to dismiss must be made prior to the second trial, and should be granted unless the court determines that, because the prosecuting attorney did not have sufficient evidence to warrant trying the additional offense at the time of the first trial, or for some other reason, the ends of justice would be defeated if the motion were granted in whole or in part.

(d) Entry of a plea of guilty or nolo contendere to one offense does not bar the subsequent prosecution of any additional offense based upon the same conduct or the same criminal episode. A defendant may enter a plea of guilty or nolo contendere on the basis of a plea agreement in which the prosecuting attorney agreed to seek dismissal, agreed not to oppose dismissal, or agreed not to initiate prosecution of other offenses based upon the same conduct or upon the same criminal episode.

The commentary of that scholarly effort makes clear that the essential purpose is to confine alternative proceedings into a single prosecution:

The standard prohibits the subsequent prosecution of offenses that are based upon the same conduct or upon the same criminal episode as the first offense but that are not charged at the time of the trial of the first offense. If the companion offenses are filed prior to the first trial, the subsequent prosecution is proper either because the defendant made a motion to join which was denied, * * * or because the defendant waived protection against subsequent prosecutions * * * by failing to move for joinder.

*Id.* at 13.27.

The direction I would take is also specifically charted by the American Law Institute and has also been adopted with increasing regularity by state court systems in some distinction to the federal judicial system proclivity for multiple prosecutions. The A.L.I. Model Penal Code (1985) originally adopted in the 1962 annual meeting of the American Law Institute and now currently presented in the 1985 text, provides:

Section 1.07. Method of Prosecution When Conduct Constitutes More Than One Offense.

(1) *Prosecution for Multiple Offenses: Limitation on Convictions.* When the same conduct of a defendant may establish the commission of more than one offense, the defendant may be prosecuted for each such offense. He may not, however, be convicted of more than one offense if:

* * * * * *

(b) one offense consists only of a conspiracy or other form of preparation to commit the other[.]

*Id.* at art. 1, § 1.07, at 10.

In its section in inchoate crimes, the American Law Institute then recognizes that if a single crime is involved, a separate sentencing process for the additional crime of conspiracy is unjustified, i.e., when the preliminary agreement does not go beyond the consummation, double conviction and sentence are barred. 1 A.L.I. Model Penal Code and Commentaries, Pt. 1, § 1.07, at 110 (1985). This is not an unchartered or novel recognition. Abraham S. Goldstein, *Conspiracy to Defraud the United States,* 68 Yale L.J. 405 (1959). The direction taken by the American Law Institute is that if the conspiracy matures into a completed crime and the co-conspirator is convicted of the crime, there will be no duplicate crimes and only a single punishment for the commission of one actual criminal offense.

I would further find the concept to be consistent with the differentiated arrangement provided in Wyo.Stat. § 6–1–301 through § 6–1–304 (1988) and in accord with an increasing number of states with specific statutes "barring conviction for an offense and an included offense." This includes conspiracy unless the completed offense committed pursuant to the conspiracy shows that the objective of the conspiracy was a commission of offenses in addition of that for which the defendant was convicted. *See* 1 A.L.I. Model Penal Code and Commentaries, *supra,* at 109. A pertinent example is provided by Illinois, where the defendant cannot be convicted of both the inchoate and principal offense. *People v. Whaley,* 184 Ill.App.3d 459, 132 Ill.Dec. 681, 540 N.E.2d 421 (1989); *People v. Atkins,* 161 Ill.App.3d 600, 113 Ill.Dec. 463, 515 N.E.2d 272 (1987); *People v. Walker,* 84 Ill.2d 512, 50 Ill.Dec. 718, 419 N.E.2d 1167 (1981), *cert. denied* 465 U.S. 1031, 104 S.Ct. 1297, 79 L.Ed.2d 697 (1984). Conversely, this "conspiracy" rule, applied by this majority to assure conviction, reaches further to encompass the whole panorama of inchoate offenses. Additionally, the decision serves to largely amend the Wyoming Constitution for deletion of the preclusive protection against double jeopardy.

Since any multi-participant course of conduct conceptually involves a possible prosecutorial contention of conspiracy, Wyo.Stat. § 6–1–303; solicitation, Wyo.Stat. § 6–1–302; attempt, Wyo.Stat. § 6–1–301; accessory before the fact, Wyo.Stat. § 6–1–201 (1988); accessory after the fact, Wyo.Stat. § 6–5–202 (1988); and, in addition, commission of an actual offense or offenses as in this case, sexual assault or attempt, Wyo. Stat. § 6–2–203 (1988), we conceptually segment any one course of conduct into the potentiality of six sequential prosecutions. Neither our court system nor the participants therein—lawyers, political officials, judicial officials or victims—should be so broadly exposed. Historical double jeopardy was not generally applied in times past with such an unprotective shield and with so many indiscriminate leaks. *See Eatherton,* 761 P.2d 91 and *Duffy,* 730 P.2d 754.

In application of the Fifth Amendment of the United States Constitution, same offense double jeopardy preclusion, it is recognized that *Corbin*—without regard for *Nowack v. State,* 774 P.2d 561 (Wyo.1989) adaptation—should have been decisive in double jeopardy resolution. Now, however, *United States v. Felix,* —— U.S. ——, 112 S.Ct. 1377, 118 L.Ed.2d 25 (1992) overtly has relevance in extrapolating conspiracy from a double jeopardy protective intervention for sequential prosecution. In some distillation of real life events—as distinguished from fictionalized adjudicatory conceptions—I refuse to redefine the Wyoming Constitution to be equivalently closed down. *Felix,* of course, brought included conspiracy out of the *Corbin* course of conduct. In *Harvey II,* we find the same conduct to be, in sequential prosecution, twice used for conviction of the same defendant. I would follow a straight line historical pathway and not adopt this current pigeonhole detour. *Felix,* 112 S.Ct. at 1385, Stevens, J., concurring in part and concurring in the judgment; *Corbin,* 495 U.S. 508, 110 S.Ct. 2084; *Illinois v. Vitale,* 447 U.S. 410, 100 S.Ct. 2260, 65 L.Ed.2d 228 (1980); *Harris v. Oklahoma,* 433 U.S. 682, 97 S.Ct. 2912, 53 L.Ed.2d 1054 (1977);

*Brown v. Ohio,* 432 U.S. 161, 97 S.Ct. 2221, 53 L.Ed.2d 187 (1977).[28]

The principle of frailty that the double jeopardy prohibition portends today, if still a part of the very fabric of our society, *see generally* George C. Thomas, III, *The Prohibition of Successive Prosecutions for the Same Offense: In Search of a Definition,* 71 Iowa L.Rev. 323 (1986), is now most tattered in present form and perhaps almost unusable.

With sequential prosecutions for conspiracy when efforts to prosecute for the principal offense have floundered, we supersede and essentially disembowel collateral estoppel in double jeopardy, *Ashe v. Swensen,* 397 U.S. 436, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970), and due process remonstration against the first-time failed dry run. *Tibbs v. Florida,* 457 U.S. 31, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982). *See also Corbin,* 495 U.S. 508, 110 S.Ct. 2084; *Vitale,* 447 U.S. 410, 100 S.Ct. 2260; *Brown,* 432 U.S. 161, 97 S.Ct. 2221; *United States v. Jorn,* 400 U.S. 470, 91 S.Ct. 547, 27 L.Ed.2d 543 (1971); *Benton v. Maryland,* 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969); *Green v. United States,* 355 U.S. 184, 78 S.Ct. 221, 2 L.Ed.2d 199 (1957); *Ex parte Lange,* 18 Wall. 163, 85 U.S. 163, 21 L.Ed. 872 (1873). *See however Eatherton,* 761 P.2d 91.[29]

I would continue to believe what Justice Powell said in writing for the majority in *Brown,* 432 U.S. at 168, 97 S.Ct. at 2226:

> The greater offense is therefore by definition the "same" for purposes of double jeopardy as any lesser offense included in it.

This conclusion merely restates what has been this Court's understanding of the Double Jeopardy Clause at least since *In re Nielsen* was decided in 1889. In that case the Court endorsed the rule that

> "where ... a person has been tried and convicted for a crime which has various incidents included in it, he cannot be a second time tried for one of those incidents without being twice put in jeopardy for the same offence." 131 U.S. [176], at 188 [9 S.Ct. 672, 676, 33 L.Ed. 118 (1889)].

Although in this formulation the conviction of the greater precedes the conviction o the lesser, the opinion makes it clear that the sequence is immaterial. Similarly, I agree with Justice Brennan in concurrence:

> stated that "the laws forbid the same man to be tried twice on the same issue...." 1 Demosthenes 589 (J. Vince trans., 4th ed. 1970). Despite its roots in antiquity, however, this guarantee seems both one of the least understood and, in recent years, one of the most frequently litigated provisions of the Bill of Rights. This Court has done little to alleviate the confusion, and our opinions, including ones authored by me, are replete with *mea culpa's* occasioned by shifts in assumptions and emphasis. Compare e.g., *United States v. Jenkins,* 420 U.S. 358 [95 S.Ct. 1006, 43 L.Ed.2d 250] (1975), with *United States v. Scott,* 437 U.S. 82 [98 S.Ct. 2187, 57 L.Ed.2d 65] (1978) (overruling *Jenkins*). See also *Burks v. United States,* 437 U.S. 1, 9 [98 S.Ct. 2141, 57 L.Ed.2d 1] (1978) (Our holdings on this subject "can hardly be characterized as models of consistency and clarity"). Although today's decision takes a tentative step toward recognizing what I believe to be the proper role for this Court in determining the permissibility of multiple punishments, it ultimately compounds the confusion that has plagued us in the double jeopardy area.

---

**28.** The volume of *Corbin* sequential prosecution case law since its 1990 publication date is astounding. The broad scope reveals the prevalence of re-prosecution efforts in our society where essentially the first effort was deemed prosecutorially unsatisfying. *Felix,* conversely, at least in this brief period, has not been directly adopted by any reported state decision within its brightline precept that conspiracy is excluded from relevance in double jeopardy protection. I continue to believe, as restated recently by our sister state of Idaho, *State v. Wheaton,* 121 Idaho 404, 825 P.2d 501, 506 (1992), Bistline, J., specially concurring (quoting *State v. Lang,* 105 Idaho 683, 672 P.2d 561, 569 (1983)): "[T]his Court need not be 'a satellite in the eccentric orbiting of the [United States Supreme Court].'" *See also* Paul R. Robinson, Comment, *Grady v. Corbin: Solidifying the Analysis of Double Jeopardy,* 17 New Eng.J. on Crim. & Civ. Confinement 395 (1991).

**29.** I find Justice Rehnquist's dissent in *Whalen v. United States,* 445 U.S. 684, 699–700, 100 S.Ct. 1432, 1441–42, 63 L.Ed.2d 715 (1980) to be singularly relevant:

> Historians have traced the origins of our constitutional guarantee against double jeopardy back to the days of Demosthenes, who

I adhere to the view that the Double Jeopardy Clause of the Fifth Amendment, applied to the States through the Fourteenth Amendment, requires the prosecution in one proceeding, except in extremely limited circumstances not present here, of "all the charges against a defendant that grow out of a single criminal act, occurrence, episode, or transaction." *Ashe v. Swenson*, 397 U.S. 436, 453–454 and n. 7 [90 S.Ct. 1189, 1199–1200 and n. 7] (1970) (Brennan, J., concurring). *See Thompson v. Oklahoma*, 429 U.S. 1053 [97 S.Ct. 768, 50 L.Ed.2d 770] (1977) (Brennan, J., dissenting from denial of certiorari), and cases collected therein.

*Brown*, 432 U.S. at 170, 97 S.Ct. at 2228. Certainly, *Blockburger*, 284 U.S. 299, 52 S.Ct. 180 is not inapposite since it does not refer to sequential prosecutions in its delineation of separate crimes within a single prosecution. We not only sidestep speedy trial constitutional protections once affirmed by this court in this case, but now use part of the first factual proceedings and grant to the state opportunity to "hon[e] its trial strategies and perfect[ ] its evidence through successive attempts at [a valid] conviction." *Tibbs*, 457 U.S. at 41, 102 S.Ct. at 2218. *See also Greene v. Massey*, 437 U.S. 19, 98 S.Ct. 2151, 57 L.Ed.2d 15 (1978) and *Burks v. United States*, 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978).

In the case of *The Commonwealth v. Olds*, [5 Littell, 137] one of the best common law judges that ever sat on the bench of the Court of Appeals of Kentucky remarked, "that every person acquainted with the history of governments must know that state trials have been employed as a formidable engine in the hands of a dominant administration.... To prevent this mischief the ancient common law, as well as Magna Charta itself, provided that one acquittal or conviction should satisfy the law; or, in other words, that the accused should always have the right secured to him of availing himself of the pleas of *autrefois acquit* and *autrefois convict*. To perpetuate this wise rule, so favorable and necessary to the liberty of the citizen in a government like ours, so frequently subject to changes in popular feeling and sentiment, was the design of introducing into our Constitution the clause in question."

*Ex parte Lange*, 85 U.S. at 170–71.

I could also find some relevance to be provided by our own Wyoming case of *State v. Keefe*, 17 Wyo. 227, 98 P. 122 (1908), which provided issues of double jeopardy, though not stated in that term, and speedy trial. Keefe, originally charged for two murders, was tried only for one, found guilty of manslaughter, and sentenced to the penitentiary where he was immediately taken. Upon release from that service, he was then re-arrested for the anticipated second prosecution of the concurrently charged second murder. Recognizing the differentiating factor that both "potential" crimes were initially charged in *Keefe*, the consideration given in denied sequential prosecution has persuasive analytical validity.

[T]he questions here reserved are clearly constitutional, for they involve the constitutional right of an accused in a criminal prosecution to a speedy trial, which right is claimed to have been violated in this case. The statute supplements the constitutional provision and secures or provides a method for securing the right thereby declared. It is to be regarded as enacted for the purpose of rendering the constitutional guaranty effective, and as a legislative declaration of what is and what is not, under the circumstances named, a reasonable and proper delay in bringing an accused to trial in respect of his constitutional right aforesaid. The authorities uniformly hold that such statutes are enacted for the purpose of enforcing the constitutional right, and that they constitute a legislative construction or definition of the constitutional provision—a provision incorporated in most of the state constitutions as well as in the constitution of the United States.

*Id.* at 243, 98 P. 122. *Harvey II* differs from *Keefe* only in that the conspiracy charge was "laid back for later use" as

opposed to the simultaneous charging in *Keefe.*

The transactional test structure of Wyoming law was well established since before statehood until redirected in *State v. Carter,* 714 P.2d 1217 (Wyo.1986). However, I fail to find precedent in that recent reconceptualization to demolish double jeopardy protection in sequential prosecutions by a process of pigeonhole law adaptation for conspiracy as now provided in this case. *See initially Phillips v. Territory,* 1 Wyo. 82 (1872), lesser included, greater inclusive; *Brown v. State,* 37 Wyo. 155, 259 P. 810 (1927), duplicated prosecution for manufacturing and possession; and similarly *State v. Williams,* 38 Wyo. 340, 266 P. 1056 (1928); *State v. Tobin,* 31 Wyo. 355, 226 P. 681 (1924), conducting or permitting as steps or stages in the same affair; and then the group of cases cited in dissent in *Carter,* 714 P.2d at 1221, Urbigkit, J., dissenting. *See also Dorador v. State,* 520 P.2d 230 (Wyo.1974); *Jackson v. State,* 522 P.2d 1286 (Wyo.1974); *Boyd v. State,* 528 P.2d 287 (Wyo.1974), *cert. denied* 423 U.S. 871, 96 S.Ct. 137, 46 L.Ed.2d 102 (1975); and *Jerskey v. State,* 546 P.2d 173 (Wyo. 1976).

Conspiracy in mechanical evolution was transactional within the events resulting in the committed criminal offense. It can only be a stage in the completed occurrence if proof of the occurrence is in fact identical with the proof of the initiating activities of the perpetrators.[30] In this case, the conduct was identically proved. The events were transitional. The first prosecution unsuccessfully directed itself to the assessment of penal retribution for asserted illegal conduct. I would apply historical concepts of double jeopardy and confine prosecutorial efforts to require success in a one-time try. *See* Wyo.Const. art. 1, § 11. *See also* Donald Eric Burton, Note, *A Closer Look at the Supreme Court and the Double Jeopardy Clause,* 49 Ohio St.L.J. 799 (1988) and Richard A. Brown, Comment, *The Double Jeopardy Clause: Refining the Constitutional Proscription Against Successive Criminal Prosecutions,* 19 UCLA L.Rev. 804 (1972). *See also The Supreme Court 1989 Term,* 104 Harv.L.Rev. 129, 149 (1990).

I would also follow the broad precepts of *Corbin,* 495 U.S. 508, 110 S.Ct. 2084. *See Felix,* 112 S.Ct. at 1385, Stevens, J., concurring in part and concurring in the judgment, as well as the rational direction originally provided by *United States v. Calderone,* 917 F.2d 717 (2d Cir.1990), *cert. granted and judgment vacated* — U.S. ——, 112 S.Ct. 1657, 118 L.Ed.2d 381 (1992) (now remanded by the United States Surpeme Court in *United States v. Gambino,* 920 F.2d 1108 (2d Cir.1990), *cert. denied* — U.S. ——, 112 S.Ct. 54, 116 L.Ed.2d 31 (1991), *cert. granted and judgment vacated* — U.S. ——, 112 S.Ct. 1657, 118 L.Ed.2d 381 (1992) and not saw a hole into the constitutional double jeopardy protection of Wyo.Const. art. 1, § 11 to allow subsequent prosecution for conspiracy or any other statutorily-provided Wyoming inchoate offenses). *See* Wyo.Stat. Title 6, art. 3. No doubt exists about the same transactional events—the same conduct was proved in nearly identical form in both cases. This fact is amplified by use of the allocution statement from the first trial for evidence in the second trial. The direction provided in state cases is decisively persuasive for me. These include: *Quinton v. Superior Court of State In and For County of Mohave,* 168 Ariz. 545, 815 P.2d 914 (1991), *cert. denied* — U.S. ——, 112 S.Ct. 1295, 117 L.Ed.2d 518 (1992); *State v. Hope,* 215 Conn. 570, 577 A.2d 1000 (1990), *cert. denied* — U.S. ——, 111 S.Ct. 968, 112 L.Ed.2d 1054 (1991); *Dixon v. State,* 584 So.2d 195 (Fla.App.1991); *Harrelson v. State,* 569 So.2d 295 (Miss.1990); *State v. Woodfork,* 239 Neb. 720, 478 N.W.2d 248 (1991); *State v. Harrington,* 236 Neb. 500, 461 N.W.2d 752 (1990); *Jivers v. State,* 406 S.E.2d 154 (S.C.1991); *State v. Head,* 469 N.W.2d 585 (S.D.1991); and *State v. Laviollette,* 60 Wash.App. 579, 805 P.2d 253

---

**30.** Conspiracy accrues comparability for denying constitutional protections as do designer drugs in evolutionary hinderance to campaigns to eliminate substance abuse.

(1991), *aff'd* 118 Wash.2d 670, 826 P.2d 684 (1992).[31]

I would reverse on the basis of the preclusive limitations under Wyo.Const. art. 1, § 11—double jeopardy.

## VI. CONCLUSION

The five members of the Wyoming Supreme Court are charged individually and collectively with a basic constitutional responsibility to support, obey and defend the Wyoming Constitution. Additionally, we serve as the architects of Wyoming law for the future. What we determine will build or demolish the structure of the law within which our children and grandchildren can, in their good time, comfortably reside or divisively only exist.

This case is neither easy nor comfortable for me as I contemplate the next century and whether our law will then guarantee a right to allocation, access to a fair and disinterested jury, availability of a speedy trial and some protection against double jeopardy.

I write in dissent not to necessarily reject the easy way out for me, but rather to identify my concern and basic understanding about what our constitution stands for and why it should protect all and not just some. The character of delay in a criminal proceeding which occurred in this case simply will not reoccur at any time in the near future in any place under the current Wyoming judiciary as it exists today. See, for example, the March 24, 1992 rule on speedy trial, W.R.Cr.P. 48(b), which, in the future, could only permit this character of delay if the responsibility was assessed and taken by the Chief Justice of the Wyoming Supreme Court.

The general issue upon which members of this court genuinely differ is whether past problems should only be prospectively resolved without benefit to persons like Harvey. Legitimate arguments exist, but

in my attention to constitutional concepts of protection of all individuals, I cannot make an exception for what essentially were past mistakes of the justice delivery system. If I am to make the deliberative decision now of taking the easy path out of present problems, how then can I build assurance in our law for the future that reoccurrence will not then be similarly explained, excused or accepted?

In my opinion, Jetty Lee Harvey was not properly convicted of conspiracy to commit kidnapping within our constitutional standard of justice. Consequently, in unwillingness to accept the pathway that takes us to approve that present result, I respectfully dissent.

GOLDEN, Justice, concurring in part and dissenting in part.

I concur in those parts of the opinion relating to the issues of double jeopardy, speedy trial, and pretrial publicity (change of venue). I respectfully dissent, however, to that part of the opinion relative to the use of allocution testimony.

I have reservations whether the right to allocution is constitutionally protected, although this court has said, in *obiter dictum*, it is. *Christy v. State*, 731 P.2d 1204, 1207 (Wyo.1987). In *Christy*, this court cited no legal authority and offered no cogent explanation in support of that proposition. A few states have implicitly elevated allocution to the level of a constitutional right, although allocution has not been so regarded in the federal system, or by the majority of states. See Arthur W. Campbell, *Law of Sentencing*, § 9.5 at 246, nn. 52–53 (2d ed. 1991), and accompanying text.

At this stage of my research, I am more inclined to agree with that said in *State v. Saari*, 152 Vt. 510, 568 A.2d 344, 351 (1989):

---

**31.** *Harvey II* presents neither the *Blockburger* exception for after-discovered or later-occurred events, *see State v. Tolbert*, 60 Ohio St.3d 89, 573 N.E.2d 617 (1991), *cert. denied* —— U.S. ——, 112 S.Ct. 1215, 117 L.Ed.2d 453 (1992); nor whether reversal for speedy trial will now serve the same

function as acquittal in application of collateral estoppel established by *Ashe*, 397 U.S. 436, 90 S.Ct. 1189. *Cf. United States v. Bolinger*, 796 F.2d 1394, 1405 (11th Cir.1986), *cert. denied* 486 U.S. 1009, 108 S.Ct. 1737, 100 L.Ed.2d 200 (1988).

The principle of allocution, which gives defendants in our courts the opportunity to address the bench prior to sentencing, is a tradition of the common law which developed when death was the penalty for felony convictions and the accused often was not allowed to testify. 3 W. LaFave & J. Israel, *Criminal Procedure* § 25.1(f) (1984).

*See also*, Paul W. Barrett, *Allocution*, 9 Mo.L.Rev. 115–24 (1944).

Wyoming's statutory recognition of allocution can be traced from Wyo.Sess.Laws 1869, title XIII, ch. 74, §§ 158–60, pp. 495–96, to Wyo.Stat. §§ 7–268 through 274 (1957). This court preserved allocution in Wyo.R.Crim.P. 33(a)(i), which superseded the 1957 statutory provisions.

Having stated my reservations about the constitutional derivation of allocution, I turn to the heart of the specific issue at hand. The sole purpose of the right of allocution today is to afford the convicted defendant the opportunity to effect the trial court's sentencing decision. As conceived in the common law, developed under statutory recognition, and practiced today under court rules, allocution plays no role in the guilt-determination stage of the trial. Unlike the guilt determination stage of the trial, in which the focus is the presentation of evidence relating to the accused's guilt or innocence, the allocution phase of the sentencing stage focuses on the presentation of information relating to imposition of punishment on a convicted person who no longer is an accused enjoying the presumption of innocence.

In considering the issue at hand, I note that in the context of a suppression hearing in the guilt determination stage, any testimony of the accused during the course of that process is inadmissible on the crucial issue of guilt or innocence. *Simmons v. United States*, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968); and *see generally*, 4 Wayne R. LaFave, *Search and Seizure* § 11.2(d), at 240–42 (2d ed. 1987). The primary purposes of the suppression hearing are to deter prosecution misconduct in the gathering of evidence and to promote public confidence in and preserve the integrity of the criminal justice system. When the suppression hearing process has served those purposes, the parties return to the level playing field, neither side having gained an unfair advantage as a result of the process.

Further, I would note that in the context of the plea agreement process, if the plea agreement fails, evidence of the accused's statement relating to the failed plea is inadmissible on the crucial issue of guilt or innocence. Wyo.R.Crim.P. 15(e)(6). The primary purposes of the plea agreement process are to promote the conservation of criminal justice resources and to ensure that the accused's rights have been protected. III ABA Standards For Criminal Justice, 14–3.1, p. 14.68 (2d ed. 1986); *Santobello v. New York*, 404 U.S. 257, 260–61, 92 S.Ct. 495, 497–98, 30 L.Ed.2d 427, 432 (1971). If the plea agreement fails, the parties return to the level playing field, neither side having gained an unfair advantage as a result of the process.

These foregoing instances in which the accused's testimony, as a criminal justice policy matter, is declared inadmissible on the crucial question of guilt or innocence, in order that a legitimate, more immediate purpose may be served, appear useful in resolving the issue in question. The primary purpose of the sentencing process is to determine punishment based upon the humane principles of reformation and prevention. Wyo.Const. art. 1, § 15. The purpose of allocution in that process is to provide the convicted defendant, before he or she is advised by the court of the right to appeal, the opportunity to effect the sentencing decision. After allocution, the court decides and declares the sentence. After that, the court informs the sentenced convict of the right of appeal. If the conviction and sentence are reversed on appeal and the defendant once again put in jeopardy, why should not the parties return to the level playing field, neither side having gained an unfair advantage as a result of the process?

Our criminal justice system is built on the concept of fairness. We pride ourselves on having informed all participants

in advance by what ground rules our system operates; the system abhors surprise and ambush. I can find no fairness in what happened to Mr. Harvey as result of his allocution statement. I see only surprise and ambush. The sentencing court did not warn him that anything he said in allocution would be used against him in criminal prosecution; in fact, it was only after Mr. Harvey made his statement that the sentencing judge informed him of his right to appeal the conviction on which, moments before, he had been sentenced. I am unable to find that Mr. Harvey made a knowing, intelligent, and informed waiver of his right to remain silent.

I would hold that any allocution testimony of the convicted defendant is inadmissible on the question of guilt or innocence in the event the conviction and sentence are reversed on appeal and that defendant is again put in jeopardy for any conduct involved in the transaction which gave rise to the first prosecution.

I would reverse Mr. Harvey's conviction on this ground and remand for retrial.